WENDY S. PARK (CA State Bar No. 237331), *pro hac vice*
DIANA DASCALU-JOFFE (CO State Bar No. 50444), *pro hac vice*
Center for Biological Diversity
1212 Broadway, # 800
Oakland, CA 94612
Tel: (510) 844-7138
Fax: (510) 844-7150
wpark@biologicaldiversity.org
ddascalujoffe@biologicaldiversity.org

Nathan Johnson (OH State Bar No.0082838)
Ohio Environmental Council
1145 Chesapeake Avenue, Suite I
Columbus, OH 43212
Tel: 614-487-5841
njohnson@theoec.org

Elizabeth Benson (CA State Bar No. 268851)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5723
elly.benson@sierraclub.org

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, HEARTWOOD, OHIO ENVIRONMENTAL COUNCIL, SIERRA CLUB<br><br>       Plaintiffs,<br><br>    vs.<br><br>U.S. FOREST SERVICE; U.S. BUREAU OF LAND MANAGEMENT; U.S.FISH AND WILDLIFE SERVICE; THOMAS TIDWELL in his official capacity as Chief of the United States Forest Service, MICHAEL NEDD, in his official capacity as Acting Director of the United States Bureau of Land Management, and GREG SHEEHAN, in his official capacity as Acting Director of the United States Fish and Wildlife Service,<br><br>       Defendants. | Civ. No. 2:17-cv-372<br><br>Judge Watson<br><br>Magistrate Judge Jolson<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      In this action, plaintiffs Center for Biological Diversity, Ohio Environmental Council, Heartwood, and Sierra Club challenge the failure of the Bureau of Land Management (BLM) and U.S. Forest Service to comply with the National Environmental Policy Act (NEPA) and the Endangered Species Act (ESA), in authorizing oil and gas leasing in Ohio's Wayne National Forest.

2.      On October 14, 2016, BLM authorized the development of all federal oil and gas minerals in the Wayne National Forest's Marietta Unit, or approximately, 40,000 acres, opening up the forest to horizontal drilling and large-scale, high-volume hydraulic fracturing or "fracking" for the first time. This dangerous technique involves high-pressure injection of millions of gallons of toxic fluids underground, to blast shale rock and release natural gas, and requires an extensive network of infrastructure and development. Increasingly, fracking of the Utica and Marcellus shale plays in Ohio and neighboring states has encroached upon communities, in the form of concrete well pads, pipelines, heavy truck traffic, accidental spills and leaks, noise, and air and water pollution. On December 13, 2016, BLM held its first lease auction after approval of new leasing in the Marietta Unit, resulting in the sale of 679.48 acres, in Monroe and Washington counties. BLM auctioned another 1,147.10 acres in Monroe County on March 23, 2017. Approximately 18,000 acres in the Marietta Unit already have been "nominated" for oil and gas leasing by oil and gas operators and could eventually be auctioned.

3.      As a result, fracking will soon occur in Ohio's only national forest, one of the few natural refuges for people and wildlife in the state. Both humans and wildlife species such as the endangered Indiana bat, river otter, bobcat, and Cerulean warbler rely on the Wayne National Forest's undeveloped woods, streams and rivers, and peace and quiet. The Wayne National Forest is one of the few public forests located in Ohio to which Ohio residents can escape from urban and industrial development and its effects.

4.      The Wayne National Forest was created under the Weeks Act to restore natural watersheds and forests devastated by industrial extraction, and to protect these lands for the public's use and enjoyment. It offers one of the best chances for restoring and preserving Ohio's wild and

natural heritage. New oil and gas leasing and fracking in the Wayne National Forest would undermine the very foundation on which it was established. Many of the lease parcels are near the Ohio River and headwater streams, which will be at risk of contamination from increased transport of fracking chemicals and wastewater via trucks and pipelines, and runoff pollution from new roads and well pads. Fracking will also threaten endangered mussels downstream from lease parcels, as well as the endangered Indiana bat, the threatened Northern long-eared bat, and the tri-colored bat. These bats are already over-stressed by existing habitat fragmentation, white-nose syndrome, and climate change. Habitat destruction, deadly wastewater pits, and water contamination from fracking activities will compound these threats.

5. In approving new leasing, however, BLM and the Forest Service failed to take a "hard look" at how the Wayne National Forest's many natural values would be impacted by fracking and horizontal drilling, in violation of NEPA's requirement for federal agencies to disclose significant environmental effects of their proposed actions. The Forest Service relied on a decade-old Forest Plan that predates the fracking boom, and a 2012 "Supplemental Information Report" that was never subject to public notice and comment, to conclude that fracking and horizontal well development in the Wayne National Forest would involve no greater or more severe effects than previously analyzed conventional oil and gas development. Likewise, BLM rushed the preparation and approval of an Environmental Assessment (EA) and Finding of No Significant Impact for its proposal to lease and allow fracking of all 40,000 acres of the Marietta Unit's federal oil and gas minerals. Both agencies failed to analyze the full scope of impacts that could result from new oil and gas leasing, including the potential for disturbance of private land surrounding or adjoining federal acreage in the national forest, total disturbance from new pipelines and other infrastructure, and unique risks posed by fracking to water, public health, and wildlife.

6. BLM and the Forest Service also failed to consult U.S. Fish and Wildlife Service regarding the effects of the proposed leasing on the Indiana bat and Northern long-eared bat, and endangered mussels—the fanshell, pink mucket pearly mussel, sheepnose, and snuffbox ("endangered mussels"), and thus failed to ensure new leasing avoids jeopardizing their continued existence, in violation of Section 7 of the ESA. 16 U.S.C. § 1536(a)(2). Instead, the agencies relied

on an outdated 2005 Biological Opinion that fails to consider fracking, white-nose syndrome, new information about climate change, and new designations of threatened and endangered species. These new circumstances and information triggered BLM, Forest Service, and Fish and Wildlife Service's duty to reinitiate consultation on the 2005 Biological Opinion, but the agencies have failed to re-consult.

7.      Accordingly, BLM's and Forest Service's approvals of new leasing, as well as BLM's underlying EA and Finding of No Significant Impact, must be set aside. Further, any new leasing or oil and gas activities cannot proceed until BLM and the Forest Service have prepared a legally adequate EIS fully disclosing the effects of new leasing, and properly consulted under Section 7 of the ESA.

## JURISDICTION AND VENUE

8.      This action arises under 16 U.S.C. §§ 1536, 1540(c) & (g), 42 U.S.C. § 4331 et seq., and 5 U.S.C. §§ 702, 706. Jurisdiction of this Court is conferred by 28 U.S.C. § 1331 (federal question). Declaratory relief is available pursuant to 28 U.S.C. §§ 2201-02 and Rule 57 of the Federal Rules of Civil Procedure.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B), because (1) a substantial part of the events or omissions giving rise to each of Plaintiffs' claims occurred in this judicial district, (2) a substantial part of property that is the subject of this action is situated in this judicial district, and (3) the Forest Service and Fish and Wildlife Service have offices in this district, and plaintiffs Ohio Environmental Council and Sierra Club have offices and members in this district. Assignment to the Columbus Division is appropriate because the Forest Service office in which a substantial part of the events or omissions giving rise to each of Plaintiffs' claims occurred is in Athens County, and minerals subject to the present action are located in Monroe, Noble, and Washington counties.

10.      Pursuant to 28 U.S.C. § 2201 *et seq*., Plaintiffs seek a declaration of rights under the laws of the United States. There exists now between the parties an actual, justiciable controversy in which Plaintiffs are entitled to have a declaration of their rights and of defendants' obligations, and further relief, because of the facts and circumstances set out herein.

11.     This action was filed more than 60 days after written notice of the Endangered Species Act violations alleged in this complaint was given to the defendants named in this action, pursuant to 16 U.S.C. § 1540(g)(2)(A)(i).

## PARTIES

12.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a non-profit membership corporation with offices in Arizona, Colorado, Alaska, California, Florida, Hawaii, Minnesota, Oregon, Washington, Washington D.C., and Mexico. The Center works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center is actively involved in species and habitat protection issues worldwide, including throughout the eastern United States, and continues to actively advocate for increased protections for species and their habitats in Ohio and the Wayne National Forest. The lands that will be affected by the approvals at issue in this action include habitat for listed, rare, and imperiled species that the Center has worked to protect, including the Indiana bat, Northern long-eared bat, tri-colored bat, fanshell, pink mucket pearly mussel, sheepnose, and snuffbox. The Center also works to reduce greenhouse gas emissions to protect biological diversity, the environment, and public health. The Center has over 52,300 members, including those living in and near Ohio who have visited these public lands in the Wayne National Forest's Marietta Unit for recreational, scientific, educational, and other pursuits and intend to continue to do so in the future, and are particularly interested in protecting the many native, imperiled, and sensitive species and their habitats that may be affected by the approved oil and gas leasing. The Center brings this action on its own behalf and on behalf of its adversely affected members.

13.     Plaintiff HEARTWOOD is a non-profit regional environmental organization dedicated to protecting the public forests of the Central Hardwood Region. Heartwood represents over seventeen hundred individual members and numerous member organizations who depend on these public lands, including the Wayne National Forest, for recreational, spiritual and ecological purposes. Heartwood members have, do and will continue to use these public lands, including the Wayne National Forest's Marietta Unit, for non-consumptive purposes and they derive important tangible and intangible ecological benefits from the presence and ecological integrity of these public

lands, including the lands that will be affected by the approved oil and gas leasing. Heartwood brings this action on its own behalf and on behalf of its adversely affected members.

