UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Center for Biological Diversity, *et al.*,

    Plaintiffs,

    v.

U.S. Forest Service, *et al.*,

    Defendants.

Case No. 2:17-cv-372

Judge Michael H. Watson
Magistrate Judge Jolson

## OPINION AND ORDER

Four non-profit organizations, the Center for Biological Diversity ("the
Center"), Heartwood, Ohio Environmental Council ("OEC"), and the Sierra Club
(together, "Plaintiffs") bring claims under the Administrative Procedure Act, 5
U.S.C. § 551 *et seq.* ("APA") against the United States Forest Service ("USFS"),
the United States Bureau of Land Management ("BLM"), the United States Fish
and Wildlife Service ("FWS"), Thomas Tidwell ("Tidwell") in his official capacity as
Chief of USFS, Michael Nedd ("Nedd") in his official capacity as acting director of
BLM, and Greg Sheehan ("Sheehan") in his official capacity as acting director of
FWS (together, "Defendants").[1] Plaintiffs claim, in short, that Defendants' oil and
gas leasing decisions in the Wayne National Forest ("Wayne National Forest" or

---

[1] On September 29, 2017, and March 18, 2018, the Court granted motions to intervene
submitted by American Petroleum Institute, Independent Petroleum Association of
America, and Eclipse Resources I, LP ("Intervenor Defendants"). ECF Nos. 52, 71.
The Intervenor Defendants have not taken a position on the motion currently under
consideration by the Court.

"the Forest") violated the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA"), the Endangered Species Act, 16 U.S.C. § 1531 *et seq.* ("ESA"), and the APA.

On February 6, 2018, USFS, BLM, and FWS ("the Federal Agencies") filed their administrative records with the Court.[2]  Notice of Lodging Admin. Records, ECF No. 57.  Plaintiffs move to compel supplementation of the Federal Agencies' administrative records.  Am. Mot. Compel, ECF No. 61.  The Federal Agencies responded, ECF No. 66, and Plaintiffs replied.  ECF No. 67.  The Court held a hearing on the motion on June 5, 2018, and ordered the parties to submit post-hearing briefs summarizing their positions.  After consideration of all of the above, for the reasons stated below, the Court **DENIES** Plaintiffs' motion.

Although the merits of Plaintiffs' claims are not yet before the Court, the Court nonetheless finds that an overview of the law relevant to their claims and the factual history in this case will provide the necessary context for its decision on Plaintiffs' motion to supplement.

## I.  LEGAL BACKGROUND

### A. Oil and Gas Leasing of National Forest System Lands

#### 1. *Governing Law*

The Mineral Leasing Act of 1920 (the "MLA"), 30 U.S.C. § 181 *et seq.*, established a permit and leasing system that granted the Secretary of the Interior

---

[2] BLM filed a corrective administrative record the next day.  Notice of Lodging Am. Admin. Record, ECF No. 58.

broad discretion in deciding whether to lease particular federal lands. The

Federal Onshore Oil and Gas Leasing Reform Act of 1987, 30 U.S.C. § 226(g)–

(h) ("FOOGLRA"), which amends the MLA, divides leasing responsibility between

the Secretary of Interior, acting through the BLM, and the Secretary of

Agriculture, acting through USFS. *See* 30 U.S.C. § 226(h)–(n); 43 C.F.R.

§ 3101.7–2(a). Generally, USFS manages the surface of the forest lands while

BLM manages the subsurface of the lands. 30 U.S.C. § 226(g). While BLM has

ultimate authority over leasing, it may not issue a lease on forest lands over

USFS's objections. 43 C.F.R. § 3101.7–2(c). Prior to issuing a lease on federal

land, BLM and USFS must verify that the activity approved by the lease complies

with NEPA, NEPA's implementing regulations at 43 C.F.R. §§ 1500–08, and

USFS policies and procedures. 36 C.F.R. § 228.102(a).

NEPA "has twin aims." *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87,

97 (1983). It obliges an agency "to consider every significant aspect of the

environmental impact of a proposed action" and to "inform the public that it has

indeed considered environmental concerns in its decisionmaking process." *Id.*

"NEPA serves procedural rather than substantive goals, and is not a 'results-

driven' statute." *Latin Ams. for Soc. and Econ. Dev. v. Adm'r of Fed. Highway

Admin.*, 756 F.3d 447, 462 (6th Cir. 2014). As a result, "[e]ven agency action

with adverse environmental effects can be NEPA-compliant so long as the

agency has considered those effects and determined that competing policy

values outweigh those costs." *Id.* (quoting *Kentuckians for the Commonwealth v.*

*U.S. Army Corps of Eng'rs*, 746 F.3d 698, 706 (6th Cir. 2014)); *see also*
*Baltimore Gas & Elec. Co.*, 462 U.S. at 97 ("Congress in enacting NEPA . . . did
not require agencies to elevate environmental concerns over other appropriate
considerations."). At bottom, NEPA's procedural requirements exist to ensure
that decisions to lease are "fully informed and well-considered." *Latin Ams. for
Soc. and Econ. Dev.*, 756 F.3d at 462 (quoting *Vermont Yankee Nuclear Power
Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 558 (1978)).

