**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

CENTER FOR BIOLOGICAL DIVERSITY,
et al.,

        Plaintiffs,                          No. 2:17-cv-00372-MHW-KAJ

v.                                       Judge Watson
                                       Magistrate Judge Jolson

U.S. FOREST SERVICE, et al.

        Defendants

v.

AMERICAN PETROLEUM INSTITUTE, et al.,

        Intervenor-Defendants.

**INTERVENOR-DEFENDANT ECLIPSE RESOURCES I, LP'S CROSS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56, Intervenor-Defendant Eclipse Resources I, LP ("Eclipse") moves this Court for an order entering summary judgment against Plaintiffs Center for Biological Diversity, Ohio Environmental Council, Heartwood, and Sierra Club ("Plaintiffs") and denying Plaintiffs' claims for relief. A Memorandum in Support of this motion is attached hereto.

                                                  Respectfully submitted,

                                                  **VORYS, SATER, SEYMOUR & PEASE, LLP**

                                                  */s/ Anthony L. Osterlund*
                                                  Kristin L. Watt (0042333)
                                                  52 East Gay Street
                                                  Columbus, OH 43216-1008
                                                  Tel: (614) 464-8398
                                                  Fax: (614) 719-5081
                                                  klwatt@vorys.com

        Anthony L. Osterlund (0071086)
        301 East Fourth Street
        Suite 3500, Great American Tower
        Cincinnati, OH 45202
        Tel: (513) 723-4678
        Fax: (513) 852-7830
        alosterlund@vorys.com

        *Attorneys for Intervenor-Defendant Eclipse*
        *Resources I, LP*

**MEMORANDUM IN SUPPORT**

**I.  PRELIMINARY STATEMENT**

This Court should reject Plaintiffs' efforts to invalidate leases Eclipse lawfully purchased via a Bureau of Land Management ("BLM") auction bidding process.  The "site specific" environmental review that Plaintiffs now seek occurs every time a lessee, including Eclipse, seeks to exercise its lease rights.  These site-specific reviews are not required to occur earlier.  Moreover, invalidating the leases would terminate private rights established by a lawful process in accordance with the requirements of the National Environmental Policy Act ("NEPA") and would harm Eclipse.  The actual harm to Eclipse, based on its past lawful actions, outweighs any alleged, unknown, potential future harms to Plaintiffs or to the environment.

**II.  FACTUAL BACKGROUND**

Eclipse is an oil and gas exploration and production company focused on applying state of the art technologies and constant innovation to the unconventional resources in the Appalachian region.  *See* Declaration of Hamsher, ¶ 3 ("Hamsher Decl.") (attached as Exhibit 1 hereto).  Since 2011, Eclipse has been acquiring oil and gas leasehold interests in the Utica and Point Pleasant shale formations across eastern Ohio.  (*Id.*, ¶ 4.)  Eclipse understands that long-term success requires operating "with environmental integrity," and environmental, health, and safety management practices "are an indispensable part of [its] commitment to excellence." (Montage Resources, *Environmental Excellence,* http://www.eclipseresources.com/environmental-excellence/).

Eclipse paid roughly $4.6 million for leasing rights to approximately 1,500 acres of federally-owned minerals in the Wayne National Forest ("WNF") during the 2016 and 2017 BLM auctions.  (*Id.*, ¶ 6.)  After obtaining these leases, Eclipse invested additional significant resources to explore and develop its lease interests.  (*Id.*)  Eclipse has current and future exploration and

1

development plans for its substantial investments in the WNF leases, which include the use of horizontal drilling and hydraulic fracturing. (*Id.*, ¶ 11.)

As part of the leasing process and the subsequent permitting process, NEPA requires multiple stages of analyses and conclusions by the Federal Defendants, all of which were properly carried out by the U.S. Forest Service ("USFS") and BLM. Plaintiffs argue that: BLM's 2016 EA was insufficient because neither USFS nor BLM took a "hard look" at environmental impacts of horizontal well development that could result from BLM's lease decisions; and that the agency should have analyzed these impacts in an Environmental Impact Statement ("EIS"). (Doc. 83, PageID# 6184.) However, as the Federal Defendants' Cross Motion explains, site-specific analyses are not required at the leasing stage, before site-specific information and effects are known. (Doc. 92, PageID# 6625-6629.)

Once a lessee requests an application for permit to drill ("APD"), BLM conducts additional analyses regarding the direct, indirect, and cumulative effects of the proposed activity on the environment at the specific site requested. Eclipse has prepared two APDs for the drilling of two proposed horizontal natural gas wells (Rolland A 1H and Rolland B 3H), to be located on private surface estate/private mineral estate on an existing well pad in the WNF. (Hamsher Decl., ¶ 14.)

