WENDY S. PARK (CA State Bar No. 237331), *pro hac vice*
DIANA DASCALU-JOFFE (CO State Bar No. 50444), *pro hac vice*
Center for Biological Diversity
1212 Broadway, # 800
Oakland, CA 94612
Tel: (510) 844-7138
Fax: (510) 844-7150
wpark@biologicaldiversity.org
ddascalujoffe@biologicaldiversity.org

Nathan Johnson (OH State Bar No.0082838)
Ohio Environmental Council
1145 Chesapeake Avenue, Suite I
Columbus, OH 43212
Tel: 614-487-5841
njohnson@theoec.org

Elizabeth Benson (CA State Bar No. 268851), *pro hac vice*
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5723
elly.benson@sierraclub.org

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, HEARTWOOD, OHIO ENVIRONMENTAL COUNCIL, SIERRA CLUB | Civ. No. 2:17-cv-372 |
| Plaintiffs, | Judge Watson |
| | Magistrate Judge Jolson |
| vs. | |
| U.S. FOREST SERVICE, et al., | **PLAINTIFFS' BRIEF ON REMEDY** |
| Federal Defendants, | **ORAL ARGUMENT REQUESTED** |
| and | |
| AMERICAN PETROLEUM INSTITUTE, et al., | |
| Intervenor-Defendants | |

**TABLE OF ACRONYMS**

| | |
|---|---|
| 2005 BiOp | 2005 Biological Opinion for the 2006 Forest Plan |
| 2006 EIS | Environmental Impact Statement for the 2006 Forest Plan |
| 2006 RFDS | Reasonably Foreseeable Development Scenario for the 2006 Forest Plan |
| 2012 SIR | 2012 Supplemental Information Report |
| APA | Administrative Procedure Act |
| APD | Application for Permit to Drill |
| BLM | Bureau of Land Management |
| CEQ | Council on Environmental Quality |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| ESA | Endangered Species Act |
| FONSI | Finding of No Significant Impact |
| FWS | Fish and Wildlife Service |
| MOU | Memorandum of Understanding |
| NAAQS | national ambient air quality standards |
| NEPA | National Environmental Policy Act |
| NOx | oxides of nitrogen |
| NSO | no surface occupancy |
| ODNR | Ohio Department of Natural Resources |
| USFS | U.S. Forest Service |
| VOC | volatile organic compounds |
| WNF | Wayne National Forest |

**INTRODUCTION**

In its March 13, 2020 decision, the Court ruled that Federal Defendants U.S. Forest Service (Forest Service) and Bureau of Land Management (BLM), in approving oil and gas leases in the Wayne National Forest, failed to take a "hard look" at the impacts of high-volume hydraulic fracturing and horizontal well development (together, "fracking") on forest habitat and surface disturbance, streams, air quality, and the endangered Indiana bat, in violation of the National Environmental Policy Act (NEPA). Dkt. 110 ("Order"). The Sixth Circuit has held that under the Administrative Procedure Act reviewing courts have a "duty" to "set aside" or vacate "unlawful" agency action, including actions approved in violation of NEPA. *Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 407, 411 (6th Cir. 2013). Accordingly, the Court should vacate the unlawful lease approvals and leases.

Practically, vacatur is the most appropriate relief because it would best fulfill NEPA's purpose to ensure informed decisionmaking, and would provide Plaintiffs the relief they seek—the agencies' full consideration of oil and gas leasing impacts *before* they commit to leasing. As the Court found, BLM and the Forest Service should have disclosed and considered these impacts before making this irretrievable commitment. Vacatur would allow the agencies to accomplish their duties in the manner NEPA contemplates—prior to their decisions—and best ensures the integrity of their decisionmaking on remand.

Contrary to Defendant-Intervenors' argument in their summary judgment briefing, *Allied-Signal v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) is not controlling, as it has not been adopted by the Sixth Circuit, nor should it be under the circumstances here. In any event, the factors under *Allied-Signal* weigh heavily in favor of vacatur. The deficiencies identified by the Court are serious—defeating NEPA's "very purpose,"

as the Court observed—and vacating the leases would not cause serious disruption. Only a handful of the leases sold in BLM's December 2016 and March 2017 lease auctions have been proposed and approved for drilling, but none have been drilled or developed or are producing. Indeed, all 37 leases remain undeveloped.

Other remedies that fall between the range of vacatur and remand without vacatur would not vindicate NEPA's statutory purpose or afford Plaintiffs complete relief. *Cf. Pit River Tribe v. United States Forest Serv.*, 469 F.3d 768, 785-86 (9th Cir. 2006) ("dilatory or ex post facto environmental review cannot cure an initial failure to undertake environmental review"). These alternatives include suspension of the challenged leases until the corrective NEPA analysis is completed, *see* 43 C.F.R § 3103.4-4; an injunction against the issuance of any drilling permits or the authorization of surface activities during remand; and cancellation or suspension of any drilling permits already issued. These alternative remedies are not appropriate because they would leave the leases in place, permitting consideration of environmental impacts of leasing *after* the decision to lease has already been made, contrary to NEPA.