14.     Plaintiff OHIO ENVIRONMENTAL COUNCIL (OEC) is a non-profit environmental organization whose mission is to secure healthy air, land, and water for all who call Ohio home. OEC has over 100 environmental and conservation member organizations and thousands of individual members throughout the state of Ohio. The OEC has a long history of working to protect the ecological integrity, and recreational and aesthetic qualities of the Wayne National Forest. Many of OEC's members have visited these public lands in the Wayne National Forest's Marietta Unit for recreational, scientific, educational, and other pursuits and intend to continue to do so in the future. OEC brings this action on its own behalf and on behalf of its adversely affected members.

15.     Plaintiff SIERRA CLUB is a national nonprofit organization of approximately 740,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Ohio Chapter of the Sierra Club has more than 20,000 members in the state of Ohio. For many decades, the Sierra Club has worked to protect the Wayne National Forest and Ohio's other public lands from harmful activities such as clear-cutting, mineral extraction, commercial development, pipelines, and oil and gas drilling. Sierra Club members use the public lands in Ohio, including the lands and waters that would be affected by actions under the challenged actions, for quiet recreation, scientific research, aesthetic pursuits, and spiritual renewal. These areas would be threatened by increased oil and gas development that could result from BLM's and the Forest Service's decisions to authorize new leasing, including the December 2016 and March 2017 lease auctions. Sierra Club brings this action on its own behalf and on behalf of its adversely affected members.

16.     The Center, Heartwood, OEC, and Sierra Club (collectively, "Plaintiffs") have individual members who live in or near the Wayne National Forest's Marietta Unit; regularly visit this area, including areas open to new oil and gas leasing, parcels sold in the December 2016 and March 2017 lease auctions, and areas near or downstream of these areas and the Marietta Unit, such

as the Ohio River and Little Muskingum River; and intend to continue to use and enjoy these areas in the near future and beyond. They use and enjoy these areas for a variety of purposes, including scientific study, hiking, cycling, photography, sightseeing, wildlife observation, swimming, canoeing, and fishing, and intend to continue to do so on an ongoing basis in the future. Plaintiffs' members derive recreational, spiritual, professional, aesthetic, educational, and other benefits and enjoyment from these activities.

17.     Plaintiffs' members also obtain drinking water from the Ohio River and other streams that are downstream from parcels that have been leased or are open to leasing, and groundwater near the lease parcels. These areas are at risk of water contamination from fracking, pipeline spills, and chemical, wastewater, and oil and gas storage that could result from new leasing.

18.     Plaintiffs and their members have an interest in participating in the management of the Wayne National Forest through participation in the development of land-use and resource management plans and oil and gas leasing decisions for the forest, and in the preparation of comprehensive environmental analyses required under NEPA and the ESA. Plaintiffs participated in BLM's decision whether to make the Marietta Unit available for new leasing by commenting on the programmatic Environmental Assessment for the decision, and submitting administrative protests against the December 2016 and March 2017 lease auctions. Plaintiffs also met with Forest Service officials and submitted comments and letters to the Service to urge it to perform an adequate environmental review of new leasing and to withhold its approval of new leasing.

19.     Plaintiffs and their members have been and are suffering, and will continue to suffer, irreparable injury as a result of BLM's and the Forest Service's authorizations of new leasing and their failure to comply with NEPA; and BLM's, the Forest Service's and Fish and Wildlife Service's failure to comply with the ESA and continued reliance on the 2005 Biological Opinion. For example, new oil and gas leases will allow increased fracking and oil and gas development, resulting in noise, visual blight, increased traffic, seismic risks, loss of natural soil function, habitat fragmentation and degradation, and greater air and water pollution and stream depletions. All of these harms will diminish Plaintiffs' members' ability to enjoy recreational, spiritual, professional, aesthetic, educational, and other activities in and around the Wayne National Forest, while increased

water pollution will contaminate drinking water sources used by Plaintiffs' members. Moreover, the agencies' failure to consult on the effects of new leasing resulting from BLM's and the Forest Service's actions will result in oil and gas development that will adversely affect the Indiana bat, Northern long-eared bat, and endangered mussels in a manner or to an extent not previously considered in the 2005 Biological Opinion, causing irreparable harm to these species. BLM, Forest Service, and Fish and Wildlife Service have failed to study and adopt adequate "reasonable and prudent alternatives," 16 U.S.C. § 1536(b)(3)(A), to avoid or reduce impacts on these listed species, and failed to study and adopt adequate mitigation measures to avoid or significantly reduce these and other significant adverse impacts of the challenged oil and gas leasing decisions.

20. BLM's and the Forest Service's failures to comply with NEPA have deprived Plaintiffs and their members of information to which they are entitled under NEPA, including information pertaining to the effects of new leasing on environmental resources in the Wayne National Forest, reasonable alternatives to the proposed action, and available measures to mitigate adverse environmental impacts. This lack of required public information has injured Plaintiffs and their members by depriving them of a meaningful opportunity to comment on the missing information; and denying them the procedural safeguards required by NEPA to ensure that BLM and the Forest Service carefully consider the direct, indirect, and cumulative effects of their proposed actions, environmentally superior alternatives to that action, and appropriate mitigation measures prior to allowing new leasing; and denying them adequate assurances that new oil and gas leasing is not likely to jeopardize ESA-listed species or adversely modify or destroy critical habitat.

21. Plaintiffs' injuries will be redressed by the relief sought herein. This court has jurisdiction to vacate and enjoin BLM's and Forest Service's authorizations of new leasing, and any leases and project approvals relying on BLM's EA and Finding of No Significant Impact, and the 2005 Biological Opinion. Requiring consultation to ensure that BLM's and Forest Service's actions do not jeopardize the existence of listed species or adversely modify their critical habitat would redress Plaintiffs' injuries by increasing the likelihood of the species' survival. Further, reasonable and prudent measures to mitigate the adverse effects of new leasing would eliminate or significantly reduce the traffic, air quality, soil conservation, water quality and quantity, scenic, seismic,

greenhouse gas, and noise impacts of new leasing allowed under the challenged decisions. All such relief would improve Plaintiffs' opportunities for using and enjoying the Wayne National Forest and the Marietta Unit in the future.

22. Plaintiffs have no adequate remedy at law to address the foregoing injuries to their interests.

23. Defendant MICHAEL NEDD is sued in his official capacity as Acting Director of Bureau of Land Management. BLM is an agency within the United States Department of the Interior and is responsible for managing federal lands and subsurface mineral estates underlying federal, state, and private lands, including minerals in the Wayne National Forest. BLM's stated mission is to sustain the health, productivity, and diversity of America's public lands for the use and enjoyment of present and future generations. BLM approved the Final EA, Finding of No Significant Impact, and lease auctions at issue in this action.

24. Defendant THOMAS TIDWELL is sued in his official capacity as Chief of the U.S. Forest Service, an agency within the Department of Agriculture, which is responsible for the management of national forest lands, including the Wayne National Forest. Its stated mission is to sustain the health, diversity, and productivity of the nation's forests and grasslands to meet the needs of present and future generations. The Forest Service authorized the lease auctions at issue in this action.

25. Defendant GREG SHEEHAN is sued in his official capacity as Acting Director of U.S. Fish and Wildlife Service, an agency within the Department of Interior, which is responsible for administering the provisions of the ESA with regard to freshwater aquatic and terrestrial species. Its stated mission is working with others to conserve, protect, and enhance fish, wildlife, plants, and their habitats for the continuing benefit of the American people. Fish and Wildlife Service issued the 2005 Biological Opinion at issue in this action.

## STATUTORY BACKGROUND

### A. National Environmental Policy Act

26. The National Environmental Policy Act is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Its twin aims are to facilitate informed agency decision-

making and public access to information. By focusing both agency and public attention on the environmental effects of proposed actions, NEPA facilitates informed decision-making by agencies and fosters public participation.

27.     To accomplish these objectives, NEPA requires "responsible [federal] officials" to prepare an environmental impact statement ("EIS") to consider the effects of each "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i). To determine whether the impacts of a proposed action are significant enough to warrant preparation of an EIS, the agency may prepare an Environmental Assessment or "EA."

28.     Under NEPA's implementing regulations, an agency's EA must include "brief discussions of the need for the proposal, of the alternatives . . . , [and] of the environmental impacts of the proposed action and the alternatives." 40 C.F.R. § 1508.9. The EA must take a "hard look" at the impacts, and if the agency decides the impacts are not significant, it must supply a convincing statement of reasons why. The EA must analyze not only the direct impacts of a proposed action, but also the indirect and cumulative impacts. *Id.* § 1508.7, 1508.8. Such analysis must include all reasonably foreseeable impacts of the proposed action.

29.     NEPA's implementing regulations require that the agency "shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions," and shall ensure the scientific accuracy and integrity of environmental analysis. *Id.* § 1502.24. The agency must disclose if information is incomplete or unavailable and explain "the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts." *Id.* § 1502.22(b)(1). The agency must also directly and explicitly respond to dissenting scientific opinion. *Id.* § 1502.9(b).