Under NEPA's procedural requirements, whenever a federal agency
endeavors to take "major . . . action[] significantly affecting the quality of the
human environment"—which may include opening up federal lands for oil and
gas leasing—the agency must first generate a "detailed statement" reviewing the
environmental impacts of the proposed action and alternatives to that action. 42
U.S.C. § 4332(C).[3] This statement is referred to as an environmental impact
statement ("EIS"), and it constitutes a "NEPA document." Developing the EIS
fulfills NEPA's procedural guarantee of informed decision-making because it

---

[3] Specifically, the statute requires the agency to consider:

(i)     the environmental impact of the proposed action,
(ii)    any adverse environmental effects which cannot be avoided should the
        proposal be implemented,
(iii)   alternatives to the proposed action,
(iv)    the relationship between local short-term uses of man's environment and the
        maintenance and enhancement of long-term productivity, and
(v)     any irreversible and irretrievable commitments of resources which would be
        involved in the proposed action should it be implemented.

*Id.*

compels the agency producing the EIS to take a "hard look at environmental consequences" stemming from its actions. *Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 407 (6th Cir. 2013).

"To spare agencies the hardship of conducting exhaustive review of every" proposed significant federal action, however, federal regulations allow the acting agency "to first prepare a less burdensome environmental assessment [("EA")] as a method for determining whether a proposal need[s] an [EIS]." *Id.* at 407–08; 40 C.F.R. § 1501.4(a)–(c). An EA, also a NEPA document, is "a concise public document . . . that serves to . . . [b]riefly provide sufficient evidence and analysis for determining" the effect of the proposed action on the environment and "whether to prepare an [EIS] . . . ." 40 C.F.R. § 1508.9(a). It includes some of the same content as an EIS—such as a "discussion[] of the need for the proposal, of alternatives . . . [and] of the environmental impacts of the proposed action and alternatives"—but does not require the same depth of analysis as an EIS. *Id.* § 1508.9(b); *see Anglers of the Au Sable v. U.S. Forest Serv.*, 565 F. Supp. 2d 812, 824 (E.D. Mich. 2008) ("An EA is a concise document that allows agencies to consider the environmental concerns associated with a proposed project while conserving agency resources for those projects in which a full EIS is required."). If after conducting an EA the agency determines that no EIS is required, the agency must issue a Finding of No Significant Impact, which "briefly present[s] the reasons why an action . . . will not have a significant effect on the

human environment and" thus does not require an EIS.  40 C.F.R. §§ 1501.4(e), 1508.13.

Finally, an agency must prepare supplements to a draft or final EIS if the agency "makes substantial changes in the proposed action that are relevant to environmental concerns" or if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1).  The agency may also prepare a supplement at any time that it "determines that the purposes of [NEPA] will be furthered by doing so."  *Id.* § 1502.9(c)(2).

2. *The Leasing Process*

The leasing process consists of a complex series of procedures during which USFS and BLM share responsibility for ensuring that the leasing decision and subsequently issued permits to drill comply with NEPA, NEPA's implementing regulations, and USFS's Forest Plan.  *See Wyoming Outdoor Council v. Bosworth*, 284 F. Supp. 2d 81, 83 (D.D.C. 2003) (outlining the process in detail).  In 2006, USFS and BLM entered into a memorandum of understanding that further clarifies the shared responsibilities outlined in those sources.

At the first step of the leasing process, after conducting a NEPA analysis, USFS determines which forest lands it will make administratively available to BLM for leasing.  36 C.F.R. § 228.102(c).  The responsibility then shifts to BLM to determine, out of all forest land USFS made administratively available for

leasing, which specific parcels it will designate for leasing. 36 C.F.R.

§ 228.102(d). Once BLM does so, it submits a proposal to lease specific parcels

to USFS for USFS's consent. Before consenting, USFS must verify that leasing

of those specific lands "has been adequately addressed in a NEPA document

and is consistent with the Forest land and resource management plan." *Id.*

§ 228.102(e)(1). Additional environmental analysis must be performed if USFS

determines that the leasing has not been adequately addressed or if significant

new information or circumstances requires further analysis. *Id.* USFS also

verifies that BLM's leasing proposal includes all required stipulations. *Id.* If these

conditions are met, USFS may consent to BLM's leasing proposal. Finally, the

process shifts back to BLM to offer lands for oil and gas leasing through a lease

sale and awards leases to the "highest qualified bidder." 43 C.F.R. §§ 3924.5,

3925.10.

### 3. *Approval of Drilling Operations on Leased Land*

Before a lessee commences drilling operations or other surface-disturbing

activities on leased land, the lessee must submit an application for permit to drill

("APD") for each planned well site on the parcel. 43 C.F.R. § 3126.3–1(c). The

APD includes a surface use plan of operation describing the proposed drilling

program and addressing environmental hazards caused by the drilling and efforts

to mitigate those hazards. *Id.* § 3162.1–1(c), (d), (e). USFS reviews the surface

use plan of operation for compliance with NEPA and its implementing regulations

as well as USFS policies and procedures. 36 C.F.R. § 228.107(a). USFS may

approve the surface use plan of operation as submitted, approve it subject to specified conditions, or disapprove it. *Id.* § 228.107(b)(2). USFS then gives public notice of its decision on the surface use plan of operation and forwards the decision to BLM. *Id.* § 228.107(c), (d). BLM may approve the APD only after USFS approves the surface use plan of operation included therein. 30 U. S.C. § 226(g); 43 C.F.R. § 3162.3–1(h). Finally, even after the APD is approved, the lessee must supplement the surface use plan of operation if it seeks to conduct additional surface-disturbing operations on a particular well site that were not previously accounted for in the plan. 36 C.F.R. § 228.106(d).