BLM approved Eclipse's APDs in a decision record issued on October 31, 2018, which it supported with a Final Environmental Assessment ("the 2018 EA") and Finding of No Significant Impact ("FONSI"). (*Id.*, ¶ 15.) Rather than considering the entire area to be affected by all the WNF leases, the 2018 EA's analysis "focuses on the relevant resources and issues related to the [permitting of the two wells], and therefore **only those elements of the affected environment that have the potential to be affected are analyzed in detail**." (*Id.*)(emphasis added).

2

The 2018 EA for the two Eclipse APDs states that it "provides site-specific analysis of potential environmental impacts that could result from the implementation of the Proposed Action [of permitting the two wells] or the No Action Alternative." (*Id.*, Ex. C.) Based on the 2018 EA and supporting documents, BLM determined that the Proposed Action, the two proposed horizontal natural gas wells, was "not a major Federal action, and will not significantly affect the quality of the human environment, individually or cumulatively, with other actions in the general area." (*Id.*, ¶ 15.)

### III. ARGUMENT

#### A. BLM And USFS Oil And Gas Lease Approvals Did Not Violate NEPA.

BLM and USFS did not fail to take a "hard look" at direct and indirect effects of horizontal well development prior to approving individual APDs, because review at the preliminary leasing stage is intentionally broad to cover a wide range of possibilities and need not be site-specific. BLM-44324 ("Since the Forest Plan does not authorize, fund or implement any site-specific actions, the EIS is appropriately broad in nature and does not analyze site-specific effects.") The 2006 Forest Plan EIS and 2012 Supplemental Information Report ("SIR"), on which BLM based the 2016 EA, considered the potential disturbed acreage that could result from both traditional and horizontal drilling. BLM-44326. The USFS concluded that no supplemental EIS was necessary and that the potential environmental effects were within the estimates considered in the 2006 Forest Plan EIS. FS-5724.

The fact that BLM did not consider site-specific impacts in preparing its 2016 EA was not a failure to take a "hard look." BLM followed the normal, lawful procedures. The individual, <u>site-specific</u> "hard look" has now occurred, and will continue to occur, when BLM considers site-specific impacts in its reviewing future APDs. Additionally, the acreage expected to be disturbed

3

from the two Eclipse projects approved in the October 31, 2018 Record of Decision is well below the limits of the disturbed acreage that USFS considered in the 2006 Forest Plan.

### 1. The disturbed acreage from Eclipse's approved APDs is well below the disturbed acreage contemplated by the agencies.

Plaintiffs argue that the USFS's 2012 SIR and BLM's 2016 EA underestimate the acreage that would need to be cleared for a horizontal well site. (Doc. 83, PageID# 6200). However, the acreage to be disturbed by Eclipse's two approved drilling projects dispels this argument. Plaintiffs assume that 28 acres must be cleared for a horizontal site and 1.1 acres cleared for a vertical site. (Doc. 83, PageID# 6199.) BLM, in considering public concerns regarding horizontal drilling, reviewed the 2006 Reasonably Foreseeable Development Scenario ("RFDS") from the Forest Plan and determined that horizontal well pad sites disturb 3 - 5.5 acres before reclamation, and vertical well pad sites disturb .69 - 1.1 acres before reclamation. FS-5641-42. Moreover, as the Federal Defendants' Cross Motion explains, the disturbed acreage *per well* is less for horizontal wells than vertical wells, given that each pad accommodates up to eight wells. (Doc. 92, PageID# 6631.)

As Eclipse's **first two approved wells result in <u>zero</u> acres of new surface disturbance**, the actual average disturbed acreage per well will be even less than the Federal Defendants' original estimates. (Hamsher Decl., Ex. C.) The natural gas wells proposed in Eclipse's two APDs will not require *any* new surface disturbance because the new wells will be drilled from an existing well pad. (*Id.*) Further, all surface activities in connection with the drilling of the two wells will be on privately owned surface. *Id.* The USFS and BLM projections relied upon in assessing and analyzing the likely disturbance resulting from horizontal wells assumed that the well pad sites would be newly constructed. *See* FS-5641. That, however, is not the case.

Eclipse's first two wells resulted in no surface disturbance. (*See* Hamsher Decl., Ex. C.) Given the cost savings in avoiding forest clearing and developing new well pads, existing well pads

4

will likely be used whenever available. And some wells, including Eclipse's first two approved wells, will be located on private surfaces and/or areas where well pads already exist. Based on this actual experience, it is all the more likely that the total disturbed acreage will fall below the 2006 Forest Plan projections. The Federal Defendants did not fail to take a "hard look" at the impacts of horizontal gas wells.

### 2. The decision to grant Eclipse's APDs was the appropriate stage for site-specific analyses of the environmental impacts of horizontal drilling.