Accordingly, Plaintiffs respectfully request that the Court vacate the Bureau of Land Management's Environmental Assessment (EA) and Finding of No Significant Impact (FONSI) authorizing leasing of 40,000 acres in the Wayne National Forest; the Forest Service's June 15, 2016 consent to offer leases, which was issued on the flawed premise that the leases had been "adequately addressed in a NEPA document" (*see, e.g.*, FS-14893), 36 C.F.R. § 228.102(e)(1)[1]; BLM's decision records authorizing the December 2016 and March 2017 lease auctions, which

---

[1] 36 C.F.R. § 228.102(e)(1) provides that the Forest Service may "authorize the [BLM] to offer specific lands for lease subject to…[v]erifying that oil and gas leasing of the specific lands has been adequately addressed in a NEPA document, and is consistent with the Forest land and resource management plan."

relied on the flawed EA and FONSI (BLM-286, BLM-2); and the 37 leases (totaling 1,826.58 acres) sold in BLM's December 2016 and March 2017 lease auctions.[2]

Finally, Plaintiffs request that the Court vacate BLM's approvals of six additional lease auctions held after Plaintiffs' filed their May 2017 complaint, and the leases sold in those auctions (totaling 1,753.56 acres), which BLM approved based on the same flawed EA and FONSI. *See* Am. Complaint at 38 ¶ D (Dkt. 24) (requesting Court to set aside "any leases or approvals issued in reliance on [BLM's Final EA and FONSI]").

## ARGUMENT

### I.  BLM's and the Forest Service's Actions Should Be Set Aside

The Administrative Procedure Act (APA) governs the Court's review of BLM's and the Forest Service's leasing decisions, and prescribes the relief for their unlawful actions. *See* Order at 15. The APA plainly mandates the "reviewing court *shall…set aside* unlawful agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (emphasis added).

Thus, courts "have a *duty* to set aside [an agency's] action when it eschews its NEPA obligation to 'adequately consider and disclose the environmental impact of its actions.'" (internal alterations omitted, emphasis added)). *Ky. Riverkeeper*, 714 F.3d 402, 411 (6th Cir. 2013). "Set aside" means "to annul or vacate." Black's Law Dictionary 1404 (8th Ed. 2004). Accordingly, the Court should vacate BLM's FONSI and EA, USFS's consent to lease parcels, BLM's decisions to approve the December 2016 and March 2017 lease auctions, and the leases issued pursuant to those decisions. *See, e.g.*, *Pit River Tribe v. United States Forest Serv.*, 469

---

[2] Three of the leases appear to have already been forfeited or terminated (leases 058202, 058217, and 058243, Declaration of Wendy Park, filed herewith ("Park Decl.") ¶ 3), so Plaintiffs' request may be moot as to these leases.

F.3d 768, 788 (9th Cir. 2006) (in light of agency's failure to perform NEPA review of geothermal lease extensions, "both the five-year lease extensions and the subsequent forty-year extensions must be undone"); *Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 859 (10th Cir. 2019) (vacating drill permits and findings of no significant impact due to failure to consider cumulative impacts of fracking); *San Juan Citizens All. v. U.S. BLM*, 326 F. Supp. 3d 1227, 1256 (D.N.M. 2018) (setting aside "BLM's finding of no significant impact and its issuance of [oil and gas] leases" due to BLM's failure to analyze under NEPA water depletion, greenhouse gas emissions, and cumulative impacts of issuing leases); *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 331 (1976) ("If the decision of the agency 'is not sustainable on the administrative record made, then the . . . decision must be vacated and the matter remanded.'" (quoting *Camp v. Pitts*, 411 U.S. 138, 143 (1973))).

For example, in *Kentucky Riverkeeper*, the Sixth Circuit considered a NEPA challenge to the Army Corps of Engineers' issuance of a nationwide permit authorizing coal mining operations to discharge dredged and fill material into waters of the United States. 714 F.3d at 404. The court found that the Army Corps' Environmental Assessment for the nationwide permit failed to assess the cumulative impacts of the reauthorization, in violation of NEPA regulations. *Id.* at 410. To remedy this error, the court "set aside the Corps' reauthorization of [the permit] as arbitrary and capricious," citing its "duty" to do so under 5 U.S.C. § 706(2)(A). *Id.* at 411.[3]

*Kentucky Riverkeeper* is consistent with other circuits, which have held that vacatur is the standard remedy for NEPA or other procedural violations. *Humane Soc'y of U.S. v. Johanns*, 520

---

[3] While the court stayed its ruling for 60 days "to allow the parties and the district court an opportunity to assess the ramifications of this ruling on existing projects and potential remedies," the court still followed the APA's plain mandate. *Id.* at 413. On remand, the district court vacated a project permit that was issued pursuant to the invalid nationwide permit, and ordered defendants to "notify [the operator] that any activities authorized by that reauthorization must cease immediately. *See Ky. Riverkeeper v. Colonel Luke Leonard*, No. 203, CV 05-181-DLB, at 2 (E.D. Ky. Aug. 22, 2013) (attached as Exhibit D to the Park Declaration).

PLAINTIFFS' BRIEF ON REMEDY

4

F. Supp. 2d 8, 37 (D.D.C. 2007) ("vacating a rule or action promulgated in violation of NEPA is the standard remedy" (citing *Am. Bioscience, Inc. v. Thompson*, 269 F. 3d 1077, 1084 (D.C. Cir. 2001)); *Pit River Tribe,* 469 F.3d at 781 ("Because [NEPA] is procedural in nature, we 'will set aside agency actions that are adopted without observance of procedure required by law.'" (citing *Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 810 n.27 (9th Cir. 2005)); *High Country Conservation Advocates v. United States Forest Serv.*, 951 F.3d 1217, 1228 (10th Cir. 2020) ("*High Country III")* ("The typical remedy for an EIS in violation of NEPA is remand to the district court with instructions to vacate the agency action.").