30.     If, after preparing an EA, the agency determines an EIS is not required, the agency must provide a "convincing statement of reasons" why the project's impacts are insignificant and issue a Finding of No Significant Impact or "FONSI." 40 C.F.R. §§ 1501.4, 1508.9 & 1508.13.

31.     Moreover, an agency "[s]hall prepare supplements to either draft or final environmental impact statements if…[t] here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts," or "[m]ay

1    also prepare supplements when the agency determines that the purposes of the Act will be furthered

2    by doing so." 40 C.F.R. § 1502.9(c)(1)(ii), (2).

3        **B.    The Endangered Species Act**

4        32.    Congress enacted the ESA to provide "a program for the conservation of . . .

5    endangered species and threatened species."  16 U.S.C. § 1531(b).  Section 2(c) of the ESA

6    establishes that it is "the policy of Congress that all Federal departments and agencies shall seek to

7    conserve endangered species and threatened species and shall utilize their authorities in furtherance

8    of the purposes of this Act." 16 U.S.C. § 1531(c)(1). The ESA defines "conservation" to mean "the

9    use of all methods and procedures which are necessary to bring any endangered species or

10   threatened species to the point at which the measures provided pursuant to this [Act] are no longer

11   necessary." 16 U.S.C. § 1532(3). The ESA imposes substantive and procedural obligations on all

12   federal agencies with regard to listed and proposed species and their critical habitats. *See id*. §§

13   1536(a)(1), (a)(2) and (a)(4) and § 1538(a).

14       33.    Under Section 7 of the ESA, federal agencies must "insure that any action authorized,

15   funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any

16   endangered species or threatened species or result in the destruction or adverse modification of

17   habitat of such species which is determined ... to be critical." 16 U.S.C. § 1536(a)(2).

18       34.    "Endangered species" means "any species which is in danger of extinction throughout

19   all or a significant portion of its range." 16 U.S.C. § 1532(6). "Threatened species" means "any

20   species which is likely to become an endangered species within the foreseeable future throughout all

21   or a significant portion of its range." *Id*. § 1532(20). The Fish and Wildlife Service "lists" species as

22   threatened or endangered. *See id*. § 1533.

23       35.    The definition of agency "action" is broad and includes "all activities or programs of

24   any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," including

25   programmatic actions. 50 C.F.R. § 402.02. BLM's and the Forest Service's approvals of oil and gas

26   leasing constitute such an action. Likewise, the "action area" includes "all areas to be affected

27   directly or indirectly by the Federal action and not merely the immediate area involved in the

28   action." *Id*.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                    11

36.     The duties in ESA Section 7 are only fulfilled by an agency's satisfaction of the consultation requirements that are set forth in the implementing regulations for Section 7 of the ESA, and only after the agency lawfully complies with these requirements may an action that "may affect" a protected species go forward.

37.     For each proposed federal action, an action agency must request from Fish and Wildlife Service whether any listed or proposed species may be present in the action area. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12. If listed or proposed species may be present in such area, the action agency must prepare a "biological assessment" to determine whether the listed species may be affected by the proposed action. *Id.*

38.     If the action agency concludes that the proposed action is "not likely to adversely affect" a listed species that occurs in the action area, Fish and Wildlife Service must concur in writing with this determination.  50 C.F.R. §§ 402.13(a), 402.14(b). If Fish and Wildlife Service concurs in this determination, then formal consultation is not required. *Id.* § 402.13(a).

39.     If the action agency concludes that an action is "likely to adversely affect" listed species or critical habitat, it must enter into "formal consultation" with Fish and Wildlife Service. 50 C.F.R. §§ 402.12(k), 402.14(a). The threshold for triggering the formal consultation requirement is "very low"; indeed, "any possible effect ... triggers formal consultation requirements." *See* Interagency Cooperation Under the Endangered Species Act, 51 Fed. Reg. 19,926 (June 3, 1996).

40.     Formal consultation commences with the action agency's written request for consultation and concludes with Fish and Wildlife Service's issuance of a "biological opinion." 50 C.F.R. § 402.02.  The biological opinion states Fish and Wildlife Service's opinion as to whether the effects of the action are "likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id.* § 402.14(g)(4).

41.     When conducting formal consultation, Fish and Wildlife Service and the action agency must evaluate the "effects of the action," including all direct and indirect effects of the proposed action, plus the effects of actions that are interrelated or interdependent, added to all existing environmental conditions – that is, the "environmental baseline." 50 C.F.R. §§ 402.14 and 402.02. The environmental baseline "includes the past and present impacts of all Federal, state, and

private actions and other human activities in the action area…." *Id.* The effects of the action must be considered together with "cumulative effects," which are "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.*

42.    If Fish and Wildlife Service concludes that the proposed action will jeopardize the continued existence of a listed species, or result in the destruction or adverse modification of critical habitat, the biological opinion must outline "reasonable and prudent alternatives" to avoid jeopardy. 16 U.S.C. § 1536(b)(3).

43.    If Fish and Wildlife Service concludes that a project is not likely to jeopardize listed species, it must nevertheless provide an incidental take statement (ITS) with the biological opinion, specifying the amount or extent of take that is incidental to the action, but which would otherwise be prohibited under Section 9 of the ESA. "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(18). Further, Fish and Wildlife Service must specify "reasonable and prudent measures" necessary or appropriate to minimize such take, and the "terms and conditions" that must be complied with by the action agency to implement any reasonable and prudent measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

44.    The action agency and Fish and Wildlife Service must use the best scientific and commercial data available when consulting about whether federal actions may jeopardize listed species or adversely modify critical habitat. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d), (g)(8).

45.    After the issuance of a biological opinion and "where discretionary Federal involvement or control over the action has been retained or is authorized by law," the agency must reinitiate consultation if:

- the amount or extent of taking specified in the incidental take statement is exceeded;

- new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;

- the identified action is subsequently modified in a manner that causes an effect to the listed species ... that was not considered in the biological opinion; or

- a new species is listed or critical habitat designated that may be affected by the identified action.

50 C.F.R. § 402.14(d).

46. Section 7(d) of the ESA provides that once a federal agency initiates consultation on an action under the ESA, the agency, as well as any applicant for a federal permit, "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section." 16 U.S.C. § 1536(d). The purpose of Section 7(d) is to maintain the environmental status quo pending the completion of consultation. Section 7(d) prohibitions remain in effect throughout the consultation period and until the federal agency has satisfied its obligations under Section 7(a)(2) that the action will not result in jeopardy to listed species or adverse modification of critical habitat.

## FACTUAL BACKGROUND

### A. The Wayne National Forest

47. The Wayne National Forest is Ohio's only national forest, beloved for its lush and rugged landscape, many headwater streams, craggy rock outcroppings, and picturesque waterfalls and covered bridges. Located in the foothills of the Appalachian Mountains in southeast Ohio, the Wayne National Forest is one of the few public forests in the state—only 14 percent of Ohio's forests are publicly owned. Within only a few hours driving distance of Columbus, Cleveland, and Cincinnati, the Wayne National Forest provides numerous recreational opportunities to Ohio residents and out-of-state visitors. Hundreds of thousands of people visit the Wayne National Forest each year for hiking, camping, canoeing, wildlife viewing, bird watching, and mushroom gathering, among many other activities.

48. The Wayne National Forest is divided into three non-contiguous units—Athens, Ironton, and Marietta—and its administrative boundary contains nearly 834,000 acres of private and federal land spanning twelve counties. The Marietta Unit is the Wayne National Forest's easternmost unit, consisting of over 268,000 acres of private and federal surface within its administrative boundary, and the Ohio River flows along its eastern edge. The Little Muskingum River, an Ohio River tributary, also winds through the Marietta Unit, making it one of the few remaining free-

flowing streams largely on public land within the state. Several campgrounds in the Marietta Unit along the Little Muskingum River make the river a popular recreational spot for backpackers, anglers, and paddlers.

49. Hundreds of wildlife and plant species are found in the Wayne National Forest, including approximately 90 species of fish, 59 amphibian and reptile species, 50 species of mammals, 158 bird species, and 2,000 species of trees and plants. Rare and sensitive species such as bobcat, black bear, beaver, river otter, Cerulean warbler, Indiana bat, Northern long-eared bat, and tri-colored bat inhabit the Wayne National Forest.

50. While the Wayne National Forest is now a peaceful and beautiful refuge for both humans and wildlife, it was not always so. Established in 1934 under the Weeks Act, the Wayne National Forest was created to restore lands and watersheds devastated by many decades of mining and logging.

51. Industrial exploitation of southeast Ohio's coal, iron, clay, and timber resources in the 19th and early 20th centuries denuded and disfigured the land, and left a legacy of environmental damage, from which the Wayne National Forest is still recovering. The prospect of increased fracking and land disturbance would reverse years of progress already made in reclaiming natural areas for the public's enjoyment and would undermine reclamation efforts.

52. Unlike other national forests, the Wayne National Forest is a highly fragmented patchwork of federal and private land, and most of the land within its administrative boundary is privately owned. In the Marietta Unit, over three-quarters of the land within the national forest boundary is under private ownership, and federal acreage (totaling approximately 64,000 acres) is scattered throughout the forest. Federal minerals underlie federal land in the Wayne National Forest (and only a very small percentage of private land), while private minerals underlie both federal and private land.