## B. The Endangered Species Act

The Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.* also has bearing on what federal forest lands USFS and BLM may approve for oil and gas leasing. The ESA "is comprehensive legislation for the preservation of endangered species." *Bosworth*, 284 F. Supp. 2d at 83–84 (citing *Tenn. Valley Auth. V. Hill*, 437 U.S. 153, 180 (1978)). It requires the Secretary of Interior, acting through the FWS to list the fish, wildlife, or plant species that it determines are endangered or threatened. *Id.* at 84; 16 U.S.C. § 1533(a).

The ESA comes into play whenever USFS determines to make forest lands administratively available for leasing and whenever BLM later designates specific lands from all those administratively available that BLM plans to offer at a lease sale. The relevant agency (the "acting agency") must ensure that its leasing decision "is not likely to jeopardize the continued existence of" a listed

species or destroy or adversely modify a species' critical habitat. 16 U.S.C.
§ 1536(a)(2).

If the acting agency concludes that its planned leasing may jeopardize a
listed species or its critical habitat, then the acting agency must engage in formal
consultation with FWS. 50 C.F.R. § 402.14(a). At the conclusion of the formal
consultation, FWS issues a biological opinion in which FWS discusses in detail
the effects of the proposed action on listed species or critical habitats. *Id.*
402.14(g)–(h). If FWS concludes that the action will jeopardize the continued
existence of a listed species or critical habitat, then "the biological opinion must
set forth 'reasonable and prudent alternatives' aimed at avoiding such
consequences." *Bosworth*, 284 F. Supp. 2d at 84 (quoting 50 C.F.R.
§ 402.12(h)(3)).

If, on the other hand, the acting agency concludes that its leasing decision
is unlikely to jeopardize a listed species or critical habitat, then it may engage in
informal consultation with FWS to verify whether FWS concurs. 50 C.F.R.
§§ 402.12(k), 402.13. If FWS agrees with the acting agency's non-jeopardy
determination, then no formal consultation is required, and "the consultation
process is terminated . . . ." 50 C.F.R. §§ 402.12(b), 402.13(a).

Even after consultation terminates, however, whenever "new information
reveals effects of the action that may affect listed species or critical habitat in a
manner or to an extent not previously considered," "[r]einitiation of formal

consultation is required and shall be requested by the [action] agency or by [FWS]." 50 C.F.R. § 402.16.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from Plaintiffs' Amended Complaint, ECF No. 24, and the Federal Agencies' administrative records.

### A. The Wayne National Forest and the Marietta Unit

The Wayne National Forest, located in the foothills of the Appalachian Mountains in southeast Ohio, is Ohio's only national forest. Unlike other national forests, the Forest is a patchwork of private and federal land, with most of the land within its administrative boundary being privately owned. Nearly 240,000 of the Forest's approximately 875,000 acres of federal and private land is owned and managed by USFS. Approximately sixty percent of the federally owned surface of the Forest has privately owned minerals beneath it.

Three non-contiguous units—Athens, Ironton, and Marietta—comprise the Wayne National Forest. The Marietta Unit, the easternmost unit and the unit at issue here, consists of over three-quarters privately owned land.

In the Wayne National Forest, federal minerals underlie federal land and a small percentage of private land; private minerals also underlie both federal and private land.

### B. USFS's 2006 EIS and Forest Plan

In 2006, after over four years of planning and analysis, USFS approved a Final Revised Land and Resource Management Plan ("2006 Forest Plan" or

"Plan"), which guides the management of the Wayne National Forest, and an accompanying EIS.  To facilitate the creation of the 2006 Forest Plan and EIS, USFS relied on a 2004 Reasonably Foreseeable Development Scenario created by BLM that projected the total surface disturbance of new oil and gas wells in Wayne National Forest.  Neither the 2006 Forest Plan nor EIS considered effects of horizontal drilling and hydraulic fracturing ("fracking") methods, because those methods did not appear to be economically feasible at the time.

Prior to finalizing its 2006 Forest Plan and EIS, USFS received substantial public input, as required by NEPA: it held public meetings, developed a draft plan and draft EIS, received feedback on those drafts through public open houses, and responded to over 1,300 public comments on the drafts.  Additionally, USFS engaged in formal consultation with FWS.  The consultation focused on the Forest Plan's effect on the endangered Indiana bat and running buffalo clover. USFS engaged in informal consultation on other species believed to be present in the area, but USFS and FWS concurred that the activities incorporated in the 2006 Forest Plan was not likely to adversely affect those species.

On November 22, 2005, at the end of the formal consultation, FWS issued a biological opinion in which it concluded that allowing surface occupancy for oil and gas leases was not likely to jeopardize the Indiana bat and running buffalo clover or critical habitats present in the Wayne National Forest.  Specifically, FWS determined that USFS's no-surface-occupancy restriction on 13% of the Wayne National Forest, incorporated into USFS's proposed 2006 Forest Plan

and EIS, was sufficient to protect scenic, recreational, and wildlife areas and that the Plan contained sufficiently protective standards and guidelines for the remaining development sites.