Notwithstanding that the actual acreage disturbed by horizontal drilling is likely to be well below the projected disturbed acreage, the 2018 EA approving Eclipse's APD was the appropriate stage for site-specific inquiry. Because Eclipse plans to extend an existing lateral into the federal leasehold, Eclipse must file an application for and obtain a permit prior to drilling. 43 C.F.R. § 3162.3-1(c). A complete APD consists of a drilling plan, a surface use plan of operations, and other required information. 43 C.F.R. § 3162.3-1(d). Such plans must describe or contain, as applicable, the "road and drillpad location, details of pad construction, methods for containment and disposal of waste material, plans for reclamation of the surface, and other pertinent data as the authorized officer may require." 43 C.F.R. § 3162.3-1(f). Before approving operations on the leasehold, BLM must determine, among other things, that "the proposed plan of operations is sound both from a technical and environmental standpoint." 43 C.F.R. § 3161.2. And, BLM must "prepare an environmental record of review or an environmental assessment, as appropriate. These environmental documents will be used in determining whether or not an environmental impact statement is required and in determining any appropriate terms and conditions of approval." 43 C.F.R. § 3162.5-1(a).

When Eclipse submitted its APDs proposing the drilling of two horizontal natural gas wells, BLM considered and analyzed site-specific information. (*See* Hamsher Decl., ¶ 15.) The 2018 EA

5

supporting BLM's decision to approve the APDs "focuses on the relevant resources and issues related to the [permitting of two wells], and therefore only those elements of the affected environment that have the potential to be affected are analyzed in detail." (*Id.*)  The 2018 EA also "provides site-specific analysis of potential environmental impacts that could result from the implementation of the Proposed Action or the No Action Alternative." (*Id.*, Ex. C.)  Plaintiffs ignore this analysis, which occurs at the appropriate time for each site-specific action.

The specific language and discussion in the EA approving Eclipse's APDs illustrates the Federal Defendants' argument that impacts of surface-disturbing activities are "analyzed in a separate environmental review during the APD stage." (Doc. 92, PageID# 6630.)  This APD stage has occurred for two wells and BLM has, in fact, conducted the site-specific analysis to which Federal Defendants refer in their brief.

      **B.**     **Plaintiffs Are Not Entitled To Have Any Eclipse Leases Vacated Because The Costs of Such a Remedy Outweigh Any Benefit.**

Even if the Federal Defendants had violated NEPA and the ESA—and they have not—vacating Eclipse's leases is an inappropriate remedy; it would be disruptive and a balance of the equities weighs against vacatur.  As Intervenor-Defendant American Petroleum Institute argues in its Cross Motion for Summary Judgment, a request that the issued leases be vacated constitutes a request for permanent injunctive relief.  Such relief would be an extraordinary remedy that should not be awarded unless Plaintiffs establish that they would, on balance, suffer greater harm than Eclipse and the other leaseholders.  Given Eclipse's enormous investment based on lawful actions, Plaintiffs cannot show that their harm would be greater than Eclipse's.

Moreover, Plaintiffs' alleged harm is speculative.  The 2006 Forest Plan, 2012 SIR, and 2016 EA evaluated the environmental impacts associated with developing all acres available for leasing, as required by NEPA.  Plaintiffs allege that their harm results from failure to sufficiently

6

consider site-specific impacts on the environment. Because the agencies analyze site-specific impacts for each APD at a later stage, Plaintiffs' allegations of harm based on the lack of site-specific impacts at the leasing stage are speculative.

Even if the Court does not treat vacatur of the leases as a permanent injunction, the Court should consider whether it is equitable to vacate the leases. Courts have held that, as equity requires, a reviewing court has discretion to leave an agency action in place, depending on the seriousness of the deficiencies in the agency action and the disruptive consequences of vacating the prior approval. *Advocates for Hwy. & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005); *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 94, 103, 109 (D.D.C.2017) (determining that vacatur was an inappropriate remedy where agency largely complied with NEPA and there was a serious possibility the agency would be able to substantiate its decision to produce an EA rather than an EIS).

Here, vacatur is inappropriate based on both factors: any deficiencies in the agency action were not serious (particularly given the later site-specific evaluation done with the Eclipse APDs) and the consequences of vacating the prior approval would be extremely disruptive. Given that the impact of Eclipse's first two wells is well below the level USFS projected, and the total environmental impact of the leases will also likely be well below the projected limits, there is a serious possibility that BLM could substantiate its decision to produce an EA rather than an EIS. Moreover, just because leases are purchased does not mean APDs will be sought or issued. Unless those APDs are issued and acted upon, there is no environmental impact. This supports the reason, and need, for individual site-specific evaluations at the post-leasing APD stage.

Vacating the leasing would be disruptive to Eclipse and would result in substantial losses that greatly outweigh any potential losses to Plaintiffs or the environment.