As a practical matter, vacatur is the only way to afford complete and meaningful relief for NEPA violations. Plaintiffs' lawsuit seeks to enforce Federal Defendants' obligation to fully and thoroughly consider the environmental impacts of oil and gas leasing on the Wayne National Forest's streams, air, forests, and wildlife *before* the agencies committed to leasing. Indeed, the Court rejected Defendants' position that BLM and the Forest Service could wait until after the issuance of leases or until the Application-for-Permit-to-Drill (APD) stage to analyze and disclose the reasonably foreseeable effects of developing leases. The Court reasoned such an approach would undermine NEPA's goal of informed-decisionmaking:

> Waiting to evaluate the environmental impacts of a decision until after the 'no action alternative' is off the table would circumvent the very purposes of NEPA, which is 'insuring that federal agencies infuse in project planning a thorough consideration of environmental values' including 'to **consider seriously** *the 'no action' alternative **before** approving a project* with significant environmental effects."

Order at 24-25 (citing *Conner v. Burford*, 848 F.2d 1441, 1451 (9th Cir. 1988), emphases added).

Vacatur of the challenged decisions and leases would thus best effectuate NEPA's "look-before-you-leap" requirement, and ensure that Federal Defendants meaningfully consider environmental effects and the maximum range of options in light of any further analysis

conducted on remand. Otherwise, remand could result in "a *pro forma* exercise in support of a predetermined outcome." *WildEarth Guardians v. Bernhardt* ("*Bernhardt*"), No. 19-cv-001920-RBJ, 2019 U.S. Dist. LEXIS 194323, at *41 (D. Colo. Nov. 8, 2019) (internal quotation marks omitted). The NEPA process must "not be used to rationalize or justify decisions already made." 40 C.F.R. § 1502.5. In other words, "NEPA's goals of deliberative, non-arbitrary decision-making would seem best served by the agencies approaching these actions with a clean slate." *High Country Conservation Advocates v. U.S. Forest Serv.*, 67 F. Supp. 3d 1262, 1265 ("*High Country II*") (D. Colo. 2014) (vacating coal lease modifications); *see also Bob Marshall All. v. Lujan*, 804 F. Supp. 1292, 1297 (D. Mont. 1992) (cancelling leases, rather than merely suspending them, because it is "the only remedy which will effectively foster NEPA's mandate requiring informed and meaningful consideration of alternatives to leasing…including the no-leasing option"); *Diné CARE v. OSM*, No. 12-cv-1275-JLK, 2015 WL 1593995, at *3 (D. Colo. Apr. 6, 2015) (vacating approval of mining operations to help ensure that NEPA compliance on remand would not become "a mere bureaucratic formality"), *abrogated on other grounds by Dine Citizens Against Ruining Our Env't v. United States Office of Surface Mining Reclamation & Enforcement*, 643 Fed. Appx. 799, 800 (10th Cir. 2016).

Anything less than vacatur, such as mere suspension of the leases during remand or an injunction against lease development, "would not satisfy NEPA's purpose of ensuring that federal agencies meaningfully consider the potential environmental impacts of a proposed action before undertaking that action." *W. Watersheds Project v. Zinke*, No. 18-CV-187-REB, --F. Supp. 3d.--, 2020 U.S. Dist. Lexis 34612, at* 92 (D. Idaho Feb. 27, 2020) (vacating oil and gas leases covering over one million acres that were issued in violation of NEPA (citing 40 C.F.R.§ 1506.1(a)-(b); 42 U.S.C. § 4332(C)(v)); *Bernhardt*, 2019 U.S. Dist. LEXIS 194323, at *43

(vacating mining plan approval and enjoining mining activities because "remand without vacatur or injunction would incentivize agencies to rubber stamp a new approval, rather than take a true and informed hard look").

Analogously, in situations where an agency belatedly performs NEPA review after committing to the action, courts have invalidated the untimely NEPA document and decision, in vindication of NEPA's purpose. *See, e.g.*, *Metcalf v. Daley*, 214 F.3d 1135, 1146 (9th Cir. 2000) (vacating binding agreement and untimely *post hoc* EA to avoid "classic Wonderland case of first-the-verdict, then-the-trial" and "ensure an objective evaluation [on remand] free of the previous taint"); *Pit River*, 469 F.3d at 785 ("we have repeatedly held that dilatory or ex post facto environmental review cannot cure an initial failure to undertake environmental review").

Accordingly, the appropriate remedy to cure BLM's and the Forest Service's failures to take a hard look at the consequences of oil and gas leasing before approving leases is vacatur of Federal Defendants' unlawful approvals and the resulting leases.[4]

## II.    Remand Without Vacatur Is Inappropriate in This Case

Contrary to Intervenor-Defendants' arguments in their merits briefing, the D.C. Circuit's two-factor balancing test in *Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146 (D.C.

---

[4] The question of whether Federal Defendants committed "prejudicial error" is not before the Court. *Cf.* Fed. Def. MSJ Reply at 19 (Dkt. 107) (citing 5 U.S.C. § 706, which provides, "In making the foregoing determinations [including whether agency action is "arbitrary and capricious"], the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."). The question of "prejudicial error" or "harmless error" goes to the merits, not remedy. *See S. Forest Watch, Inc. v. Jewell*, 817 F.3d 965, 976-77 (6th Cir. 2016) (finding harmless error where "there was substantial compliance with [public notice requirement] and its purposes were served"). The Court has already determined that Defendants' decisions in approving oil and gas leasing were "arbitrary and capricious" and violated NEPA's statutory mandate to take a "hard look" at environmental effects. Order at 47, 60, 69, 71. In any case, Federal Defendants' failures to take a hard look are prejudicial errors, because they undermine NEPA's core purpose to facilitate informed decisionmaking.