**B. Imperiled Species of the Wayne National Forest**

53. Several listed species will be harmed by BLM and Forest Service's plans to allow new oil and gas development in the Wayne National Forest's Marietta Unit, including the Indiana

bat, Northern long-eared bat, fanshell, pink mucket pearly mussel, sheepnose mussel, and snuffbox mussel.

54. The endangered Indiana bat is well-documented in the Marietta Unit. It hibernates in caves, or occasionally in abandoned mines, during winter. During the summer, the Indiana bat roosts under the peeling bark of dead and dying trees, as well as under the exfoliating bark of mature hickories and white oaks. The Indiana bat, which eats flying insects found along rivers or lakes and in uplands, depends on the Wayne National Forest for foraging and roosting habitat. The Indiana bat was listed as endangered in 1967 due to human disturbance of hibernating bats in caves during winter, resulting in the death of large numbers of bats. Summer habitat loss, pesticides and other contaminants, and, most recently, white-nose syndrome also threaten the Indiana bat's survival.

55. White-nose syndrome is a fatal disease affecting hibernating bats that was first documented in the winter of 2006-2007 in New York, and has since rapidly spread across the U.S., killing over 6 million bats. Bats with white-nose syndrome display a white fungus on their noses and on other hairless parts of their body. The disease causes bats to wake up from hibernation and fly outside their caves, causing untimely consumption of stored fat reserves, resulting in emaciation and increased mortality.

56. Because the Indiana bat's life cycle is dependent on temperature changes, making it highly temperature sensitive, climate change is also a major threat to the species. Human-induced climate change driven by greenhouse gas emissions from fossil fuel combustion is increasing temperatures and altering the climate across the Midwestern United States.

57. Like the Indiana bat, the Northern long-eared bat hibernates in caves in winter, and lives in forested areas during the summer, in the eastern and north central United States and Canada. In summer, it forages on flying insects and roosts in trees with peeling bark, or in tree cavities or crevices of live and dead trees. The Marietta Unit contains ample suitable foraging and roosting habitat for the species. Among the hardest hit by white-nose syndrome, the species has experienced declines of up to 99% in its Northeast populations. In 2015, these dramatic declines prompted the U.S. Fish and Wildlife Service to list the species as "threatened." Forest fragmentation and development, logging, and environmental contaminants are also major threats to the species.

58. Oil and gas development harms species like the Indiana bat and Northern long-eared bat by fragmenting and destroying habitat for spring staging/fall swarming, foraging, and summer roosting, disrupting breeding and foraging patterns, polluting and degrading water sources, and trapping or poisoning bats attracted to insects on the surface of wastewater pits.

59. Several species of endangered mussels are also threatened by new oil and gas leasing in the Wayne National Forest. These mussels are remarkable for their long life spans of up to several decades and for their unique life cycles, which involve larvae developing on host fish until they are juveniles with shells of their own. The fanshell and pink mucket pearly mussel are both found in sections of the Ohio River immediately downstream of the Marietta Unit. These species are listed as "endangered." Host fish for the fanshell and pink mucket pearly mussel are found within the Marietta Unit of the Wayne National Forest, and could travel downstream and play a role in the life cycle of downstream mussels in the Ohio River.

60. The sheepnose and snuffbox mussels may be present in waterways within the Wayne National Forest. In 2012, Fish and Wildlife Service listed both species as "endangered."

61. Major threats to the endangered mussels include habitat fragmentation and destruction from dams, sedimentation from road construction, mining and logging, and pollution from accidental spills and industrial activities, including oil and gas drilling and fracking.

**C. Hydraulic Fracturing and the Utica and Marcellus Shale Plays**

62. The Marietta Unit overlies both the Marcellus and Utica shale plays. The Marcellus Shale, which extends through northern Appalachia, including much of Ohio, West Virginia, Pennsylvania, and New York, is one of the largest natural gas-producing areas in the U.S. The Utica Shale, which underlies the Marcellus Shale and extends through much of the same area and into Canada, is an emerging area of interest to oil and gas operators, and a significant source of natural gas, oil, and natural gas liquids. According to the U.S. Energy Information Administration (EIA), in recent years, natural gas production in the Marcellus and Utica regions has largely driven growth in total U.S. natural gas production.

63. Before 2008, the Marcellus Shale was largely untapped, because the extraction of commercial quantities of natural gas from this formation using "conventional" vertical drilling

techniques was not possible. Since then, improved technology—namely, the coupling of hydraulic fracturing ("fracking") with horizontal drilling—has enabled the profitable exploitation of the Marcellus Shale. In 2010, oil and gas operators also began developing the Utica Shale using these techniques, and current Utica Shale production is largely centered in eastern Ohio.

64.     Fracking is a dangerous practice in which operators inject millions of gallons of toxic fluid underground under extreme pressure to produce fractures that release oil and gas. The main ingredient in modern fracturing fluid (or "frack fluid") is generally water, although petroleum has also been used as a base fluid. The second ingredient is a "proppant," typically sand, that becomes wedged in the fractures and holds them open so that passages remain after pressure is relieved. In addition to the base fluid and proppant, a mixture of chemicals is used for purposes such as increasing the viscosity of the fluid, keeping proppants suspended, and impeding bacterial growth or mineral deposition.

65.     Accordingly, fracking entails the transport of massive quantities of fluid and other products to a single well site: thousands of tons of sand, thousands of gallons of chemicals, and up to eight million gallons of water may be used to frack a single well. Up to eight wells may be drilled from a single well pad. Moreover, many millions of gallons of wastewater may be produced from a single well, which must then be stored, transported, and disposed of. This includes highly toxic frack fluid that returns to the surface after it is injected (known as "flowback") and brine water that discharges from the fractured formation (known as "produced water"). These wastewaters may be laced with naturally occurring radionuclides, heavy metals, and hydrocarbons that are carried to the surface from the underground formation.

66.     Horizontal drilling—or drilling down and then sideways along the shale formation— enables economic extraction of thin, deep layers of shale that are not profitable to extract via vertical drilling and hydraulic fracturing alone. Horizontal drilling exposes more of the oil- or gas-bearing formation to the production well.  In the Utica and Marcellus shales, fracking typically occurs in multiple stages every 300 to 500 feet along a horizontal borehole that can be over two miles long.

67.     With the rise in fracking and horizontal drilling operations, significant new information has emerged about fracking in the last decade, and even the last several years, showing significant impacts to air quality, public health, water resources, and wildlife.

68.     The high volumes of chemicals and water involved, and the high volumes of oil and gas produced, in the Utica and Marcellus shales requires larger-scale infrastructure and equipment—e.g., larger pipelines, tanks, pits, and rigs—and thus greater land disturbance than conventional oil and gas development, to support fracking operations. The clearance of land and construction of new infrastructure destroys and fragments wildlife habitat, and industrializes rural areas.

69.     Fracking can result in the discharge of hazardous wastes, including petroleum products, into drinking water. The hydraulic fracturing process involves hundreds of toxic chemicals that can escape into water supplies either through deep well injection or through more conventional routes, like migration through faulty casing or via surface spills. In 2016, the U.S. Environmental Protection Agency (EPA) finalized a study that concluded that fracking can and has resulted in adverse effects on drinking water resources. The study noted numerous cases of water contamination resulting from spills, leaks, and faulty wells. Numerous studies indicate that leaks from fracked wells are a chronic problem, even for newer wells.

70.     Increased storage, transport, and disposal of chemicals and wastewaters associated with fracking can result in a higher incidence and severity of spills and leaks, and devastating consequences for wildlife. For example, in June 2014, a well pad located in Monroe County near the Marietta Unit boundary caught fire, resulting in 54,000 gallons of hazardous fracking chemicals and 300,000 gallons of fire retardants washing into a tributary of the Ohio River; the runoff killed 70,000 fish over a five-mile long stretch. Studies that compared water quality downstream from a wastewater storage and injection site in West Virginia to that of upstream areas found that downstream sites had elevated levels of endocrine-disrupting chemicals at levels known to adversely affect aquatic organisms.

71.     Recently published scientific papers describe the harmfulness of the chemicals often used in fracking fluid. One analysis found that 37 percent of the chemicals found at fracked gas wells were volatile, and that of those volatile chemicals, 81 percent can harm the brain and nervous

system, 71 percent can harm the cardiovascular system and blood, and 66 percent can harm the kidneys. Volatile organic compounds (VOCs) from car and truck engines, as well as the drilling and fracking stages of oil and gas production, make up about 3.5 percent of the gases emitted by oil or gas operations. The VOCs emitted include the BTEX compounds – benzene, toluene, ethyl benzene, and xylene – which are listed as hazardous air pollutants (HAPs) by EPA. These toxic air contaminants coupled with smog-forming chemicals (such as nitrogen oxides or NOx, methane, and ethane) threaten local communities and regional air quality.

72.     The Marietta Unit is located in an impaired airshed. Washington County, Ohio is classified as "non-attainment" for federal, health-based sulfur dioxide (SO2) standards. Oil and gas extraction operations and transport, especially vehicle emissions, emit SO2 into the atmosphere, potentially exacerbating the already compromised air quality problem in the region. SO2 has been linked to an array of adverse respiratory effects including bronchoconstriction and increased asthma symptoms. Studies also show a connection between short-term exposure and increased visits to emergency departments and hospital admissions for respiratory illnesses, particularly in at-risk populations including children, the elderly, and asthmatics.