In the final EIS, USFS announced that it would continue to make "all federally owned oil and gas rights within the Forest . . . administratively available for oil and gas leasing," and that it would subsequently review and authorize BLM to lease specific lands within the Forest. The EIS allowed surface occupancy on only 13% of the Wayne National Forest, but on up to 96% of the land in the Marietta Unit.

## C. Subsequent Information Bearing on the 2006 EIS and Forest Plan

In 2008, in light of emerging information about the white-nose syndrome[4] affecting the Indiana bat in several states, USFS issued a Supplemental Information Report ("2008 SIR")[5] to examine the effect on the 2006 Forest Plan on the Indiana bat. The 2008 SIR concluded that information related to white-nose syndrome was not significant new information requiring USFS to amend the 2006 Forest Plan or supplement the 2006 EIS, because the white-nose syndrome had not yet been discovered in Ohio or any adjacent states.

---

[4] Plaintiffs explain in their Complaint that white-nose syndrome is "a fatal disease affecting hibernating bats" in which bats are plagued by a "white fungus on their noses and on other hairless parts of their body. The disease causes bats to wake up from hibernation and fly outside their caves, causing untimely consumption of stored fat reserves, resulting in emaciation and increased mortality." Compl. ¶ 37.
[5] As counsel for the Federal Agencies explained in the hearing on the motion to supplement, an SIR is another tool that may be used for determining whether to conduct a NEPA analysis.

Later, in November 2011, public concern over fracking led USFS to request that BLM review and update the projections contained in its 2004 Reasonably Foreseeable Development Scenario, on which the 2006 Forest Plan and EIS relied. BLM concluded that USFS's 2006 Forest Plan and EIS did not require updating because current and anticipated surface disturbance, including that caused by horizontal drilling and fracking, fell below the 2006 forecast. After receiving this information from BLM, USFS conferred with FWS about whether to reinitiate ESA consultations, but both agencies agreed that further consultation was unnecessary.

In January 2012, USFS issued another SIR ("2012 SIR"), which determined that the environmental effects caused by horizontal drilling and fracking fell within the surface-disturbance limits analyzed in the 2006 EIS and accounted for in the 2006 Forest Plan. Consequently, USFS concluded that it was not required to conduct additional NEPA analysis on the effects of these oil and gas extraction methods.

### D. Oil and Gas Leasing in the Marietta Unit

In 2015, BLM proposed to lease up to 40,000 acres of federally owned minerals on specific parcels of the Marietta Unit of the Wayne National Forest. BLM undertook an EA to analyze the effect of its leasing proposal. In April 2016, BLM issued its draft EA for public comment.

On June 15, 2016, USFS consented to BLM's lease sale of approximately 2,718.58 acres of federal land in the Marietta Unit.

In October 2016, BLM issued a final EA and Finding of No Significant Impact (thus concluding that no additional NEPA analysis was required) for its 40,000-acre leasing proposal.

The Center for Biological Diversity appealed that decision to the Interior Board of Land Appeals ("IBLA") but dismissed the appeal after IBLA denied its request for a stay of the decision. In December 2016, BLM offered approximately 719 acres, spread over 17 parcels, for sale, and in March 2017, BLM offered an additional 1,147.10 acres, spread over 20 parcels, for sale. All Plaintiffs in this action appealed both of the sale decisions to IBLA but subsequently withdrew the appeals after their requested stay was denied.

### E. This Action

Plaintiffs instituted this action on May 5, 2017. In their Amended Complaint, Plaintiffs bring claims against USFS for (1) violating NEPA and the APA by consenting to BLM's leasing proposals without conducting additional NEPA analysis (specifically, without preparing a supplemental EIS), and (2) violating the ESA for failing to consult or complete consultation with FWS prior to consenting to BLM's leasing proposals. They also bring claims against BLM for (1) violating NEPA by preparing an "unlawful" EA and Finding of No Significant Impact instead of preparing an EIS prior to making its leasing decisions, and (2) violating the ESA for failing to consult or complete consultation with FWS prior to making its leasing decisions. Finally, Plaintiffs allege that USFS, BLM, and FWS violated the ESA by failing to reinitiate consultation regarding the conclusions

reached in FWS's 2005 biological opinion, because new species were
designated by FWS as threatened or endangered after USFS issued its 2006
Forest Plan and EIS.

      After the Federal Agencies lodged their administrative records with the
Court, Plaintiffs moved for supplementation of each record. The motion is ripe
for review.

### III. STANDARD OF REVIEW

      Under the APA, judicial review of NEPA and ESA compliance is confined
to the agency's whole administrative record or those parts of it cited by a party.
*Sierra Club v. Slater*, 120 F.3d 623, 638 (6th Cir. 1997) (citing 5 U.S.C. § 706).
The "whole record" includes "materials compiled by the agency at the time its
decision was made." *Latin Ams. for Soc. & Econ. Dev.*, 756 F.3d at 464–65
(citing *Slater*, 120 F.3d at 638). These materials include "the order involved, any
findings or reports on which that order is based, and 'the pleadings, evidence,
and other parts of the proceedings before the agency." *Am. Wildlands v.
Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008) (quoting Fed. R. App. P.
16(a)). The Court's role in reviewing the administrative record is to "ensure that
the agency has adequately considered and disclosed the environmental impacts
of its actions and that its decision is not arbitrary or capricious." *Ky. Riverkeeper,
Inc. v. Rowlette*, 714 F.3d 402, 407 (6th Cir. 2013) (quoting *Balt. Gas & Elec.
Co.*, 462 U.S. at 97–98).