### 1. Eclipse would suffer substantial losses if its leases are invalidated.

If this Court invalidates Eclipse's leases, Eclipse will lose its significant invested resources. Eclipse purchased 30 federal leases in the WNF for approximately $4.6 million.  (*See* Hamsher Decl., ¶ 6.)  Since acquiring these leases, Eclipse has continued to spend money on exploring and developing its lease interests.  (*Id.*, ¶ 10.)  Eclipse has also spent time and resources preparing and obtaining two APDs for drilling of two proposed horizontal natural gas wells.  (*Id.* ¶ 14.)

Vacating the leases would also significantly interfere with Eclipse's ability to develop its interests, risking millions of dollars in resources.  (*Id.*, ¶ 17.)  In addition to the funds already spent, Eclipse would lose its expected future payout from its exploration and development plans.  (*See id.*, ¶ 11.)  Renewing the lengthy NEPA and ESA review processes could substantially delay Eclipse's ability to receive the benefit of its bargain from its lease acquisitions.  (*Id.*, ¶ 18.)  Eclipse may be required to continue to make rental payments on the land even when it cannot develop it.  (*Id.*, ¶ 19.)  Further, invalidating the leases jeopardizes Eclipse's entire business and the jobs of the 173 Eclipse employees.  (*Id.*, ¶ 20.)  This Court should not vacate Eclipse's leases because the substantial losses would be disruptive and seriously impact Eclipse's business.

### 2. Eclipse's leases provide environmental protections and limit the extent of the potential environmental harm caused by development.

While vacating the leases would cause Eclipse substantial losses, Plaintiffs' alleged losses from leaving the agency action in place are limited by the lease provisions.  The leases require Eclipse to "exercise reasonable diligence in developing and producing, and … prevent unnecessary damage to, loss of, or waste of leased resources."  (Hamsher Decl., ¶ 8.)

The Eclipse lease provisions address several of Plaintiffs' alleged harms, thereby reducing the potential for any harm.  Plaintiffs assert: "Several listed species will be harmed by BLM and Forest Service's plans . . . including the Indiana bat, Northern long-eared bat, fanshell, pink mucket

pearly mussel, sheepnose mussel, and snuffbox mussel." (Doc. 24, ¶ 53.) But, Eclipse's leases specifically address interactions with threatened or endangered species: "If in the conduct of operations, threatened or endangered species . . . or substantial unanticipated environmental effects are observed, lessee must immediately contact lessor. Lessee must cease any operations that would result in the destruction of such species or objects." (Hamsher Decl., Ex. A.) And, Notification #3 of Eclipse's leases requires that the area to be disturbed must be examined prior to surface disturbing activities to determine effects on any federally listed plant or animal and their habitats. (*Id.*) "If findings of this examination determine that the operation(s) may have a detrimental effect on a species covered by the Federal Endangered Species Act as amended, the operator's plans may be denied or restrictions added. The presence of regional sensitive species may also require some restrictions of the operation(s)." (*Id.*)

Plaintiffs also assert that leasing puts leased areas at risk of water contamination. (Doc. 24, ¶¶ 17, 19.) Eclipse's leases require it to "conduct operations in a manner that minimizes adverse impacts to the land, air, and water . . . and to other land uses or users [and to] take reasonable measures deemed necessary by lessor…" (Hamsher Decl., Ex. A.) The leases also require that a responsible officer determine "appropriate surface use restrictions necessary to maintain the structural and ecological integrity of riparian areas, and aquatic and riparian-dependent species viability." (*Id.*) These requirements limit the extent of any harm to water bodies and allow the federal lessor to dictate the measures needed to protect water resources. Thus, in balancing the relative harms to the parties, the Court should consider that Plaintiffs' harms are reduced or eliminated by the protective provisions of Eclipse's leases.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be denied, and Eclipse's cross-motion for summary judgment should be granted.

9

Respectfully submitted,

**VORYS, SATER, SEYMOUR & PEASE, LLP**

*/s/ Anthony L. Osterlund*
Kristin L. Watt (0042333)
52 East Gay Street
Columbus, OH 43216-1008
Tel:  (614) 464-8398
Fax: (614) 719-5081
klwatt@vorys.com

Anthony L. Osterlund (0071086)
301 East Fourth Street
Suite 3500, Great American Tower
Cincinnati, OH 45202
Tel:  (513) 723-4678
Fax: (513) 852-7830
alosterlund@vorys.com

*Attorneys for Intervenor-Defendant Eclipse Resources I, LP*

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of March, 2019, a true and correct copy of the foregoing was filed with the Court electronically and served by the Court's CM/ECF System upon all counsel of record.

*/s/ Anthony L. Osterlund*
Anthony L. Osterlund

10