Cir. 1993) does not require the Court to leave BLM's and the Forest Service's unlawful approvals and issuance of the leases in place during remand. Under this test, a court considers "the seriousness of the orders deficiencies (and thus the extent of doubt whether the agency chose correctly)," and "the disruptive consequences" of vacatur. *Allied-Signal v. United States Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (1993) (citation omitted). *Allied-Signal* is not binding authority in this Circuit, and its application should not be extended to the circumstances here. But even if the Court were to apply *Allied-Signal*, Defendants cannot overcome the presumption of vacatur. *See Public Employees for Envtl. Responsibility v. U.S. Fish and Wildlife Service ("PEER")*, 189 F. Supp. 3d 1, 3 (D.D.C. 2016) (finding agency failed to "make a compelling case" to "depart[] from the presumptive remedy of vacatur" where the "forecasted harms [were] imprecise or speculative").

## A. The *Allied-Signal* Doctrine Does Not Apply Here

As an initial matter, the Sixth Circuit has never adopted the *Allied-Signal* doctrine, and instead, follows the mandatory language of the APA. *See Ky. Riverkeeper*, 714 F.3d at 411 ("[W]e have a duty to set aside [an agency's] action when it eschews its NEPA obligation to 'adequately consider and disclose the environmental impact of its actions.'" (internal alterations omitted)). Because the Court is bound by the precedent set in *Kentucky Riverkeeper*, it need not turn to another Circuit court decision for guidance.[5]

Even if *Allied-Signal* were followed in this Circuit, its reach should not extend to this case. The Fourth Circuit has stated that it has "never formally embraced the *Allied-Signal*

---

[5] The Tenth Circuit does not apply the *Allied-Signal* doctrine, but the court broadly refers to its "traditional equitable powers to fashion appropriate relief, which are retained under the APA." *High Country III*, 951 F.3d at 1229. Further, if the Court "has wide discretion to fashion an appropriate remedy" in this case, as Federal Defendants claim, Fed. Def. MSJ Reply at 19, it is unclear why the Court should strictly follow *Allied-Signal*.

remand-without-vacatur approach," and observed that it "principally is relevant in matters where agencies have "inadequately supported rule[s]," and not in situations where the agency "exceeded [its] statutory authority." *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 655 (4th Cir. 2018) (citation omitted). *See also Am. Bioscience*, 269 F.3d at 1086 (noting court's practice of remanding without vacatur where it is "unsure of the grounds the agency asserts to defend its action (and, perhaps, where it perceives that a ground poorly articulated might be sufficient to sustain the action)"). Here, the Court found multiple grounds on which the agencies' approvals of oil and gas leasing were "arbitrary and capricious," and violated NEPA's requirement to take a "hard look" at the consequences of their proposed actions, before their approvals. Order at 47, 60, 69, 71. This flawed procedure—which goes to the integrity of the agencies' decisionmaking, not merely the adequacy of their explanation—requires vacatur without resort to the balancing factors under *Allied-Signal*. *Cf. All. for the Wild Rockies v. United States Forest Serv.*, 907 F.3d 1105, 1121-22 (9th Cir. 2018) (project's inconsistency with Forest Plan was "sufficient to justify vacatur").

In any case, *Allied-Signal* represents only a narrow exception to the rule that vacatur is the "ordinary result" of unlawful agency action. *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (citation omitted). *See also PEER*, 189 F. Supp. 3d at 2 ("A review of NEPA cases in this district bears out the primacy of vacatur to remedy NEPA violations.") (collecting examples); *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 78 (D.D.C. 2010) (remand with vacatur is the "presumptively appropriate remedy for a violation of the APA"), *aff'd in part, rev'd in part on other grounds,* 661 F.3d 1147 (D.C. Cir. 2011); *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. MSHA*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (remand without vacatur is "rare"). The Ninth

Circuit, for example, has allowed remand without vacatur "[i]*n rare circumstances*, when [the court] deem[s] it advisable that the agency action remain in force until the action can be reconsidered or replaced…." *Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010) (emphasis added). *See also Defs. of Wildlife v. U.S. Envtl. Prot. Agency*, 420 F.3d 946, 978 (9th Cir. 2005) ("Typically, when an agency violates the Administrative Procedure Act and the Endangered Species Act, we vacate the agency's action and remand to the agency to act in compliance with its statutory obligations."), *rev'd on other grounds, Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007).

Such rare circumstances exist when vacatur would cause serious environmental harm. *See, e.g.*, *Ctr. for Food Safety v. Vilsack*, 734 F. Supp. 2d 948, 951 (N.D. Cal. 2010) (noting the Ninth Circuit has remanded without vacatur "in limited circumstances, namely [when] *serious irreparable environmental injury*" will occur if the decision is vacated) (emphasis added); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) (keeping rule in place to avoid potential extinction of species); *Cal. Cmtys. Against Toxic v. EPA,* 688 F.3d 989, 994 (9th Cir. 2012) (remanding without vacatur because vacating could lead to air pollution, undermining Clean Air Act's goals). The D.C. Circuit has similarly remanded without vacatur where vacatur would cause environmental harm that a deficient rule was meant to address. *See, e.g.*, *North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008) ("[I]t is appropriate to remand without vacatur in particular occasions where vacatur 'would at least temporarily defeat ... the enhanced protection of the environmental values covered by [the EPA rule at issue].'" (quoting *Envtl. Def. Fund, Inc. v. Adm'r of the United States EPA*, 898 F.2d 183, 190  (D.C. Cir. 1990) (alteration in original)); *Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1265 (D.C. Cir. 2007) (Rogers, J., concurring in part and dissenting in part) ("Where the court has concluded that a final rule is

deficient, the court has traditionally not vacated the rule if doing so would have serious adverse implications for public health and the environment.").