73.     A number of studies link proximity to unconventional oil and gas development to increased rates of cancer, birth defects, poor infant health, endocrine disruption, cardiology-patient hospitalization, and acute health effects (e.g., skin rashes, nausea or vomiting, headache, dizziness, eye and throat irritation). For example, a 2015 Pennsylvania study found a correlation between proximity to unconventional gas drilling and higher incidence of lower birth weight and small-for-gestational-age babies.

74.     Despite the rapid rise in fracking, state and federal regulators have lagged behind in safeguarding public health and the environment from fracking activities. For example, Ohio does not require the storage of wastewaters or other fluids in closed tanks, instead allowing fluids to be stored in open pits. Open pits not only create hazardous conditions for humans and wildlife, but can also leak and contaminate streams or groundwater if improperly constructed or unlined. Ohio lacks any specific standards for pit construction or liners, and only requires that pits be "liquid tight" and constructed and maintained to "prevent the escape of brine and other waste substances." Ohio

Administrative Code, § 1501:9-3-08. According to EPA's study on drinking water resources, between 1983 and 2007, 63 incidents of non-public water supply contamination from unlined or inadequately constructed pits occurred in Ohio. Increased fracking activities and storage of wastewaters and frack fluids increases the likelihood of additional water contamination incidents.

### D. BLM and the Forest Service's Approval of New Leasing and the December 2016 and March 2017 Lease Auctions

75.     On October 14, 2016, BLM approved new leasing of all federal minerals in the Wayne National Forest's Marietta Unit, opening it up to large-scale, high-volume fracking of the Utica and Marcellus shales for the first time. BLM held its first lease auction pursuant to this approval on December 13, 2016, selling 17 parcels totaling 679.48 acres. BLM held a second lease auction pursuant to this approval on March 23, 2017, selling 20 parcels totaling 1147.10 acres.

76.     Prior to the December and March auctions, the Forest Service authorized the leasing of the parcels sold in each auction, pursuant to 30 U.S.C. § 352 and 36 C.F.R. § 228.102(e).

77.     BLM's and the Forest Service's approvals of new leasing and the December 2016 and March 2017 lease sales did not take into account significant information concerning fracking and horizontal drilling operations, climate change, and white-nose syndrome, but instead relied on outdated and inadequate analyses from 2006 and 2012.

78.     In 2006, the Forest Service approved the Final Revised Land and Resource Management Plan for the Wayne National Forest ("2006 Forest Plan"), which made available 238,000 acres of the Wayne National Forest, including the Marietta Unit, for oil and gas leasing. The BLM was purportedly a cooperating agency in development of the 2006 Forest Plan and the related Final Environmental Impact Statement ("2006 FEIS") prepared under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*

79.     To inform the 2006 FEIS's effects analysis of new oil and gas leasing authorized by the 2006 Forest Plan, in 2004 BLM prepared a Reasonably Foreseeable Development Scenario. The 2004 Reasonably Foreseeable Development Scenario projected that 110 vertical wells would be developed in the Wayne National Forest's Marietta Unit, and that horizontal drilling in the Wayne National Forest was not economically feasible at that time. The 2004 Reasonably Foreseeable

Development Scenario projected that 135 acres of surface disturbance would likely occur on federal surface overlying federal and private minerals in the Marietta Unit due to "oil and gas drilling activity." The 2006 FEIS also included an upper limit of 50 acres total of surface disturbance across the entire Wayne National Forest from all forms of utilities construction, including oil and gas pipelines.

80.     The 2006 FEIS's analysis of all impacts resulting from new oil and gas leasing in the Wayne National Forest was based on the 2004 Reasonably Foreseeable Development Scenario's projections of total surface disturbance and new wells. These surface disturbance assumptions were the basis for many of the resource impact analyses contained in the 2006 FEIS, including those for air, water, vegetation, and wildlife.

81.     The 2004 Reasonably Foreseeable Development Scenario did not estimate surface disturbance from private surface activities that could result from new federal leasing, or on private surface adjacent to federal surface—e.g., the drilling of non-vertical wells, such as horizontal wells, or the development of supporting infrastructure. Private inholdings make up 76% of the Marietta Unit.

82.     To comply with Section 7 of the ESA, the Forest Service prepared a Biological Assessment, issued on August 31, 2005, assessing, among other things, the 2006 Forest Plan's effects on the Indiana bat, pink mucket pearly mussel, and fanshell. The Biological Assessment concluded that the 2006 Forest Plan, including new oil and gas leasing authorized thereunder, "may affect, is likely to affect the Indiana bat." With respect to the pink mucket pearly mussel and fanshell, the Biological Assessment concluded that the 2006 Forest Plan would have "no effects" on the species and was "not likely to adversely affect" the species' habitat.

83.     On November 22, 2005, Fish and Wildlife Service issued its Biological Opinion ("2005 Biological Opinion") for the Forest Plan. The 2005 Biological Opinion concluded that the 2006 Forest Plan, including new oil and gas leasing, was "not likely to jeopardize" the continued existence of the Indiana bat, or result in adverse modification of its critical habitat. Fish and Wildlife Service also concurred in the Forest Service's determination that the 2006 Forest Plan was "not likely to adversely affect" the fanshell and pink pearly mucket mussel. Neither the Biological

Assessment nor the 2005 Biological Opinion accounted for impacts to these species from oil and gas activities on private surface.

84.     Since 2005 several issues directly relevant to the Forest Plan and its impacts on listed species and national forest resources have arisen, including the significant rise in fracking and horizontal well development and development of the Marcellus and Utica shale plays, increased scientific knowledge about and environmental impacts from climate change, and the outbreak of white-nose syndrome.

85.     Neither the 2005 Biological Opinion nor the 2006 Forest Plan EIS addressed these issues.

86.     In 2011, bats infected with white-nose syndrome were discovered in Ohio in the Wayne National Forest for the first time. Since 2011, Ohio has seen a steep decline in its bat populations. According to monitoring data from Ohio Department of Natural Resources, bat populations in Ohio's two largest hibernacula (or overwintering sites) have declined by over 90 percent; summer bat detection rates have dropped by over 50 percent. In addition, a 2013 study projects that climate change will result in a northeast-ward shift in the Indiana bat's population range-wide, reducing its overall range. The bat's summer range in Ohio and other Midwestern states are likely to become unsuitably warm for the temperature-sensitive species.

87.     In 2011, BLM proposed the sale of over 3,300 acres of oil and gas minerals in the Wayne National Forest nominated for leasing by oil and gas operators. Increasing interest in the Utica shale in Ohio and reports that large-scale, high-volume fracking and horizontal drilling could make exploitation of this shale play feasible led to an outpouring of public concern about the lease sale. Among the public's many concerns were increased risks to water resources and fragmentation of the forest.

88.     Before the scheduled date of the lease sale, in response to the public's concerns, the Forest Service withdrew consent to new leasing and BLM canceled the lease sale, pending a review of new information about fracking and "the effects analysis in the 2006 FEIS and associated planning documents." To inform its review, the Forest Service requested that BLM review the 2004

Reasonably Foreseeable Development Scenario in light of the new potential for fracking and horizontal drilling activities not considered in the 2006 EIS.

89.     In 2012, BLM reviewed the 2004 Reasonably Foreseeable Development Scenario and determined that horizontal drilling was now economically viable within the Wayne National Forest, and that 10 horizontal well sites could potentially be developed in the Marietta Unit. BLM found that new surface disturbance and other impacts from these activities are "still well within the levels forecast" in the 2004 Reasonably Foreseeable Development Scenario, and concluded "the [2004 Reasonably Foreseeable Development Scenario] is still applicable and does not need to be revised."

90.     BLM's review underestimated surface disturbance from horizontal well pads, new pipelines, compressor stations, and other infrastructure associated with horizontal drilling and fracking activities, and ignored surface disturbance from new wastewater pits or impoundments. It also ignored the potential for these activities to be located on private land and open up underlying private minerals for extraction, even though: (1) a driller must have the right to access a continuous and large enough portion of a shale formation to make horizontal wells economically viable; (2) well pads can be located over two miles away from targeted minerals; (3) private land surrounds or adjoins the acreage available for federal leasing; and (4) operators may prefer conducting surface operations on private land over national forest land, given the weaker controls that apply to private surface.

91.     The Forest Service prepared an internal Supplemental Information Report ("2012 SIR") based on BLM's updated oil and gas surface disturbance analysis, to assess whether a supplemental NEPA review or update to the 2006 Forest Plan was warranted.

92.     The 2012 SIR is not a NEPA document and was not subject to public notice and comment procedures.

93.     The 2012 SIR concluded that "[n]o additional analysis or protections are needed at the Forest Plan level" with respect to all Forest resources, including water and wildlife. The 2012 SIR did not analyze the potential for new or increased private surface activities resulting from new federal oil and gas leasing. It also erroneously assumed that the 2006 Forest Plan's requirements would mitigate the effects of new leasing, without regard to the potential for new leasing to result in

1   horizontal drilling and fracking on private surface. The 2006 Forest Plan's requirements do not

2   govern private surface activities.

3       94.    The 2012 SIR did not consider climate change effects on the forest or listed species.

4       95.    In 2015, BLM began preparing a programmatic Environmental Assessment ("EA")

5   for new oil and gas leasing in the Marietta Unit. By that time, approximately 18,000 acres in the

6   Wayne National Forest's Marietta Unit—or nearly half of all the Marietta Unit's estimated acreage

7   in federal minerals—had been nominated by oil and gas operators for leasing. Much of this acreage

8   is along or near the Ohio and Little Muskingum rivers.