The agency's designation of its administrative record is entitled to a strong presumption of regularity. *Hickey v. Chadick*, No. 2:08-cv-0824, 2009 WL 3064445, at *2 (S.D. Ohio Sept. 18, 2009) (citing *Sara Lee Corp. v. Am. Bakers Ass'n*, 252 F.R.D. 31, 34 (D.D.C. 2008)). "The court assumes the agency properly designated the Administrative Record absent clear evidence to the contrary." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993). The district court may exercise its discretion to supplement the administrative record only under "exceptional circumstances." *Charter Tp. Of Van Buren v. Adamkus*, No. 98-1463, 1999 WL 701924, at *4 (6th Cir. Aug. 30, 1999) (citing *Slater*, 120 F.3d at 638); *Lands Council v. Powell*, 395 F.3d 1019, 1029 (9th Cir. 2005) ("Were the federal courts routinely or liberally to admit new evidence when reviewing agency decisions, it would be obvious that the federal courts would be proceeding, in effect, de novo rather than with the proper deference to agency process, expertise, and decision-making."). "The court assumes the agency properly designated the Administrative Record absent clear evidence to the contrary." *Partners in Forestry Co-op. v. U.S. Forest Serv.*, 45 F. Supp. 3d 677, 682 (W.D. Mich. 2014), *aff'd sub nom. Partners in Forestry Co-op., Northwood All., Inc. v. U.S. Forest Serv.*, 638 F. App'x 456 (6th Cir. 2015) (quoting *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10 Cir. 1993)). Ultimately, Plaintiffs bear the burden of justifying supplementation. *Latin Ams. For Soc. & Econ Dev.*, 756 F.3d at 465.

## IV.    DISCUSSION

Plaintiffs seek to supplement all three Federal Agencies' administrative records.  They argue that USFS's and FWS's administrative records should be supplemented with the public comments (including the studies attached to them) that were submitted to BLM during the notice and comment period to its April 2016 draft EA.  The public comments are included in BLM's administrative record lodged with the Court; but Plaintiffs contend that they should also comprise part of USFS's and FWS's administrative records, because Plaintiffs also sent them to USFS and FWS during the relevant time period.  Additionally, Plaintiffs contend that all three Federal Agencies' administrative records should be supplemented with an APD submitted to BLM in August 2017.  The Court addresses the completeness of each Federal Agency's administrative record in turn.

### A. Supplementing USFS's Administrative Record with Public Comments on BLM's Draft EA

Plaintiffs argue that in order for the Court to properly adjudicate its claim against USFS, its administrative record should be supplemented with public comments responding to BLM's April 2016 draft EA.  Contained in the public comments are: (1) requests to both BLM and USFS to prepare additional environmental analysis for BLM's proposed leasing based on the agencies' purported failure to address issues related to fracking and horizontal drilling in the 2006 EIS and Forest Plan, and (2) emails with attached studies regarding

adverse environmental effects caused by oil and gas development and fracking.
Am. Mot. 10–11, ECF No. 61. Plaintiffs contend that these comments should be
added to USFS's administrative record under two exceptions to the presumption
of regularity afforded to an agency's designation of its administrative record:
(1) the comments were deliberately omitted from USFS's record, or (2) the
comments provide background information for the Court to determine whether
USFS considered "all relevant factors" before consenting to BLM's leasing
proposal.

### 1. Negligent or Deliberate Omission

The Sixth Circuit has allowed courts to supplement an agency's
administrative record when a plaintiff shows that the agency "deliberately or
negligently excludes certain documents" from its record. *Slater*, 120 F.3d at 638.
For this exception to apply, the plaintiff must show that the "evidence . . . should
have been properly a part of the administrative record but was excluded," either
negligently or deliberately, "by the agency." *Dist. Hosp. Partners, L.P. v.
Sebelius*, 971 F. Supp. 2d 15, 20 (D.D.C. 2013), *aff'd sub nom. Dist. Hosp.
Partners, L.P. v. Burwell*, 786 F.3d 46 (D.C. Cir. 2015) (citation omitted). If
evidence was properly before the agency when it made its decision, the agency
may not exclude it "simply because it did not rely on it for its final decision." *Dist.
Hosp. Partners, L.P. v. Sebelius*, 971 F. Supp. 2d 15, 20 (D.D.C. 2013), *aff'd sub
nom. Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46 (D.C. Cir. 2015) (citation
omitted). Nor may the agency "skew the record by excluding unfavorable

information but must produce the full record that was before the agency at the time the decision was made." *Id.* (quoting *Blue Ocean Inst. v. Gutierrez,* 503 F.Supp.2d 366, 369 (D.D.C.2007)). But to carry its burden under this exception, a plaintiff must "introduce non-speculative, concrete evidence to support their belief that the specific documents allegedly missing from the administrative record were directly or indirectly considered by the actual decision makers involved in the challenged agency action." *Dist. Hosp. Partners, L.P. v. Sebelius,* 971 F. Supp. 2d 15, 20 (D.D.C. 2013), *aff'd sub nom. Dist. Hosp. Partners, L.P. v. Burwell,* 786 F.3d 46 (D.C. Cir. 2015) (citation omitted).