In contrast, this is the typical NEPA case where vacatur would "prevent significant [environmental] harm." *Sierra Club*, 719 F. Supp. 2d at 80. *See also Pollinator Stewardship Council v. United States EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (finding vacatur appropriate when leaving agency action in place "risks more potential environmental harm than vacating it"). Vacatur of the leases would preclude their development, preventing harm to water resources and wildlife, increased air pollution, and forest degradation. *See, e.g.*, Declaration of Rich Sidwell (Dkt. 83-2) ¶¶ 15-16, 34-40, 42-43, 55-57; Declaration of Joe Hazelbaker (Dkt. 83-3), ¶¶ 10, 19-20, 22, 28-34; Declaration of Bonie Bolen (Dkt. 83-6), ¶¶ 28-30, 33, 35, 38-39. The Court should thus adhere to the APA's mandatory language, and set aside the unlawfully issued leases.[6]

## B. Vacatur Is Still Warranted Under *Allied-Signal*

Even if the Court were to apply the *Allied-Signal* factors to this case, "the burden is on [defendants] to show that compelling equities demand anything less than vacatur." *W. Watersheds Project*, 2020 U.S. Dist. Lexis 34612, at *81-82. *See also Ctr. for Envtl. Health v. Vilsack*, 2016 WL 3383954, at *13 (N.D. Cal. 2016) ("given that vacatur is the presumptive remedy for a procedural violation such as this, it is Defendants' burden to show that vacatur is unwarranted"). Here, the *Allied-Signal* factors weigh overwhelmingly in favor of vacatur.

[6] Some courts have declined to vacate leases despite NEPA violations, but those cases are either distinguishable or unpersuasive. *See WildEarth Guardians v. Zinke*, 2019 WL 1273181, at *27-28 (D.D.C. 2019) (plaintiffs challenged "only one aspect of nine lease sales that otherwise complied with NEPA," "nothing in the record indicate[d]" an EIS would be needed, and court enjoined issuance of APDs during remand to "guard against" possibility "that BLM did not choose correctly the first time around"). In *Native Village of Point Hope v. Salazar*, 730 F. Supp. 2d 1009 (D. Alaska 2010), the court remanded without addressing case law on vacatur. Still, the court temporarily enjoined drilling on the lease. *See Native Vill. of Point Hope v. Salazar*, No. 1:08-CV-0004-RRB, 2010 WL 3025163, at *1 (D. Alaska Aug. 2, 2010).

### 1. The Errors Identified by the Court Are Serious

The agencies' errors constitute "serious[]…deficiencies" in the underlying action. *Allied-Signal*, 988 F.2d at 150-51. The seriousness of the defect "should be measured by the effect the error has in contravening the purposes of the statute[s] in question." *W. Watersheds Project*, 2020 U.S. Dist. LEXIS 34612, at *82 (quoting *Oregon Natural Desert Assoc. v. Zinke*, 250 F. Supp. 3d 773, 774 (D. Or. 2017)) (alteration in original). As discussed above, the Court found that allowing BLM and the Forest Service to analyze the impacts of leasing after committing to leases "would circumvent the very purposes of NEPA," which include "insuring that federal agencies infuse in project planning a thorough consideration of environmental values including to consider seriously the 'no action' alternative." Order at 24-25 (citation and internal quotation marks omitted). The agencies' failures to consider and take a hard look at the impacts of greater surface disturbance from the full scope of fracking-related infrastructure, water depletions on the Little Muskingum River, habitat destruction on the endangered Indiana bat, and harms from air pollution "lie[] at the heart of NEPA's requirement that agencies make informed decisions." *Mont. Envtl. Info. Ctr. v. U.S. Office of Surface Mining,* No. CV 15–106–M–DWM, 2017 WL 5047901, at *6 (D. Mont. Nov. 3, 2017); *see also Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*, 109 F. Supp. 3d 1238, 1244-45 (N.D. Cal. 2015) (finding that NEPA cumulative impacts analysis is "an integral part of fulfilling NEPA's purpose" and agency's failure to conduct such analysis warranted vacatur).

These errors are even more egregious because they influenced Federal Defendants' review of impacts to other resources. For instance, the failure to take into account all sources of surface disturbance and forest clearing, including pipelines—which require the most forest clearing of all infrastructure—resulted in not just a failure to quantify total surface disturbance at

the typical individual well site and forest-wide. It also resulted in the agencies ignoring or minimizing the impacts of land clearing and earthmoving, and the resulting surface runoff, industrialization, habitat fragmentation, and edge effects. BLM-51263 (Plaintiffs' comments on EA); *see also* Pls.' MSJ at 17-18, 23, 25 (Dkt. 83); Pls.' MSJ Reply at 13-14 (Dkt. 105). For example, as BLM's Environmental Assessment observed, "[i]n a mature interior forest, the loss of a few acres of canopy can result in the loss of suitability of *hundreds* of acres of habitat for a wildlife species, such as the cerulean warbler, that depends on the presence of large blocks of unbroken forest." BLM-1430 (emphasis added).[7] But the agencies' failure to account for the full scope of forest clearing activities precluded disclosure of the full magnitude of potential habitat loss and harm to interior-forest species like the cerulean warbler.