9       96.    In November 2015, BLM initiated a public scoping process for the EA to determine

10  what issues the EA should address. BLM received comments from proponents of federal leasing

11  urging that new federal leasing in the Wayne National Forest was necessary to "provide private

12  landowners the opportunity to develop their minerals," while "withholding leasing the federal

13  minerals will pose an obstacle to development of private minerals." This is because private mineral

14  owners would not be able to profitably develop their shale resources in the Marietta Unit without the

15  ability to "pool" and horizontally drill through large contiguous areas of shale resources (e.g., one to

16  two miles wide), including federal minerals scattered throughout the forest.

17      97.    On November 4, 2015, BLM submitted a Biological Assessment to U.S. Fish and

18  Wildlife Service initiating informal ESA Section 7 consultation on its contemplated proposal to open

19  the Wayne National Forest to new oil and gas leasing. The Biological Assessment concluded that

20  new leasing is not likely to adversely affect the Northern long-eared bat, Indiana bat, and endangered

21  mussels, among other species. On information and belief, Fish and Wildlife Service has never issued

22  a written response to the Biological Assessment or completed the consultation process.

23      98.    BLM released the draft programmatic EA ("Draft EA") for public comment on April

24  28, 2016. The Draft EA proposed to make available all of the acreage in the Marietta Unit open to

25  leasing, or approximately 40,000 acres of federal mineral estate. The Draft EA relied on the 2012

26  SIR and 2006 FEIS for its analysis of the effects of leasing.

27      99.    BLM received over 14,000 comment letters from the public on the Draft EA, many

28  opposed to allowing fracking in the Wayne National Forest's Marietta Unit.

100.    On May 31, 2016, Plaintiffs submitted comments on the Draft EA, raising concerns that the EA failed to consider, among other things: (1) the impacts of fracking on various resources, including increased surface disturbance associated with Marcellus and Utica shale horizontal drilling and oil and gas infrastructure, as well as increased water contamination risks; (2) the potential for new leasing to open up private minerals and related private surface development; (3) habitat fragmentation and habitat degradation effects of fracking and private surface activities on the Indiana bat, Northern long-eared bat, and endangered mussels; and (4) in connection with these effects, the impacts of white-nose syndrome and climate change on the Indiana bat.

101.    On June 15, 2016, before the Draft EA was finalized, the Forest Service authorized BLM to offer a number of parcels for new leasing, to be offered in the December 13, 2016 and March 23, 2017 lease auctions.

102.    On October 17, 2016, BLM issued its Final EA and Finding of No Significant Impact, which found that the action of leasing up to 40,000 acres of federal mineral estate within the Marietta Unit "is not a major Federal action" and "will not significantly affect the quality of the human environment." On the same day, BLM posted an oil and gas lease sale notice for 33 parcels, totaling 1,600.69 acres, located in Monroe and Washington counties in the Marietta Unit, scheduled to take place on December 13, 2016. Sixteen of the parcels were later deferred or removed from the auction due to concerns that the parcels were not available for leasing. These changes reduced the leasing proposal to 17 parcels totaling 679.48 acres.

103.    In response to Plaintiffs' comments, in the Final EA BLM admitted the potential for new leasing to result in private surface activities, but failed to analyze or estimate total private surface disturbance and associated impacts, or to adequately consider mitigation for these impacts. Moreover, Plaintiffs' comments on BLM's Draft EA cited several reports and field data demonstrating that horizontal shale development results in pipeline construction-related surface disturbance far greater than what was considered in BLM's Draft EA, the 2012 SIR, or the 2006 FEIS. Nonetheless, BLM's Final EA failed to acknowledge the pipeline reports and data submitted by Plaintiffs, and declined to analyze or estimate the potential pipeline construction-related

disturbance on either federal or private surface that could reasonably be expected to result from new leasing. BLM dismissed or failed to adequately respond to all other comments raised by Plaintiffs.

104.   On November 11, 2016, Plaintiffs filed a formal administrative protest against BLM's offer of all parcels in the December 13, 2016 sale, raising their same previous concerns. BLM received over 100 formal protests of the lease sale. On December 12, 2016, BLM denied or dismissed all of the protests, and issued its Decision Record authorizing the lease auction. The lease sale took place on December 13, 2016. All 679.48 acres were sold for a total of over $1.7 million.

105.   On January 13, 2017, Plaintiffs filed an administrative appeal and petition for stay of the December 12, 2016 Decision Record with the Interior Board of Land Appeals. The Board denied Plaintiffs' petition for stay on February 28, 2017. Plaintiffs filed a notice of withdrawal of their appeal on May 1, 2017. On May 8, 2017, the Board dismissed the appeal.

106.   On January 13, 2017, BLM posted a notice of a second lease auction offering 21 parcels totaling 1,186.06 acres in Monroe County in the Wayne National Forest. BLM later removed one parcel because it was already leased, reducing the March 23 auction to an offer of 20 parcels totaling 1,147.10 acres.

107.   On February 13, 2017, Plaintiffs filed a formal administrative protest against BLM's offer of all parcels in the March 23 lease auction. BLM received a total of 78 formal protests opposing the auction. On March 22, 2017, BLM denied or dismissed all of the protests. On March 23, 2017, BLM issued its Decision Record authorizing the lease auction and held the lease auction. All 1,147.10 acres were sold for a total of over $5.1 million.

108.   On May 1, 2017, Plaintiffs filed an administrative appeal and petition for stay of the Decision Record for the March 23, 2017 lease auction with the Interior Board of Land Appeals. The Board denied Plaintiffs' petition for stay on May 17, 2017. Plaintiffs withdrew their appeal on June 27, 2017.

109.   The Forest Service has never performed or adopted a formal NEPA environmental review of the impacts of horizontal drilling and fracking development in the Wayne National Forest, including impacts caused by reasonably foreseeable private surface activities, or analyzed climate change effects in a NEPA document subject to public notice and comment.

110.    Neither BLM nor the Forest Service consulted Fish and Wildlife Service over the December 2016 or March 2017 lease sale's effects on the listed species in the action area, or reinitiated consultation with Fish and Wildlife Service over the 2006 Forest Plan, despite new information regarding white-nose syndrome and associated bat population declines, climate change, fracking, and the potential for private land disturbance.

111.    On information and belief, BLM will continue to hold quarterly lease sales until all 18,000 acres in the Marietta Unit that have been nominated for leasing are sold, and will rely on the Final EA, 2006 Forest Plan EIS, 2012 SIR, and the 2005 Biological Opinion for approvals of future leasing auctions of the Marietta Unit. On information and belief, the Forest Service also intends to rely on the 2006 Forest Plan EIS for its authorization of new leasing auctions.

112.    The next oil and gas lease auction for Wayne National Forest parcels is scheduled for September 21, 2017, and another auction is tentatively scheduled for December 14, 2017.

113.    On January 26, 2017, Plaintiffs provided notice to BLM, U.S. Forest Service, U.S. Fish and Wildlife Service, and the U.S. Department of the Interior Acting Secretary, pursuant to Section 11(g) of the Endangered Species Act (ESA), that BLM, the Forest Service, and the Fish and Wildlife Service are in violation of ESA Section 7 for, among other things, their ongoing failure to initiate and complete Section 7 consultation on the effects of new oil and gas leasing in the Marietta Unit, and their failure to reinitiate consultation on the 2005 Biological Opinion, despite new information regarding white-nose syndrome and associated bat population declines, climate change, fracking, and the potential for private land disturbance.

114.    On April 21, 2017, Plaintiffs provided a supplemental notice to BLM, Forest Service, U.S. Fish & Wildlife Service, and the Secretary of Interior, clarifying their January 26 notice that BLM is in violation of Section 7 of the ESA due to its ongoing failure to initiate and complete Section 7 consultation regarding (1) its decision in the Final EA and Finding of No Significant Impact to make available all federal minerals in the Marietta Unit for oil and gas leasing; (2) BLM's decisions to authorize the December 13, 2016 lease auction and March 23, 2017 lease auction.

**CLAIMS FOR RELIEF**

**FIRST CLAIM**

**FOREST SERVICE'S VIOLATION OF 30 U.S.C. § 352, NEPA, AND APA – FAILURE TO PREPARE A SUPPLEMENTAL ENVIRONMENTAL REVIEW**

115.    Plaintiffs hereby reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

116.    Before new leasing of federal oil and gas minerals can proceed in the national forests, the Forest Service must authorize or "consent" to any leasing proposed by BLM. 30 U.S.C. § 352. As a prerequisite to consent, the Forest Service must verify that "leasing of the specific lands [1] has been adequately addressed in a NEPA document, and [2] is consistent with the Forest land and resource management plan." 36 C.F.R. § 228.102(e)(1). "If NEPA has not been adequately addressed, or if there is significant new information or circumstances as defined by 40 C.F.R. § 1502.9 requiring further environmental analysis, additional environmental analysis shall be done before a leasing decision for specific lands will be made." *Id*.

117.    Pursuant to NEPA, agencies "[s]hall prepare supplements to either draft or final environmental impact statements if…[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii).

118.    The leasing of the specific lands sold in the December 2016 and March 2017 lease auctions have not been adequately addressed in a NEPA document adopted or prepared by the Forest Service.