Plaintiffs fail to demonstrate that this exception applies because they cannot show that the public comments were before USFS at the time it consented to BLM's leasing proposal and, thus, were properly a part of USFS's administrative record. Plaintiffs contend that the public comments were properly before USFS because they and other members of the public emailed the comments to USFS with the intent that it would consider them before it consented to the leasing proposal. Moreover, Plaintiffs contend, the comments are properly part of USFS's administrative record because both USFS and BLM "considered essentially the same action—whether to allow oil and gas leasing in the Wayne National Forest." Am. Mot. 11, ECF No. 61.

Plaintiffs' argument glosses over the crucial division of responsibilities between USFS and BLM in the leasing process. Even if both agencies' decisions had bearing on the same action—allowing oil and gas leasing on

specific parcels in the Marietta Unit—each agency's role in the decision-making process regarding that action is distinct.    BLM was required by regulation to consider and respond to the public comments submitted to it during the 30-day comment period on its draft EA.  There is no public comment process applicable to USFS's consent decision, however.  USFS was obligated only to review BLM's leasing proposals and verify whether the likely environmental consequences from such leasing were adequately addressed in its existing 2006 Forest Plan and EIS.

The division of decision-making responsibility controls the outcome here. Although the Court questions the wisdom behind such a policy, because there is no requirement that USFS consider public comments submitted to BLM, and because Plaintiffs present no evidence that USFS actually or likely considered the public comments submitted to BLM, the Court finds that the public comments were not properly before USFS and USFS did not negligently or deliberately omit them from its administrative record.  *Cf. Latin Ams. for Soc. & Econ. Dev.*, 756 F.3d at 474–75 (finding that the district court did not abuse its discretion when it denied the plaintiff's motion to supplement Federal Highway Administration's administrative record with a study that was prepared by the Canadian government to determine how it would meet its financial responsibilities for a project under consideration and that was not considered by the Federal Highway Administration when it determined how the project should proceed).

## 2. Background Information Pertinent to "All Relevant Factors"

The Sixth Circuit also allows supplementation of an agency's administrative record when, even if the records were not considered by the agency, they provide helpful background information that helps the court "determine whether the agency considered all of the relevant factors" to its decision. *Slater*, 120 F.3d at 638. Courts have allowed supplementation under this exception when the agency's "failure to explain [its] administrative action . . . frustrate[s] effective judicial review." *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 285 (D.C. Cir. 1981) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Even when the documents sought to be admitted might create a "fuller record," however, they should not be admitted if the issues they address are already contained in the record. *Southwest Ctr. For Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1451 (9th Cir. 1996); *see also Partners in Forestry Co-op. v. U.S. Forest Serv.*, 45 F. Supp. 3d 677, 682–83 (W.D. Mich. 2014), *aff'd sub nom. Partners in Forestry Co-op., Northwood All., Inc. v. U.S. Forest Serv.*, 638 F. App'x 456 (6th Cir. 2015) (denying supplementation when much of the information contained in the document the plaintiffs sought to add to the record was already "captured in other documents that [were] part of the Administrative Record"). Rather, the evidence must be "*necessary* for adequate judicial review .

. . ." *Partners in Forestry Co-op. v. U.S. Forest Serv.*, 45 F. Supp. 3d 677, 683 (W.D. Mich. 2014) (emphasis added).

Courts also allow supplementation under this exception when the information provides clarification regarding technical terminology that the court needs to understand when evaluating the agency's action. *See Costle*, 657 F.2d at 285; *Adamkus*, 1999 WL 701924, at *4 (upholding the district court's decision not to supplement the record with certain evidence as background information when the district court concluded it was already familiar with the technical terms in the case and the information presented in the evidence was already in the record).

If a court finds the agency's record is inadequate, it "may 'obtain from the agency, either through affidavits or testimony, such additional explanations of the reasons for the agency decision as may prove necessary.'" *Costle*, 657 F.2d at 285 (citation omitted). This new information must be "merely explanatory of the original record and should contain no new rationalizations." *Id.* Once the agency action is adequately explained, if the court determines that it cannot be sustained on the record itself, the court must vacate the action and remand the issue back to the agency for further consideration. *Id.* Accordingly, under this exception, the Ninth Circuit permitted testimony by two expert witnesses at trial who "elucidated the process by which the [agency] reached its decision" and provided technical information and clarification regarding smelting operations. *Asarco, Inc. v. U.S. Envtl. Protection Agency*, 616 F.2d 1153, 1161 (9th Cir. 1980). In so doing, the

court made clear, however, that "[c]onsideration of the evidence to determine the *correctness* or wisdom of the agency's decision [was] not permitted, even when the court has also examined the administrative record." *Id.* at 1160 (emphasis added).

Plaintiffs aver that the public comments will assist the Court in determining whether USFS considered all relevant factors before consenting to BLM's leasing proposal. There are four categories of information contained in the public comments that Plaintiffs contend USFS failed to consider before consenting: (1) specific types of surface disturbance caused by horizontal drilling, (2) surface contamination, (3) air pollution from fracking, and (4) threats to the Indiana bat. According to Plaintiffs, these four categories of environmental effects caused by horizontal drilling and fracking were not addressed in USFS's 2006 Forest Plan and EIS or any subsequent USFS documents (including the 2012 SIR) analyzing the effects of oil and gas leasing in the Wayne National Forest.