Likewise, the failure to evaluate the cumulative impacts of water depletions from fracking operations on the Little Muskingum River watershed goes far beyond failing to acknowledge that the Little Muskingum River would be impacted. As the Court noted, the agencies failed to analyze *how* massive water depletions would impact the river, such as harms to the river's flows, aquatic habitat, water quality, and recreational values. Order at 58-59; Pls.' MSJ at 35. And the failure to quantify criteria pollutants resulted in not just a failure to quantify pollutants, but a failure to evaluate these emissions' adverse effects on public health. *Id*. at 38.

In short, these sweeping errors will require Federal Defendants to redo their analysis from the ground up, including preparing a new Reasonably Foreseeable Development Scenario for projecting overall surface development, to serve as a "baseline" for the rest of the agency's

---

[7] Forest clearing creates more edges, which results in indirect loss of forest habitat for species preferring "interior forest" habitat or more buffering from development or open spaces. *See* Pls.' MSJ at 17.

analysis.[8] BLM-45785, 66870. *See also* Order at 70-71 (concluding the "agencies made decisions premised on a faulty foundation: that the 2006 Forest Plan's and 2006 EIS's consideration of vertical drilling sufficiently accounted for the impacts of fracking," and that "[e]ach iteration of agency review built upon that faulty foundation—the 2016 EA relied on the 2012 SIR, which relied on a 2012 BLM Letter, which relied on the 2006 Forest Plan and 2006 EIS—but neither USFS nor BLM stopped to take that 'hard look' that was required of them").

Critically, "[t]he NEPA duty is more than a technicality; it is an extremely important statutory requirement to serve the public and the agency *before* major federal actions occur...." *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 157 (D.C. Cir. 1985) (emphasis in original). Additional analysis "could lead the agencies to different conclusions," including increased protections for the national forest or the closing of certain lands to leasing. *Sierra Club*, 803 F.3d at 43; *Pollinator Stewardship Council*, 806 F.3d at 532 (vacating pesticide registration because "on remand, a different result may be reached")." *High Country II*, 67 F. Supp. 3d at 1266 (vacating lease modifications because case was "more like a Gordian knot that needs cutting than a simple tangle that the government can untie with a little extra time," and outcome on remand was "not a foregone conclusion").[9] Vacatur of the agencies' approvals and leases would allow full and fair consideration of such alternatives.

---

[8] The Court did not explicitly address Plaintiffs' cumulative impacts claim that Federal Defendants failed to quantify the total number of well pads and wells that could be developed on private lands adjacent to the national forest, and the resulting surface disturbance and habitat loss. Pls.' MSJ at 31; Pls.' MSJ Reply at 19. But a new cumulative effects analysis of impacts on streams and the Indiana bat will necessarily entail a comprehensive projection and assessment of "past, present, and reasonably foreseeable future" well pads, wells, and other infrastructure that could be developed throughout the national forest, "regardless of what agency (Federal or non-Federal) or person undertakes such actions." 40 C.F.R. § 1508.7.

[9] Some courts have focused narrowly on the question of whether "there is a serious possibility that the agency will be able to substantiate its decision [to not prepare an EIS] on remand," by supporting its FONSI with additional analysis. *See, e.g.*, *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 84 (D.D.C. 2019) (citation omitted). This approach misses the fundamental purpose

### 2. Vacatur Would Not Have Disruptive Consequences

Halting a project that has proceeded despite a defective environmental review may entail some disruption, but if that prohibited vacatur it would nullify NEPA's plain mandate that adequate analysis occur before the agency decision. *See* 40 C.F.R. § 1506.1(a). It would also nullify the APA's requirement for reviewing courts to set aside unlawful agency action. *PEER,* 189 F. Supp. 3d at 4 (If vacatur's effect of stopping activities "were enough to carry the day, then it seems vacatur would never be appropriate. Obviously the effect of vacatur is to stop these activities."). In any event, vacatur of the approvals and leases at issue here would not have significantly disruptive consequences. *See Allied-Signal*, 988 F.2d at 150-51.

First, with respect to future oil and gas leasing, vacatur of BLM's EA and FONSI, which authorize leasing of 40,000 acres in the Wayne National Forest, would not cause any disruptions to the BLM and Forest Service's administration of oil and gas leases. BLM can pause oil and gas leasing in the national forest. For example, on March 18, 2020, BLM voluntarily "deferred" parcels in the Wayne National Forest the day before its March 19, 2020 lease auction, as a result of the Court's March 13 Opinion and Order in this case. Park Decl. ¶ 9. BLM routinely removes

---

of NEPA, which is "not to generate paperwork – even excellent paperwork" (or even an EIS )— "but to foster excellent action." 40 C.F.R. § 1500.1(c). In any event, the Forest Service has begun a new Forest Plan revision and preparation of an EIS, which includes the preparation of a new Reasonably Foreseeable Development Scenario for oil and gas development in the Wayne National Forest. Park Decl. ¶ 8, Ex. G at 1-2 & n. 1. The Draft Assessment, which "informs the 'need to change' the current forest plan," *id*., Ex. F at 1, strongly suggests the need to revise the Forest Plan in light of increased fracking activities in the national forest. *See, e.g.*, *id*., Ex. F at 45 ("Stream dewatering as a result of water withdrawals for [fracking]…could adversely affect aquatic ecosystems far beyond the point of impact."); *id*. at 62 ("increased emphasis should be placed on the mitigation and minimization of potential impacts of future energy development to surface water and groundwater resources"); *id*. at 63 (noting potential "need to focus on thoughtfully crafting forest plan components to mitigate for social, ecological, and other impacts" given "potential increase" in energy development). Accordingly, the Forest Service's EIS process for the Forest Plan revision would be the most logical venue for remand of the deficient NEPA review here.