119.    Since the adoption of the 2006 Forest Plan and 2006 FEIS, significant new information or circumstances not addressed in these documents but bearing on the December 13, 2016 lease auction, March 23, 2017 lease auction, and their impacts have arisen, including but not limited to:

(a)    development potential of the Marcellus and Utica shale plays in eastern Ohio and the Wayne National Forest made possible by fracking and horizontal drilling, and its potential to open up private minerals and private surface to new development;

(b) empirical studies analyzing the greater amount of land disturbance required for horizontal drilling and fracking in the Utica and Marcellus shales in eastern and central Ohio, including disturbance from pipelines, well pads, wastewater ponds, and compressor stations;

(c) new information about the effects of fracking on water resources, soil, vegetation, wildlife, air quality, public health, greenhouse gas emissions, and climate change;

(d) new information about climate change and its effects on the Indiana bat and other forest resources;

(e) white-nose syndrome and associated declines in bat populations;

(f) the listing of new species under the ESA, including the Northern long-eared bat, sheepnose mussel, and snuffbox mussel.

120. According to the 2012 SIR, "the SIR itself is not a NEPA analysis or approval." The 2012 SIR is not a proper "NEPA document" as it has never been subject to public notice and comment, or other NEPA requirements. *See* 40 C.F.R. § 1502.9(c)(4) (agencies "[s]hall prepare, circulate and file a supplement to [an EIS] in the same fashion…as a draft and final statement…."); *see also* Forest Service Handbook 1909.15_10 at 45 ("A SIR is not a NEPA document and therefore cannot be used to fulfill the requirements for a revised or supplemental EA or EIS. A SIR cannot repair deficiencies in the original environmental analysis or documentation, nor can it change a decision.").

121. Substantively, the 2012 SIR fails to consider or analyze numerous effects of horizontal drilling and fracking, the potential for private surface development, empirical data showing greater surface disturbance associated with fracking of the Marcellus and Utica shale plays, and climate change and its effects, among other significant new circumstances and information. It also erroneously assumes that Forest Plan rules applying to federal surface will mitigate the effects of new leasing, even though those rules do not apply to private surface. For example, the 2012 SIR assumes that Forest Plan prohibitions or restrictions on wastewater injection, open wastewater pits, and surface and groundwater water depletions will mitigate the impacts of new leasing.

122.  Before consenting to leasing, the Forest Service failed to prepare "additional environmental analysis" in a proper NEPA document addressing these significant new circumstances and information, as required by 36 C.F.R. § 228.102(e)(1).

123.  Accordingly, the Forest Service's authorizations of the December 13, 2016 and March 23, 2017 lease auctions are arbitrary and capricious and not in accordance with law, as required by 36 C.F.R. § 228.102(e)(1), NEPA, its implementing regulations, and the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 701-706, 706(2).

## SECOND CLAIM

### BLM'S VIOLATION OF NEPA AND THE APA—
PREPARATION OF AN UNLAWFUL EA AND FONSI AND FAILURE TO PREPARE AN EIS

124.  Plaintiffs hereby reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

### *Preparation of an Unlawful EA and Finding of No Significant Impact*

125.  Pursuant to NEPA, BLM must take a "hard look" at the consequences, environmental impacts, and adverse effects of its proposed actions. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9. The effects analysis must analyze not only the direct impacts of a proposed action, but also the indirect and cumulative impacts. 40 C.F.R. §§ 1508.7, 1508.8, 1508.9. Such analysis must include all reasonably foreseeable impacts of the proposed action.

126.  BLM failed to analyze the full scope of the effects of (1) making available 40,000 acres of the Wayne National Forest's Marietta Unit to new leasing, and (2) leasing the specific parcels offered in the December 2016 and March 2017 lease sales, including the direct, indirect, and cumulative effects of these actions.

127.  BLM failed to take a hard look at the potential for new leasing in the Marietta Unit to open up private minerals and private surface to new development. The EA's failure to address private mineral development and private surface disturbance resulting from federal leasing infects the entire effects analysis in the EA. By opening up federal and, as a consequence, *private* minerals and surface to drilling, new leasing will increase the total number of new well pads and wells, total surface disturbance, watershed impacts, cumulative air pollution emissions, public health risks,

habitat loss, and disturbance to wildlife. The EA also erroneously assumes that effects of new leasing would be mitigated by the 2006 Forest Plan, even though its requirements do not apply to private surface and were adopted with only vertical drilling in mind. It further erroneously assumes that Ohio state laws and regulations can adequately mitigate these effects. For example, because open pits are allowed on private surface under Ohio state law, birds and bats would be at risk of entrapment in pits, but the EA fails to analyze these potential impacts.

128. BLM failed to take a hard look at the total surface disturbance impacts from fracking and horizontal drilling in the Marietta Unit. The EA's surface impact footprint estimates for new oil and gas development, including gathering lines, well pad sites, compressor station sites, and wastewater ponds, are significantly lower than empirical field data indicates, thereby precluding a complete disclosure and analysis of soil, water quality, vegetation, air quality, and wildlife impacts. For example, the EA fails to quantify surface disturbance from new gathering lines, which transport natural gas from the well to a central collection point, even though gathering lines are the single largest source of surface disturbance associated with shale oil and gas development.

129. BLM failed to take a hard look at numerous effects of horizontal drilling and fracking on water resources, vegetation, wildlife, air quality, public health, seismicity, greenhouse gas emissions, and climate change, including the site-specific and aggregate effects of leasing all federal minerals in the Marietta Unit, and of leasing parcels auctioned in the December 2016 and March 2017 lease sales. The EA improperly "tiers" to an insufficient NEPA document by relying on the 2006 Forest Plan EIS to authorize the new leases in the Marietta Unit, despite the EIS's failure to analyze any impacts associated with fracking and horizontal shale oil and gas development.

130. BLM failed to take a hard look at climate change and its effects on the Indiana bat, Northern long-eared bat, and other forest resources; white-nose syndrome and associated declines in bat populations; and how increased fracking in connection with climate change, white-nose syndrome, and private surface development will affect these species. For example, because open wastewater pits are allowed on private surface under Ohio state law, new leasing could result in the construction of pits that could trap and kill bats or expose them to toxic substances.

131.    BLM failed to take a hard look at the impacts of fracking, including high-volume water withdrawals, runoff pollution, and spills and leaks, on the endangered mussels and their host fish.

132.    BLM failed to take a hard look at the cumulative impacts of its proposals in connection with private surface and private oil and gas development, and other past, present, and reasonably foreseeable future projects, including other existing industrial processes with similar environmental impacts in the vicinity of the Marietta Unit.

### *Failure to Prepare an EIS*

133.    NEPA requires the preparation of an EIS for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.

134.    BLM's decision to make available for new leasing all federal mineral acreage in the Marietta Unit is a major federal action significantly affecting the quality of the human environment. Each of its decisions to hold the December 2016 and March 2017 lease auctions is also a major federal action significantly affecting the quality of the human environment.

135.    BLM's conclusion that preparation of an EIS was not required prior to approving each of these actions was arbitrary, capricious, and inconsistent with the law.

136.    Numerous factors requiring the preparation of an EIS are triggered by BLM's leasing decisions. Ten factors must be considered in determining the significance of an action's environmental effects. 40 C.F.R. § 1508.27. Among these are that the action affects "ecologically critical areas," is "highly controversial," involves possible effects that are "highly uncertain or involve unique or unknown risks," is related to other actions with "cumulatively significant impacts," and "may adversely affect an endangered or threatened species." 40 C.F.R. §§ 1508.27(b)(3)(4), (5), (7) & (9). The presence of any or all of these factors in the actions challenged here renders BLM's decisions to not prepare an EIS arbitrary, capricious, and inconsistent with the law.

137.    In sum, BLM's adoption of an inadequate EA and Finding of No Significant Impact for its proposed action making available the Marietta Unit for new leasing; issuance of Decision

Records authorizing the December 2016 and March 2017 lease sales; and failure to prepare EISs are arbitrary and capricious and not in accordance with the law, as required by NEPA, its implementing regulations, and the APA. 5 U.S.C. §§ 701-706, 706(2).

**THIRD CLAIM**

**VIOLATION OF ESA SECTION 7(a)(2)—FAILURE TO CONSULT OR COMPLETE CONSULTATION**

138.    Plaintiffs hereby reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

139.    BLM's decision to open the Marietta Unit to oil and gas leasing, each of its decisions to authorize the December 2016 and March 2017 lease auctions, and the Forest Service's consent to the lease auctions are each agency actions under the ESA, for which Section 7 consultation was required, because new leasing and resulting oil and gas development "may affect" listed species within the action area.

140.    Although BLM submitted a Biological Assessment to Fish and Wildlife Service for BLM's proposal to open the Marietta Unit to new oil and gas leasing, on information and belief, Fish and Wildlife Service failed to concur in writing with the Biological Assessment's determination that BLM's proposed decision "is not likely to adversely affect" the Indiana bat, Northern long-eared bat, and endangered mussels, among other species. In the absence of a written concurrence, BLM was required to complete formal consultation with Fish and Wildlife Service, but failed to do so. *See* 50 C.F.R. §§ 402.13(a), 402.14(b).

141.    Neither BLM nor the Forest Service consulted with Fish and Wildlife Service over the December 2016 or March 2017 lease auctions.