USFS responds that analysis as to each of these four categories of environmental effects is contained in the administrative record. Therefore, USFS asserts that the public comments and attached references submitted to BLM do not provide information related to the environmental consequences of oil and gas leasing that is not already contained in the record. The Court agrees.

Here, Plaintiffs conflate the need for supplementation with the underlying merits of their claim. "This is not a case where the agency failed "to explain administrative action [so] as to frustrate effective judicial review." *James*

*Madison Ltd. By Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996). It
appears that the Court will not need additional background information to
determine whether the agency adequately considered the effects of horizontal
drilling. To the contrary, any dearth of information in USFS's record regarding
the effects of horizontal drilling may inform the Court's ultimate decision on the
merits, but such a determination is not properly before the Court at this juncture.
*See e.g., Pacifcans for a Scenic Coast v. Cal. DOT*, 2016 U.S. Dist. LEXIS
55672, at *7 (N.D. Cal. Apr. 25, 2016) (denying Plaintiffs' request to add emails
to the record because "whether the agencies' assessment of the evidence was
'incorrect' isn't the point: courts 'may not look to [extra-record] evidence as a
basis for questioning the agency's scientific analyses or conclusions.'").

However, because the merits of the case are not properly before the Court
at this stage, it cannot conclude with certainty that additional background
information will not be required in the future. The Court will address the propriety
of any future motion to supplement in due course, but the present motion is
denied because even if the Court later permits supplementation, public
comments are not the types of information that have been used to provide
additional background. *See, e.g., Costle*, 657 F.2d at 285 ("When a record is
inadequate, a court may obtain from the agency, either through affidavits or
testimony, such additional explanations of the reasons for the agency decision as
may prove necessary.").

### B. Supplementing FWS's Administrative Record with Public Comments on BLM's Draft EA

Plaintiffs assert that FWS's record should be supplemented with the public comments submitted to BLM because those comments address whether FWS should have reinitiated consultation with USFS or BLM regarding BLM's leasing proposal.  Plaintiffs maintain that those comments were sent to FWS at the same time they were sent to USFS and BLM and that they are therefore part of FWS's record.  Therefore, according to Plaintiffs, FWS deliberately omitted from the record comments that it did or could have relied upon when determining not to reinitiate consultation.  Alternatively, Plaintiffs contend that their claim against FWS is a "failure to act" claim, and that the Court's review of such claims is not confined to any administrative record in existence at any set point in time.

FWS argues that the public comments are not part of its administrative record because there was no agency decision making process before FWS to consider when Plaintiffs and other members of the public sent the EA public comments to FWS.  Specifically, FWS explains that while it may request another agency to reinitiate consultation, it may not compel the agency to do so; consequently, FWS maintains that any request or failure to request that another agency reinitiate consultation does not implicate a deliberative process that would be supported by an administrative record.

For the same reasons the Court concluded that USFS did not deliberately omit from its administrative record public comments regarding BLM's draft EA,

the Court also finds that FWS did not omit the same comments from its administrative record.  And, setting aside the parties' arguments whether FWS in fact had any authority to compel re-initiation (and, hence, whether Plaintiffs have a valid claim against FWS), Plaintiffs alternative theory, that this is a "failure to act" claim, does not support supplementation either.

Federal review of claims to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. 706(1), is not confined to the administrative record in existence "at any single point in time, because there is no final agency action to demarcate the limits of the record." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000) (citation omitted).  On this basis Plaintiffs assert that public comments pertaining to another agency's decision-making process are also pertinent to FWS's alleged failure to act.  But case law allowing supplementation of an agency's record under this theory does not support Plaintiffs' request to supplement FWS's record with evidence *created by Plaintiffs* and other outside members of the public.  Instead, it supports supplementation with documents in possession of the agency itself.  *See, e.g.*, *id.* (permitting USFS to supplement its administrative record with an additional report prepared by the agency after federal litigation commenced that provided further explanation of the agency's decision not to supplement its EIS).  The Court's own review of case law turned up no case in which a court permitted the plaintiffs to supplement an agency's administrative record with public comments pertaining to a *different* agency's action (here, BLM's draft EA) that were submitted to the

agency at issue (here, FWS) without solicitation and without any open notice and comment process before it. The law, in short, does not appear to support Plaintiffs request to supplement FWS's record with public comments.

### C. Supplementing each Federal Agencies' Administrative Record with an August 2017 APD

Finally, Plaintiffs argue that all three Federal Agencies' administrative records should be supplemented with an APD submitted to BLM by Eclipse Resources in August 2017 on the grounds that it is "newly discovered evidence which undermines the soundness" of the Marietta Unit leasing decisions. Am. Mot. 20, ECF No. 61 (quoting *Sierra Club v. U.S. Army Corps of Engineers*, 935 F. Supp. 1556, 1566 (S.D. Ala. 1996)). The APD, according to Plaintiffs, demonstrates that the estimates of surface disturbance caused by gathering lines, well sites, and access roads included in USFS's 2012 SIR and BLM's EA are "far below" the figures estimated for the drilling activities described in the APD. Therefore, Plaintiffs contend that the APD should be added to all three Federal Agencies' administrative records, because it provides evidence that oil and gas leasing in the Marietta Unit was approved without adequate environmental analysis.