15

PLAINTIFFS' BRIEF ON REMEDY

parcels from lease auctions, or postpones auctions, when further environmental analysis of leases is required. *See, e.g.*, FS-5529; BLM-263.

Vacating BLM's approvals of the December 2016 and March 2017 lease auctions and issuance of the leases, as well as the Forest Service's underlying June 15, 2016 authorization to lease these parcels, will also not cause any serious disruptions. The vast majority of the leases have not yet been proposed or approved for drilling, and none of the leases are producing, which severely undermines any claim of disruption. Park Decl. ¶¶ 5-6. Further, any allegation of disruption here would be solely economic. But even where courts have remanded without vacatur under *Allied-Signal*, they have declined to do so "on the basis of alleged economic harm alone," much less on assertions without "empirical bases." *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 84 n.35 (D.D.C. 2019). *See also Cal. Cmtys. Against Toxics v. United States EPA*, 688 F.3d 989, 994 (9th Cir. 2012) (citing increased pollution, risk of blackouts, "economically disastrous" consequences, and likely necessity of a new bill from California legislature, as reasons the court remanded without vacatur). This is because "the risk of economic harm from procedural delay and industrial inconvenience is the nature of doing business, especially in an area fraught with bureaucracy and litigation." *WildEarth Guardians*, 368 F. Supp. at 84 n.35 (citation omitted); *see also PEER*, 189 F. Supp. 3d at 3 ("it is not clear economic concerns are as relevant in an environmental case" when weighing disruptive consequences under *Allied-Signal*). BLM's own regulations reflect this inherent risk: "Leases shall be subject to cancellation if improperly issued." 43 C.F.R. § 3108.3(d). Federal Defendants and Intervenor-Defendants cannot cry foul now, when they knowingly assumed the risk of cancellation.[10] Indeed, both BLM

---

[10] BLM can and does cancel leases when it determines that a lease was issued in error. *Boesche v. Udall*, 373 U.S. 472, 478-81 (1963). *See, e.g.*, *Bd. of Comm'rs of Pitkin Cty.*, 173 IBLA 173, 181 (2007) (BLM's own Interior Board of Land Appeals setting aside leases that it found were

and the lessees were aware of significant public controversy around leasing in the national forest, and numerous administrative protests challenging the lease sales (including Plaintiffs' protest raising the issues in this litigation), but still proceeded with the lease transactions. Pls.' MSJ Reply at 35. BLM had ample opportunity to correct its errors, while the prudent lessee would have been prepared for the real possibility that they would be challenged and invalidated.

Moreover, lessees can request a refund for their lease purchase and be made whole again. *See* 30 U.S.C. § 1721a. To the extent Federal Defendants may claim economic harm from having to refund lessees, the amount of funds that would need to be returned (in the neighborhood of $6.4 million[11]) "is not of the magnitude that courts recognize as warranting a suspension over vacatur." *W. Watersheds Project v. Zinke*, 2020 U.S. Dist. LEXIS 34612, at *89-90 (rejecting BLM's claim that vacatur would be too disruptive because it would require having to unwind leases and return $125 million to lessees); *cf. Cal. Cmtys. Against Toxics*, 688 F.3d at 993-94 (threat to "billion-dollar venture" supporting 350 jobs, among other factors, justified remand without vacatur).

Eclipse Resources' prior claims of economic harm seem speculative at best, given the lack of proposed activity on the vast majority of its leases at issue in this case. Over one year since Eclipse Resources first alleged harm from potential vacatur of its leases (*see* Pls.' MSJ Reply at 34 n.32), BLM's records show that none of those leases have been developed. Park Decl. ¶¶ 5-6. Indeed, *none* of the 37 leases sold in the December 2016 or March 2017 lease

---

issued in violation of NEPA). *See also Belville Mining Co. v. United States*, 999 F.2d 989, 999 (6th Cir. 1993) (observing that private party's "reliance on the [agency] determinations" that it had valid existing mining rights "does not preclude [agency's] reconsideration of this decision").

[11] *See* Fed. Defs.' Answer (Dkt. 49) ¶ 104 (December 2016 lease parcels sold for $1.7 million), BLM-284; Park Decl. ¶ 10 (March 2017 leases sold for $5.1 million, but because one lease was apparently forfeited, actual proceeds were $4.7 million).

auctions have been drilled or are in production. *Id*. Further, only a handful of drill permits have been authorized to develop a fraction of the leases. These include:

- Eclipse's four drilling permits for development of three leases it purchased in the December 2016 and March 2017 lease sales (leases 58226, 58229, and 58213);[12]

- Two other drilling permits granted to another operator (Triad Hunter, LLC) for the development of one lease from the December 2016 lease auction (lease 58187).

*Id*.; *see also id*., Ex. C. None of these six wells (or the four targeted lease parcels) have been drilled, much less are producing oil or gas. Park Decl. ¶¶ 5-6. This is certainly not a case where the "egg has been scrambled" and it is too late to reverse course. *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002). [13] The delay in development of the leases suggests that the prospect of economic returns is anything but certain, and could depend on a multitude of geological factors, economic conditions, and other contingencies.

Finally, BLM has authorized six additional lease auctions in reliance on its flawed EA and FONSI authorizing leasing in the Wayne National Forest. These should also be set aside. Park Decl. ¶¶ 11-12; *see also* BLM-1750 (FONSI stating: "Any nominated parcels reviewed and approved for competitive leasing by the BLM and Forest Service after the initial lease sale, in which parcels are auctioned, would be addressed with a Determination of NEPA Adequacy (DNA) document tiered to the environmental analysis from the final EA for this Proposed Action."). Vacatur of these lease sales would not cause any serious disruption. Only two APDs have been approved for leases issued pursuant to these sales, but neither of the wells has been

---

[12] In addition, Eclipse has assigned at least several of its leases to another driller (leases 58187, 58191, 58234, 58252), s*ee* Park Decl. ¶ 4), further suggesting its economic interests in each lease may be speculative and/or that it may not be capable of developing each of its leases. In any event, Eclipse no longer appears to have any economic interest in the four assigned leases.