142.    BLM and the Forest Service failed to request from Fish and Wildlife Service whether any listed or proposed species "may be present in the action area" before authorizing the December 2016 or March 2017 lease auctions. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12.

143.    Listed species are or may be present in the action areas, and thus BLM and the Forest Service further violated the ESA by failing to prepare a biological assessment for each of the lease auctions. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12.

144.    To the extent that BLM and the Forest Service rely on the 2005 Biological Opinion for compliance with their Section 7 duties, that reliance is misplaced because the 2005 Biological Opinion is out of date, and violates Section 7 of the ESA. 16 U.S.C. § 1536(a)(2). Such reliance on the 2005 Biological Opinion is also arbitrary and capricious in violation of the APA. 5 U.S.C. § 706.

145.    BLM and the Forest Service each have an independent, substantive duty under Section 7 of the ESA to insure that their respective actions are not likely to jeopardize listed species or adversely modify their critical habitat. 16 U.S.C. § 1536(a)(2). Despite the glaring need for a number of years to reinitiate consultation with Fish and Wildlife Service concerning oil and gas development in the Wayne National Forest authorized under the 2006 Forest Plan, and to consult over the December 2016 and March 2017 lease auctions and decision to open the Marietta Unit to new leasing, BLM and the Forest Service have proceeded with new oil and gas leasing, and the authorization and allowance of oil and gas exploration and development activities in the Wayne National Forest. By failing to comply with their Section 7 consultation requirements, BLM and the Forest Service are in ongoing violation of their substantive duties to insure that their authorization of oil and gas leasing and exploration and development in the Wayne National Forest is not likely to jeopardize the continued existence of listed species found within the action area, or result in the destruction or adverse modification of their critical habitat. 16 U.S.C. § 1536(a)(2).

146.    In sum, BLM and the Forest Service have violated both their procedural and substantive obligations under Section 7 of the ESA concerning BLM's decision to open the Marietta Unit to oil and gas leasing, each of BLM's decisions to authorize the December 2016 and March 2017 lease auctions, and the Forest Service's consent to the lease auctions.  16 U.S.C. § 1536.  BLM and the Forest Service have failed to properly consult with the Fish and Wildlife Service for each of these actions, and have failed to comply with their substantive duty to ensure that these actions are not likely to jeopardize threatened or endangered species. *Id.* Each of these BLM and Forest Service decisions is therefore arbitrary, capricious, an abuse of discretion, and contrary to the ESA, and should be held unlawful and set aside.  5 U.S.C. §706(2).

### FOURTH CLAIM

**VIOLATION OF ESA SECTION 7(a)(2), 50 C.F.R. § 402.16—FAILURE TO REINITIATE CONSULTATION**

147.    Reinitiation of consultation is required when "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," and "[i]f a new species is listed or critical habitat designated that may be affected by the identified action." 50 C.F.R. § 402.16(b), (d).

148.    The 2005 Biological Opinion for the 2006 Forest Plan does not address several new issues that have arisen over the last decade showing that new leasing may affect listed species in a manner or to an extent not previously considered, including new fracking and horizontal drilling techniques, the potential for private surface development to result from new leasing, white-nose syndrome, and climate change.

149.    In addition to the significant new information described above, several new species that may be affected by the 2006 Forest Plan and new oil and gas leasing in the Marietta Unit have been listed since the 2005 Biological Opinion. At least the following species have been designated by Fish and Wildlife Service as threatened or endangered under the ESA subsequent to the 2006 Forest Plan, and may be impacted by the projects and activities authorized by the Plan: (1) the sheepnose mussel, designated as endangered on April 12, 2012; (2) the snuffbox mussel, designated as endangered on March 15, 2012; and (3) the Northern long-eared bat, designated as threatened on May 4, 2015.

150.    BLM, the Forest Service, and Fish and Wildlife Service, however, have failed to reinitiate consultation in order to address significant new information and newly listed species, in ongoing violation of the ESA. 50 C.F.R. § 402.16. These agencies' failure to reinitiate consultation on the 2005 Biological Opinion also constitutes agency action unlawfully withheld and unreasonably delayed pursuant to the APA. 5 U.S.C. § 706(1).

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief against BLM, the Forest Service, and Fish and Wildlife Service as follows:

A.    For declarations that:

(1)     the Forest Service's authorization of new oil and gas leasing and failure to prepare a supplemental environmental analysis in a lawful NEPA document violated 36 C.F.R. § 228.102, NEPA, its implementing regulations, and the APA;

(2)     BLM's adoption of the Final EA, Finding of No Significant Impact, and Decision Records for the December 13, 2016 and March 23, 2017 lease auctions violated NEPA, its implementing regulations, and the APA;

(3)     BLM's failure to prepare an EIS for its action making the Marietta Unit available for oil and gas leasing and for the December 13, 2016 and March 23, 2017 lease auctions violated NEPA, its implementing regulations, and the APA;

(4)     BLM's and the Forest Service's failures to consult Fish and Wildlife Service over the December 13, 2016 and March 23, 2017 lease auctions, and failures to insure that oil and gas leasing is not likely to jeopardize listed species or modify or destroy critical habitat; BLM's failure to formally consult with Fish and Wildlife Service or complete consultation with Fish and Wildlife Service over its decision to open the Marietta Unit to new oil and gas leasing; and BLM's, the Forest Service's, and Fish and Wildlife Service's failure to reinitiate consultation on the 2005 Biological Opinion, violated Section 7 of the ESA and its implementing regulations;

B.     For an order, including a preliminary and permanent injunction invalidating and setting aside BLM's Final EA, Finding of No Significant Impact, December 12, 2016 Decision Record, and March 23, 2017 Decision Record; the Forest Service's June 15, 2016 consent to leasing Marietta Unit parcels, including parcels offered in the December 13, 2016 and March 23, 2017 lease auctions; Fish and Wildlife Service's 2005 Biological Opinion; and any leases or approvals issued in reliance on the foregoing documents or decisions;

C.     For an injunction restraining BLM and the Forest Service, and each of their agents, employees, officers, and representatives from implementing BLM's December 12, 2016 and March 23, 2017 Decision Records, or from authorizing new oil and gas leasing, exploration, or development in the Marietta Unit, pending (1) BLM and the Forest Service's completion of an EIS analyzing the effects of new oil and gas leasing allowed under the Final EA and Finding of No Significant Impact, and allowed in the December 2016 and March 2017 lease auctions; (2)

completion of a reinitiated consultation on the 2005 Biological Opinion; and (3) completion of a

Section 7 consultation on BLM's decision to open the Marietta Unit to new leasing; and (4) where

leasing or development of minerals leased in the December 13, 2016 lease auction or March 23,

2017 lease auction is concerned, completion of a Section 7 consultation over the auction, in full

compliance with NEPA, ESA, and all other applicable legal requirements.

D.      For an injunction restraining any person or entity from constructing new wells or

other projects authorized under BLM or Forest Service approvals that rely on or tier to the Final EA

or Finding of No Significant Impact, 2006 Forest Plan EIS, or the 2005 Biological Opinion, pending

BLM and the Forest Service's completion of an EIS analyzing the effects of new oil and gas leasing

allowed in the December 2016 and March 2017 lease auctions and the Final EA and Finding of No

Significant Impact; (2) completion of reinitiated consultation on the 2005 Biological Opinion; (3)

completion of a Section 7 consultation on BLM's decision to open the Marietta Unit to new leasing;

and (4) where leasing or development of minerals leased in the December 13, 2016 or March 23,

2017 lease auction is concerned, completion of a Section 7 consultation over the lease auction, in full

compliance with NEPA, ESA, and all other applicable legal requirements.

E.      For Plaintiffs' costs of suit and attorneys' fees pursuant to all applicable legal

authority including, but not limited to, ESA, 16 U.S.C. § 1540, the Equal Access to Justice Act, 28

U.S.C. § 2412, and any and all other provisions of law or equity; and

F.      For such other and further relief as this Court may deem just and proper.

DATED: July 5, 2017                    Respectfully submitted,


                                       WENDY S. PARK
                                       DIANA DASCALU-JOFFE
                                       *Trial Attorney & Counsel for Plaintiffs Center for Biological Diversity, Heartwood, and Sierra Club*
                                       Center for Biological Diversity
                                       1212 Broadway, # 800
                                       Oakland, CA 94612
                                       Tel: (510) 844-7138
                                       Fax: (510) 844-7150
                                       wpark@biologicaldiversity.org
                                       CA State Bar No. 237331, *pro hac vice*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                            38

/s/ Nathan G. Johnson
NATHAN G. JOHNSON
(OH State Bar No.0082838)
*Trial Attorney for Ohio Environmental Council*
Ohio Environmental Council
1145 Chesapeake Ave., Suite I
Columbus, OH 43212
Tel: (614) 487-5841
NJohnson@theOEC.org

Elizabeth Benson
*Counsel for Sierra Club*

**CERTIFICATE OF SERVICE**

I certify that on July 5, 2017, I filed the foregoing First Amended Complaint on behalf of

Plaintiffs Center for Biological Diversity, Heartwood, Ohio Environmental Council, and Sierra Club

via the CM/ECF system which will provide electronic service to all counsel of record.


DATED: July 5, 2017

/s/ Nathan Johnson

NATHAN JOHNSON
*Lead Attorney for Plaintiff Ohio Environmental Council*