The Federal Agencies respond that the APD is a prospective proposal from a lessee, which is subject to modification by BLM. *See* 43 C.F.R. § 3162.3–1(h). The Federal Agencies maintain that the figures contained in the APD are subject to change after the USFS and BLM review it further and, therefore, that it

cannot be relied upon as evidence that any prior environmental analyses of the environmental impacts of oil and gas leasing were unsound. In any event, the Federal Agencies assert, the APD does not undermine the Marietta Unit leasing decisions because the surface disturbance projections contained therein still fall below the maximum surface disturbance allowed on federal land under the 2006 EIS and Forest Plan.

The Sixth Circuit has allowed courts to consider new "materials supplementary to the administrative record in order to determine the adequacy of the government agency's decision, even when the court's scope of review is limited to the administrative record." *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1427 (6th Cir. 1991).

The court found this exception applicable based on the unique circumstances of the case. There, the court reviewed a consent decree between the Environmental Protection Agency ("EPA") and certain defendants. The district court declined to consider an affidavit that was not part of the administrative record, finding that its review of the consent decree was confined to the administrative record only. The Sixth Circuit reversed the district court's decision, finding its failure to consider the affidavit "erroneous under the circumstances of this case." *Id.* at 1427. The court emphasized that CERCLA,[6]

---

[6] "CERCLA" is the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, which applies "primarily to the cleanup of leaking inactive or abandoned sites and to emergency responses to spills." *Id.* at 1471.

the law governing the creation of the consent decree, "specifically provides that the State in which a remedial action plan is to be implemented should be given a reasonable opportunity to review and comment on the supporting technical data and engineering design of the plan." *Id.* at 1427 (citation omitted). CERCLA also provided a period of time for public comment before court entry of a consent decree as final judgment. *Id.* And the affidavit in question "was filed over one month before the district court held a hearing . . . to consider approval of consent decree." *Id.* The court found that, "[i]n light of the congressional intent expressed in the statute that public comment and state participation are to be encouraged and considered, . . . the district court improperly refused to accept the affidavit . . . ." *Id.* The affidavit, the court explained, should have been considered by the district court, "but only for the purpose of determining the adequacy of the EPA's decision, not in order to determine whether the decision was the best one available." *Id.* at 1429. In other words, the court emphasized, the addition of the affidavit should not turn the review process into a de novo one. *Id.*

The court reached this decision with hesitation, noting the Supreme Court's concerns in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.* that:

> Administrative consideration of evidence . . . always creates a gap between the time the record is closed and the time the administrative decision is promulgated . . . . If upon the coming down of the order litigants might demand rehearing as a matter of law because some new circumstance has arisen, some new trend has been observed, or

> some new fact discovered, there would be little hope that the
> administrative process could ever be consummated in an order that
> would not be subject to reopening.

435 U.S. 519, 554–55. Because of these concerns, the Sixth Circuit's exception

for supplementation of the record with new evidence was limited to "the

circumstances of this case." *Id.* at 1427.

The unique circumstances justifying supplementation of the record with

new evidence in *Akzo* do not exist in this case. The APD is not a final document

reflecting agency-approved oil and drilling actions. Rather, it is a "prospective

proposal from a lessee, the review of which is still ongoing and over which the

BLM retains full authority to grant, modify, or deny." Resp. 19, ECF No. 66.

Because the surface use plan of operation contained in the APD is subject

to change by USFS and FWS, it will not help the Court in reviewing the adequacy

of the Federal Agencies' decisions.

The case Plaintiffs primarily rely on to support their position, *Sierra Club*,

935 F. Supp. 1556, is inapposite. Applying the *Azko* rule, the court in *Sierra Club*

reviewed extra-record evidence that took the form of statements made by

members of the decision-making body that seemed to explicitly acknowledge that

the decision-makers failed to consider all the relevant factors they were

statutorily required to review before making their decision. *See id.* at 1566–67

(referring to statements made by the City's mayor and others having decision-

making authority over where to construct a baseball stadium indicating that those

individuals ignored alternative locations even though the applicable statute

required them to consider such alternatives). As those statements were made by the decision-makers themselves, the Court allowed the statements into evidence to help the Court determine the "soundness of the [City's] decision." *Id.* at 1566 (citing *Akzo Coatings*, 949 F.2d at 1429).

The APD that Plaintiffs seek to add to the Federal Agencies' records, on the other hand, is not a document created by the Federal Agencies. Instead, it is created by the lessee and is subject to USFS's and BLM's review and final approval. Because the information contained in the APD is subject to revision by USFS and BLM, for the purpose of ensuring conformity with its 2006 Forest Plan and EIS and other NEPA documents, the APD does not show that the Federal Agencies failed to adequately assess the environmental consequences of allowing oil and gas leasing in Wayne National Forest in those documents.

For reasons already stated, the APD will not aid the Court in reviewing the soundness of any of the Federal Agencies' decisions.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion to supplement all of the Federal Agencies' administrative records is **DENIED**. The Clerk is directed to terminate ECF No. 59 from the Court's pending motions list.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**