[13] Vacatur of the leases would preclude development of the wells, effectively voiding the drill permits.

developed. Park Decl. ¶¶ 5-6. Further, the sales' proceeds are of relatively small magnitude, totaling roughly $2.6 million. *Id*. ¶ 10.

While Plaintiffs' Complaint could not specifically identify lease sales held after the filing of the Complaint, the invalidation of BLM's FONSI, which authorizes oil and gas leasing in the Wayne National Forest,[14] should result in the invalidation of any lease auctions and leases authorized pursuant to that unlawful approval. For example, in *Kentucky Riverkeeper*, the Sixth Circuit vacated a nationwide permit allowing the discharge of mining waste into streams, because the underlying NEPA analysis was flawed. 714 F.3d at 411. On remand, the district court invalidated a site-specific permit that was issued pursuant to the nationwide permit and that relied on the same NEPA analysis invalidated by the Sixth Circuit, even though the individual permit had not been challenged in the underlying action. *See Ky. Riverkeeper*, No. 203, CV 05-181-DLB at 2 (discussed in n.8 above). While the plaintiff suggested it could also supplement its complaint if the court did not grant the requested relief, *id*., No. 199 at 4-5 (Park Decl. ¶ 7, Ex. E), the court still vacated the site-specific permit. *Id*., No. 203 at 2. Similarly, here, because BLM's lease sales and leases post-dating Plaintiffs' Complaint rely on an unlawful EA and FONSI, and were thus authorized pursuant to unlawful action, the Court should vacate them. *See* Am. Complaint at 38 ¶ D (Dkt. 24). Alternatively, Plaintiffs may seek invalidation of these lease sales and leases through a separate legal action, but the Court's granting relief as to these leases now would promote judicial economy and avoid further litigation.

---

[14] The FONSI approves "the *Proposed Action to lease federal mineral estate within the proclamation boundary of the Wayne National Forest*…. The parcels that could be leased as part of the Proposed Action consist of all federal mineral estate underlying National Forest System (NFS) lands and total approximately 40,000 acres." BLM-1750 (emphasis added).

PLAINTIFFS' BRIEF ON REMEDY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The potential economic impact to BLM and the lessees, which they could and should have anticipated, does not override the statutory mandate to set aside the unlawfully issued leases.

**CONCLUSION**

Plaintiffs respectfully request the Court to remand and vacate:

(1) BLM's Environmental Assessment and Finding of No Significant Impact approving oil and gas leasing in the Wayne National Forest;

(2) The Forest Service's June 15, 2016 authorizations to BLM to offer oil and gas leases in the Wayne National Forest (FS-14893, 14946, 14960, 14974, 14988);

(3) BLM's Decision Records approving the December 2016 and March 2017 lease auctions for parcels in the Wayne National Forest (BLM-286, BLM-2);

(4) The leases sold in the December 2016 and March 2017 lease auctions; and

(5) BLM's Decision Records approving all other lease auctions in reliance on BLM's FONSI and EA, the underlying Determinations of NEPA Adequacy, and all leases sold in those lease auctions (Park Decl., Exs. J-O).

Finally, Plaintiffs respectfully request oral argument, given the "public importance" of the Court's determination as to whether unlawfully issued oil and gas leases in Ohio's only national forest should be voided. *See* Local Rule 7.1(b)(2).

DATED: APRIL 17, 2020                    Respectfully submitted,


                                         /s/ Wendy S. Park
                                         WENDY S. PARK
                                         DIANA DASCALU-JOFFE
                                         *Trial Attorney & Counsel for Plaintiffs Center for*
                                         *Biological Diversity, Heartwood, and Sierra Club*
                                         Center for Biological Diversity
                                         1212 Broadway, # 800

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Oakland, CA 94612
Tel: (510) 844-7138
Fax: (510) 844-7150
wpark@biologicaldiversity.org
ddascalujoffe@biologicaldiversity.org
CA State Bar No. 237331, *pro hac vice*
CO State Bar No. 50444, *pro hac vice*

/s/ Nathan G. Johnson
NATHAN G. JOHNSON
(OH State Bar No.0082838)
*Trial Attorney for Ohio Environmental Council*
Ohio Environmental Council
1145 Chesapeake Ave., Suite I
Columbus, OH 43212
Tel: (614) 487-5841
NJohnson@theOEC.org

Elizabeth Benson
*Counsel for Sierra Club*
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
Tel: (415) 977-5723
elly.benson@sierraclub.org
CA State Bar No. 268851, *pro hac vice*

PLAINTIFFS' BRIEF ON REMEDY

21

1

**CERTIFICATE OF SERVICE**

2

     I certify that on April 17, 2020, I filed the foregoing document on behalf of Plaintiffs

3

Center for Biological Diversity, Heartwood, Ohio Environmental Council, and Sierra Club via

4

the CM/ECF system which will provide electronic service to all counsel of record.

5

6

DATED: April 17, 2020

7

8

                    /s/ Wendy S. Park     

9

                    WENDY S. PARK
*Lead Attorney for Plaintiffs Center for Biological Diversity, Heartwood, and Sierra Club*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

22