PRERAK SHAH
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

BRIDGET K. McNEIL (CO Bar 34299)
Senior Trial Attorney
Wildlife and Marine Resources Section
999 18th St., South Terrace, Suite 370
Denver, Colorado 80202
Ph: 303-844-1484
bridget.mcneil@usdoj.gov

JOHN P. TUSTIN (TX 24056458)
Senior Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Ph: 202-305-3022
john.tustin@usdoj.gov

*Attorneys for Federal Defendants*

## UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, HEARTWOOD, OHIO ENVIRONMENTAL COUNCIL, SIERRA CLUB | Civ. No. 2:17-cv-372 |
| Plaintiffs, | Judge Michael H. Watson<br>Magistrate Judge Kimberly A. Jolson |
| vs. | |
| U.S. FOREST SERVICE, *et al*. | **FEDERAL DEFENDANTS' BRIEF REGARDING THE APPROPRIATE REMEDY** |
| Federal Defendants; and | |
| AMERICAN PETROLEUM INSTITUTE, *et al*. | |
| Intervenor Defendants. | |

# **TABLE OF ACRONYMS**

| | |
|---|---|
| APD | Application for Permit to Drill |
| BLM | Bureau of Land Management |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FONSI | Finding of No Significant Impact |
| FWS | Fish and Wildlife Service |
| NEPA | National Environmental Policy Act |
| ROD | Record of Decision |
| USFS | U.S. Forest Service |

**<u>INTRODUCTION</u>**

In its March 13, 2020 Order, the Court directed the parties to brief the appropriate remedies, advising the parties to "discuss a range of remedies appropriate for this case, meaning options that fall somewhere between complete vacatur or remand."  ECF No. 110 at 72.  Plaintiffs ignore this request and insist on vacatur of every challenged decision connected with the thirty-six leases challenged in this case.  In addition, Plaintiffs overreach to request that the Court issue injunctive relief requiring the U.S. Bureau of Land Management ("BLM") to cancel twenty-nine leases not even identified in the amended complaint.

Plaintiffs base their overbroad request on the assertion that the Sixth Circuit standard always requires vacatur of an agency action when a court identifies errors in that action.  Not so.  Plaintiffs' argument significantly overstates the remedy holding in *Kentucky Riverkeeper v. Rowlette*, 714 F.3d 402, 411 (6th Cir. 2013).  This Court should reject the attempt to spin the fact-specific ruling in that case into binding precedent that would deprive district courts of their traditional equitable powers to fashion appropriate relief.  The better course is to apply the two-part test evaluating vacatur that was developed in the D.C. Circuit and routinely applied in several other courts, including the Third, Ninth, Eleventh, and Federal Circuits.  Application of that test here counsels in favor of remanding the decisions to the agencies without vacatur, especially given that no oil and gas development is currently occurring, as Plaintiffs concede, and little ecologic disturbance is expected, if any, in the time it would take to complete corrective environmental analysis under the National Environmental Policy Act ("NEPA").  As such, Plaintiffs' interests will suffer only the slightest of harms, if any, during the pendency of the remand. On the other side, significant disruption will flow from vacatur of the decision documents and challenged leases – not only to the agencies and lessees, but also to the State of Ohio and its counties that have already received a significant portion of the lease sale monies.

Even if the Court ultimately finds that vacatur is appropriate, it can employ its equitable powers to avoid the significant disruption that would result from vacatur by staying the effect of any vacatur order for twelve months, which is the time period the agencies estimate they need to

complete an environmental assessment on remand evaluating the errors identified by the Court and to re-evaluate the consent decisions for the leased parcels. Thus, while the agencies submit that remand without vacatur is appropriate here, the Court can also choose deferred vacatur as a tailored balance between the disruption that would result and the minimal environmental harm that would occur during the remand.

## RELEVANT FACTS

While the Court is familiar with the factual background, Federal Defendants highlight the respective agency actions at issue in the remedy proposals as well as provide additional facts relevant to the appropriate remedy. The 2006 Forest Plan directs management of the Wayne National Forest. As part of that planning effort, the United States Forest Service ("USFS") performed an in-depth analysis of alternatives for federal mineral development and their effects as part of the Environmental Impact Statement ("EIS") and decision supporting the Plan. FS-8939, 9553-87, 10361-62. In order to streamline future project-level planning for mineral development, the EIS, by design, contained an analysis sufficiently detailed to be relied upon at the verification and consent stage, under the USFS's regulations for analyzing oil and gas leases under NEPA and for forest plan consistency. 36 C.F.R. § 228.102(e); FS-9553-87, 10361. Ultimately, the Forest Plan imposed a no-surface-occupancy restriction on 13% of the Forest, but allowed for potential surface occupancy on 96% of the Marietta Unit of the Forest. FS-10361.

In response to at least fifty Expressions of Interest to nominate parcels on the Marietta Unit for lease, BLM undertook an Environmental Assessment ("EA") to analyze future leasing of up to 40,000 acres of federally-owned minerals on the Marietta Unit. BLM-1346. As required by the regulations, BLM requested USFS consent for the leasing of the selected parcels of federal minerals on Forest land, and the USFS performed a consent review under 36 C.F.R. § 228.102(e) that included verification of consistency with the Forest Plan, verification of federal ownership, and the creation of maps that reflected applicable stipulations. *See, e.g.*, FS-11070, 13373, 14998. On June 15, 2016, the USFS consented to the lease sale of approximately 2,718.58 acres. FS-14893, 14929, 14946, 14960, 14974, 14988. In October 2016, BLM issued

*Fed. Defs.' Remedy Br.*                                                        2

the final EA and Finding of No Significant Impact ("FONSI") for the lease decision.  BLM-1750.  In December 2016, BLM offered approximately 719 acres (17 parcels) for sale.  BLM-286.  In March 2017, BLM offered 1,147.10 acres (20 parcels) for sale.  BLM-2.  BLM refers to the December 2016 and March 2017 leases as Category 1.[1]  Declaration of Anthony D. Bobo, Jr. ¶ 3 ("Bobo Decl.").  Since February 2017, BLM has received $6,445,845.00 in bonus bids and rental payments from these Category 1 leases, and almost half of this amount – or $3,158,464.05 – has been transferred to the State of Ohio.  *Id.* ¶ 8.  The State of Ohio shares a substantial portion of this revenue with the counties directly impacted by oil and gas development, who expend this revenue on schools, roads, and bridges.  *Id.* ¶ 6.

Since the filing of Plaintiffs' amended complaint, BLM has continued to offer parcels in the Marietta Unit for lease, holding lease sales in September 2017, December 2017, March 2018, December 2018, September 2019, and December 2019.  *Id.* ¶ 2.  Through these sales, referred to as Category 2, another twenty-nine parcels on the Marietta Unit have been leased.  *Id.* ¶ 3.  BLM has received $1,515,449.00 in bonus bids and rental payments from these Category 2 leases, and almost half of this amount – or $742,570.01 – has been transferred to the State of Ohio.  *Id.* ¶ 8.

Accordingly, a total of sixty-five parcels in both Categories 1 and 2 on the Marietta Unit have been leased since BLM's October 2016 decision to lease.  *Id.* ¶ 2.  For the sixty-five leased parcels, applications for permits to drill ("APDs") have been approved on just six leases – four of the Category 1 leases and two of the Category 2 leases.[2]  *Id.* ¶ 3.  Of the six leases with approved APDs, no oil and gas production or drilling has commenced, with the exception of drilling completed for the installation of 100 vertical feet of conductor casing in privately owned minerals, on a pre-existing private surface well pad, through which the operator will eventually

---

[1] While these sales resulted in thirty-seven leases, one of these lessee defaulted and BLM cancelled the lease, according to its regulations.  Thus, there are thirty-six leases at issue in Category 1.

[2] There may be more than one approved APD per lease.

*Fed. Defs.' Remedy Br.*                                                                 3

reach one of the leases, located more than a mile away (lease number OHES058213, a Category 1 lease). *Id*. ¶ 5; Exhibit A (spreadsheet of leases).

BLM anticipates no additional drilling in the next ten months on any of the six leases with approved APDs. *Id.* ¶ 14. After mid-March 2021, it is possible that the operator may drill three leases (OHES058226 and OHES058229 in Category 1, and OHES058298 in Category 2) off of one pre-existing well pad located on private land. *Id.* Under the terms of the approved APDs, activity under all three of the additional leases will be accessed from a single well pad and require the drilling of just one well, which descends vertically to depth before transitioning to a horizontal orientation. *Id.* This well pad has already been constructed and the roadways needed for access to it have been built. *Id.* The operator for two additional leases (OHES058187 in Category 1 and OHES0058308 in Category 2) similarly does not anticipate drilling before mid-March 2021. *Id.* Under the terms of the approved APDs, drilling would be from an existing well pad on private land. *Id.* Finally, the operator for lease number OHES058213, with the existing 100 feet of casing, does not anticipate drilling prior to mid-May 2021. *Id.* Under the terms of the APDs for all six of these leases, water needed for fracking operations would be drawn from the Ohio River, not the Muskegon Creek or the Little Muskingum River. *Id.* ¶ 18. Thus, for these six parcels with approved APDs, even when operations do commence, no earlier than mid-March 2021, those operations will not occupy federal surface, not result in additional ground disturbance, and not withdraw water from Little Muskingum River or Muskegon Creek.

BLM will not approve any APDs on the fifty-nine other leases until the Court's remedy order is satisfied, nor will BLM conduct any further lease sales prior to March 2021, at the earliest. *Id.* ¶ 13.

## **STANDARD OF REVIEW**

When a court finds an agency action or decision to be unlawful, the law is well-settled that "the proper course, except in rare circumstances, is to remand [the action] to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). Under established principles of Administrative Procedure Act ("APA") review, the

1   Court is not to direct the outcome of agency decisions and should remand for the agency to

2   exercise its discretion and expertise.  *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*,

3   423 U.S. 326, 333 (1976) (upon remand, a reviewing court may not "proceed by dictating to the

4   agency, the methods, procedures, and time dimension of the needed inquiry").  While ordinarily

5   an unlawful agency action is set aside, *see* 5 U.S.C. § 706(2), vacatur is a form of equitable

6   relief, and courts are not mechanically obligated to vacate agency decisions that they find

7   invalid.  *See* 5 U.S.C. § 702 ("[n]othing herein . . . affects . . . the power or duty of the court to

8   dismiss any action or deny relief on any other appropriate legal or equitable ground"); 5 U.S.C. §

9   703 (authorizing suit for declaratory or injunctive relief); *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d

10  1337, 1343 (9th Cir. 1995) ("[a]lthough the district court has power to do so, it is not required to

11  set aside every unlawful agency action.  The court's decision to grant or deny injunctive or

12  declaratory relief under [the] APA is controlled by principles of equity.") (citations omitted).

13          Contrary to Plaintiffs' claim, there is no binding precedent in the Sixth Circuit that

14  district courts must set aside agency actions found to be unlawful.  Plaintiffs significantly

15  overstate the remedy holding in *Kentucky Riverkeeper*, 714 F.3d at 411, when they claim that

16  "reviewing courts have a 'duty' to 'set aside' or vacate 'unlawful' agency action, including

17  actions approved in violation of NEPA."  ECF No. 111("Pls.' Br.") at 1; *see id.* 3-4 (claiming the

18  Sixth Circuit set aside a permit "citing its 'duty' to do so under [the APA]"), 8 (the Sixth Circuit

19  "follows the mandatory language of the APA").  In *Kentucky Riverkeeper*, the Sixth Circuit

20  invalidated one of two Army Corps discharge permits as arbitrary and capricious and then

21  remanded the matter "to allow the parties and the district court an opportunity to assess

22  ramifications of this ruling on existing projects and potential remedies."  714 F.3d at 413.  On

23  remand, the district court vacated and set aside the permit, but that two-page order does not

24  elucidate the court's rationale.  Order & J., ECF No. 203, *Ky. Riverkeeper v. Leonard*, Civ. No.

25  05-181-DBL (E.D. Ky. Aug. 22, 2013), *attached as* Pls.' Ex. D, ECF No. 111-5.  Plaintiffs

26  acknowledge the *Kentucky Riverkeeper* remand in a footnote, but incorrectly attribute the court's

27  ultimate vacatur of the permit to "the APA's plain mandate."  Pls.' Br. 4 n.3.  Plaintiffs thus

28

*Fed. Defs.' Remedy Br.*                                                    5

overreach by characterizing the unexplained, fact-specific vacatur in *Kentucky Riverkeeper* as compelling a similar result here.

In the absence of controlling Sixth Circuit precedent, this Court should look to the key decision routinely used by courts in multiple circuits to guide the analysis of remedy in such situations. In *Allied Signal v. U.S. Nuclear Regulatory Commission*, the D.C. Circuit emphasized that "[a]n inadequately supported rule . . . need not necessarily be vacated." 988 F.2d 146, 150 (D.C. Cir. 1993). The D.C. Circuit reasoned, "[t]he decision whether to vacate depends on 'the seriousness of the order's deficiencies (and thus the extent of doubt about whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'" *Id.* at 150-51. Neither factor is dispositive, as "[t]here is no rule requiring either the proponent or opponent of vacatur to prevail on both factors." *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 270 (D.D.C. 2015) (citing cases). The "resolution of the question turns on the Court's assessment of the overall equities and practicality of the alternatives." *Id.*

Several courts – including the Third, Ninth, Eleventh, and Federal Circuits – have adopted the D.C. Circuit's two-part test. In *California Communities Against Toxics v. EPA*, 688 F.3d 989 (9th Cir. 2012), the Ninth Circuit considered whether to vacate an EPA rule approving revisions to a portion of California's Clean Air Act State Implementation Plan. Emphasizing that a "flawed rule need not be vacated," the Court adopted the two-part test articulated in *Allied-Signal*. *Id.* at 992. The Eleventh Circuit also adopted *Allied-Signal* when it considered remanding without vacatur a dredge and fill permit for surface coal mining operations. *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015). The Eleventh Circuit found the test "instructive" for determining "when a court should remand without vacating the agency's action." *Id.* The Eleventh Circuit did not decide whether vacatur was warranted, but rather remanded the question to the district court as it "is best-suited to make

these fine-grained and fact-intensive determinations."  *Id.* at 1291.[3]  In *Prometheus Radio Project v. FCC*, the Third Circuit applied *Allied-Signal* when it declined to vacate broadcast ownership rules because the FCC likely would be able to justify restriction on remand, and where vacatur of the existing rules "would invite chaos."  824 F.3d 33, 52 (3d Cir. 2016).  The Federal Circuit, too, adopted *Allied-Signal* when it declined to invalidate a regulation restricting certain benefits to survivors.  *Nat'l Org. of Veterans Advocates, Inc. v. Sec'y of Veterans Affairs*, 260 F.3d 1365, 1380 (Fed. Cir. 2001).[4]

Seemingly recognizing the pervasive use of this test, Plaintiffs attempt to limit its applicability here, but *Allied-Signal* is not limited to agency rulemaking as Plaintiffs suggest.  Pls.' Br. 8-9.  The D.C. and Eleventh Circuits have applied *Allied-Signal* to discrete agency actions such as permits.  *See, e.g.*, *Nat'l Parks Conservation Ass'n v. Semonite*, 925 F.3d 500 (D.C. Cir. 2019) (permit for a series of electrical transmission towers); *Black Warrior Riverkeeper*, 781 F.3d 1271 (nationwide permit for surface coal mining operations).  Numerous district courts have applied the two-part test to discrete agency actions as well, from oil and gas leasing to big game hunting.  *See, e.g.*, *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41 (D.D.C. 2019) (oil and gas leases); *All. for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152 (D.

---

[3] On remand, the district court again held in favor of the agency on the merits and thus did not reach the question of remedy.  *Black Warrior Riverkeeper*, No. 2:13-CV-2136-WMA, 2015 WL 6152898 (Oct. 20, 2015), *aff'd* 833 F.3d 1274 (11th Cir. 2016).

[4] Other circuits, while not formally adopting *Allied-Signal*, cite the decision favorably in weighing whether to vacate an agency decision.  *Cent. Me. Power Co. v. F.E.R.C.*, 252 F.3d 34, 48 (1st Cir. 2001) ("A reviewing court that perceives flaws in an agency's explanation is not required automatically to set aside the inadequately explained order."); *Nat. Res. Def. Council v. EPA*, 808 F.3d 556, 584 (2d Cir. 2015); *Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (remanding without vacatur rule concerning the use and disposal of polychlorinated biphenyls because "EPA may well be able to justify its decision to refuse to promulgate a national variance for the electric utilities and it would be disruptive to vacate a rule that applies to other members of the regulated community."); *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 655 (4th Cir. 2018) (stating "[t]his Court has never formally embraced the *Allied-Signal* remand-without-vacatur approach" but then analyzing the decision whether to vacate a pipeline permit under the *Allied-Signal* test).  The Tenth Circuit has not specifically addressed whether *Allied-Signal* applies.  *High Country Conservation Advocates v. U.S. Forest Serv.*, 67 F. Supp. 3d 1262, 1263-644 (D. Colo. 2014).

*Fed. Defs.' Remedy Br.*                                                                          7

Mont. 2019) (vegetation management project); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91 (D.D.C. 2017) (oil pipeline); *Mayo v. Jarvis*, 177 F. Supp. 3d 91 (D.D.C. 2016) (no jeopardy finding for grizzly bears during elk hunt); *Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100 (E.D. Cal. 2013) (forest plan amendment); *Md. Native Plant Soc'y v. U.S. Army Corps of Eng'rs*, 332 F. Supp. 2d 845 (D. Md. 2004) (discharge permit).

The two-step test articulated in *Allied-Signal* follows the well-established rule that district courts have considerable discretion to fashion an equitable remedy and is firmly grounded in the court's equitable powers. *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."); *Ford Motor Co. v. NLRB*, 305 U.S. 364, 373 (1939) ("while the court must act within the bounds of the statute and without intruding upon the administrative province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action."); *United States v. City of Parma*, 661 F.2d 562, 576 (6th Cir. 1981) ("courts must carefully tailor the remedy in cases of statutory violations, limiting it to relief necessary to correct the violations"), *cert. denied*, 456 U.S. 926 (1982); *City of Romulus v. Wayne Cty.*, 392 F. Supp. 578, 594 (E.D. Mich. 1975) ("general principles of equity are applicable in NEPA cases and these principles will control the Court's discretion."). The Sixth Circuit has not yet spoken to *Allied-Signal's* applicability, but the test has been widely adopted or cited by other courts and provides a useful framework for this Court to analyze the competing interests present at the remedial stage of this litigation.

## ARGUMENT

## I.    The Court should leave in place the existing leases and remand BLM's FONSI and USFS's consent to lease without vacatur.

Applying *Allied-Signal* here, the Court should decline to vacate the leasing approval decisions challenged in this action and allow the thirty-six existing leases from Category 1 to remain in place while the agencies conduct additional NEPA analysis on remand. In keeping with the significant degree of discretion courts enjoy in exercising their equitable powers, the

1   Court can consider the *Allied-Signal* factors in any sequence, and neither factor is dispositive.

2   *See Shands Jacksonville Med. Ctr.*, 139 F. Supp. 3d at 270.

3        Under the second *Allied-Signal* factor, vacatur would have serious disruptive

4   consequences for the thirty-six leases sold in December 2016 and March 2017 that are

5   challenged in this action.  In evaluating the disruptive consequences of vacatur, the Court should

6   consider the economic and social effects to the surrounding community.  *See, e.g.*, *Cal. Cmtys.*

7   *Against Toxics*, 688 F.3d at 994 (ordering remand without vacatur because under the second

8   *Allied-Signal* factor, vacatur would be "economically disastrous"); *Black Warrior Riverkeeper*,

9   781 F.3d at 1290 (rejecting plaintiff's "argument that the potential disruption to the mining

10  industry is irrelevant.  Here, vacatur could suspend a substantial amount of surface mining in the

11  state of Alabama, all for an error that may well turn out to be inconsequential.").  If these thirty-

12  six leases are vacated, BLM would need to go through the administrative process to cancel them,

13  update the land and minerals record systems, and process refunds.  Bobo Decl. ¶ 8.  Since

14  February 2017, BLM has received $6,445,845 in bonus bids and rental payments from these

15  Category 1 leases, monies already spent or allocated to other programs.  *Id.*  Importantly, almost

16  half of this amount – or $3,158,464.05 – has been transferred to the State of Ohio.  *Id.*  The State

17  of Ohio shares a substantial portion of this revenue with the counties directly impacted by oil and

18  gas development, who expend this revenue on schools, roads, and bridges.  *Id.* ¶ 6.  Vacating

19  these leases would have considerable financial ramifications for local, state, and federal

20  governments and would divert BLM staff time from other public land stewardship

21  responsibilities.  *Id.* ¶¶ 6, 8, 9, 16.  Furthermore, any subsequent re-leasing would require

22  additional administrative processes and tasks, diverting agency personnel from other land

23  management activities and obligations.  *Id.* ¶ 9.  And due to the changed economic climate, these

24  same lease parcels could end up selling for less money, which in turn means a smaller amount of

25  funds to be shared with the State of Ohio for roads, school, and bridges.  *Id.*  The economic and

26  social impacts of vacating these leases counsel in favor of leaving the leases intact.

27

28

As for the first *Allied-Signal* factor – the seriousness of the action's deficiencies – the Court must "assume the [agency] will comply with the law" on remand.  *N. Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157 (9th Cir. 1988); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) ("when equity demands, the regulation [or action] can be left in place while the agency follows the necessary procedures."); *see Croman Corp. v. United States*, 724 F.3d 1357, 1364 (Fed. Cir. 2013) ("The presumption that government officials act in good faith is enshrined in our jurisprudence.") (citation omitted); *Del Norte Cty. v. United States*, 732 F.2d 1462, 1468 (9th Cir. 1984) ("In the absence of clear evidence to the contrary, courts presume that public officers properly discharge their duties.").  BLM believes the deficiencies identified by the Court can be cured by additional NEPA analysis on remand.  Bobo Decl. ¶ 7.  BLM estimates that it can complete the additional NEPA analysis (including obtaining the necessary Forest Service consent decisions on the leases) in approximately twelve months following entry of the remedy order.[5]  *Id.*

Plaintiffs are wrong when they claim remand without vacatur is limited to circumstances where vacatur would cause serious environmental harm.  Pls.' Br. 10-11.  Courts consider a variety of impacts when balancing the equitable factors, including economic impacts.  *Pub. Emps. for Envtl. Responsibility v. Hopper*, 827 F.3d 1077, 1084 (D.C. Cir. 2016) (explaining that the second *Allied-Signal* factor includes consideration of "social and economic costs" (citation omitted)); *see also Cal. Cmtys. Against Toxics*, 688 F.3d at 994; *Black Warrior Riverkeeper*, 781 F.3d at 1290.  Thus, there is no reason for this Court to discount the very real social and economic costs that would follow vacatur of the challenged leases.

Plaintiffs are also wrong when they depict vacatur of the thirty-six leases sold in December 2016 and March 2017 as a simple accounting measure with no real world

---

[5] While this is BLM's best estimate, it is possible that factors could impact this estimate, such as extensive public comment, a decision that an EIS is necessary, or the need to engage in additional ESA consultation.  In the event that the estimated period is longer than twelve months from the date of the remand order, Federal Defendants will notify the Court and the parties in sufficient time to allow for any further proceedings, if necessary.

*Fed. Defs.' Remedy Br.*                                                                 10

consequences. Pls.' Br. 16-18. Revoking the existing leases "would set in motion a chain of events that could lead to the type of serious, disruptive consequences with which the second *Allied-Signal* factor is concerned." *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 100 (D.D.C. 2019). As noted above, almost half of the lease revenue has been transferred to the State of Ohio, and a substantial portion of that has been passed on to local governments to be used for roads, schools, and bridges. Bobo Decl. ¶ 8. Additionally, vacatur could cause significant operational and financial challenges for the lessees, their authorized operators, and private citizens who own mineral rights within the drilling units. *Id.* ¶¶ 10-12.

Plaintiffs cite *Western Watersheds Project v. Zinke* for the proposition that it is not too disruptive to vacate existing leases. Pls.' Br. 17 (citing No. 1:18-cv-0187-REB (D. Idaho Feb. 27, 2020)); *see id.* 6, 11, 12 (citing same). But the district court there subsequently *granted* defendants' motion to stay vacatur pending appeal. *See* No. 1:18-cv-0187-REB, 2020 WL 2462817 (D. Idaho May 12, 2020). In granting the motion to stay, the court held "there is the prospect of irreparable harm to the appealing parties as well as to states and local communities that rely on the bonus bid payment and royalties [from leased parcels] as well [as] upstream oil and gas industry-related jobs connected to such activity." *Id.* The court ultimately reconsidered its earlier order and declined to vacate the leases; instead, it suspended the development of, and production from, the leases. *Id.* Similarly, for the December 2016 and March 2017 leases at issue here, the "egg has been scrambled" and vacatur of these leases is "an invitation to chaos." *Sugar Cane Gowers Co-op of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002); *Prometheus Radio Project*, 824 F.3d at 52 (declining to vacate broadcast ownership rules because doing so "would invite chaos.").

The economic chaos that would result from vacatur of these leases stands in stark contrast to the minimal environmental impacts of leaving the leases intact. While Plaintiffs claim that vacatur of the December 2016 and March 2017 leases is necessary to prevent harm to the environment, Pls.' Br. 5-7, 11, this argument relies on generalized discussions of the impacts of oil and gas development. However, the evidence shows that any harm to the environment during

*Fed. Defs.' Remedy Br.* 11

the remand would be de minimis, if there is any at all. Of the four Category 1 leases with approved APDs, the soonest an operator anticipates drilling on three of them is mid-March 2021, and there are no plans to drill the other parcel any sooner than mid-May 2021. Bobo Decl. ¶ 14. If and when operations do go forward after that, activity will be accessed from single well pads located on private land served by existing roads. *Id.* And water needed for any operations will not be drawn from the Muskegon Creek or the Little Muskingum River. *Id.* ¶ 18. Thus, there is little to no environmental impact expected to occur during the remand period.

As for the remaining thirty-three leases from Category 1, there is no harm to the environment during the remand period because BLM will not approve any other APDs during that time. *Id.* ¶ 13. This means the on-the-ground status of these leases remains unchanged during the remand period, an approach that has been found sufficiently protective by numerous other courts that allowed leases to remain in place pending additional environmental analysis. *See Connor v. Burford*, 848 F.2d 1441, 1460-61 (9th Cir. 1988) (keeping leases intact while enjoining surface disturbing activities pending compliance with NEPA and the ESA); *WildEarth Guardians*, 368 F. Supp. 3d at 84-85 (keeping leases intact while enjoining BLM from issuing APDs pending further NEPA analysis); *Wilderness Soc'y v. Wisely*, 524 F. Supp. 2d 1285, 1305-06 (D. Colo. 2007) (keeping leases intact while enjoining activity on the leases pending further consultation under the ESA); *Mont. Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032, 1038 (D. Mont. 2006) (keeping leases intact while enjoining surface disturbing activities on oil and gas leases pending compliance with NEPA and the ESA); *Colo. Envtl. Coal. v. Office of Legacy Mgmt.*, 819 F. Supp. 2d 1193, 1224 (D. Colo. 2011) (staying leases issued pursuant to an EA and FONSI), *amended on reconsideration*, No. 08-cv-01624-WJM-MJW, 2012 WL 628547 (D. Colo. Feb. 27, 2012).

In sum, vacatur is not warranted here. BLM has already stated that it will not issue any additional leases or approve any APDs for the lease parcels, Bobo Decl. ¶ 13, and the equities strongly favor allowing the thirty-six existing leases from Category 1 to remain in place. *See, e.g.*, *W. Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 813 (9th Cir. 1980) ("[G]uided by authorities

that recognize that a reviewing court has discretion to shape an equitable remedy, we leave the challenged designations in effect."); *Idaho Farm Bureau Fed'n*, 58 F.3d at 1405 (leaving Fish and Wildlife decision in place despite "significant procedural error"); *Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014 (E.D. Cal. 2013) (holding NEPA error did not warrant vacatur of challenged decision). The Court should decline to vacate the existing thirty-six leases while the agencies address on remand the NEPA deficiencies identified by the Court.

**II.  Even if the Court finds that vacatur may be warranted, it should exercise its discretion to stay vacatur of the challenged leasing decisions.**

In the alternative, if the Court finds that vacatur of the challenged leasing decisions is appropriate, it should exercise its equitable discretion to stay vacatur of these decisions for a period of twelve months, which is the period during which the agencies currently estimate they can address the violation identified by the Court. Courts in the D.C. Circuit have ordered such a remedy when the underlying deficiencies in the rule are too substantial to avoid vacatur, but a stay is appropriate "due to equitable considerations, to relieve the parties from the onerous results of the court's holding until the agency can redo its analysis." *Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv.*, 288 F. Supp. 2d 7, 11-12 (D.D.C. 2003) (exercising equitable powers to stay mandate of prior decision vacating biological opinion); *Flaherty v. Pritzker*, 17 F. Supp. 3d 52, 58 n.5 (D.D.C. 2014) (discussing one-year stay of the vacatur order so that the agency may address the legal deficiencies); *Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 855 (D.C. Cir. 1987) (staying mandate for six months "to avoid further disruptions in the domestic market and to allow the Secretary to undertake further proceedings"); *Chamber of Commerce of U.S. v. SEC*, 443 F.3d 890, 909 (D.C. Cir. 2006) (staying vacatur of agency rule for ninety days to avoid disruption in regulated industry and confusion in the investing public). District courts in the Ninth Circuit have also deferred decisions on vacatur, based on the prospect of irreparable harm to parties and state and local communities. *W. Watersheds Project*, 2020 WL 2462817.

Staying the effect of a vacatur order would avoid the significant disruptions and required return of the monies already shared with the State of Ohio for construction of roads, schools, and

bridges. And because no operations are planned any sooner than mid-March 2021, Plaintiffs will not be prejudiced by limited activity permitted during this timeframe, if any occurs. And such impacts would be minimal, as they would be contained to existing well pads on private land served by existing roads. Accordingly, if the Court believes that the *Allied-Signal* factors require vacatur of the challenged leasing decisions, it should still exercise its equitable discretion and stay the effect of the vacatur order for twelve months. The stay of the remedy order would automatically lift at the end of this period, putting the onus on BLM and the Forest Service to complete their additional analyses and supplemental decisionmaking prior to the expiration of the say. *See, e.g.*, *WildEarth Guardians v. U.S. Office of Surface Mining Reclamation and Enforcement*, 104 F. Supp. 3d 1208, 1232 (D. Colo. 2015) (deferring entry of a vacatur order for a set time period, during which the agency was expected to undertake NEPA analysis, and if the NEPA process was not completed within that time window, then "an order of vacatur will be immediately effective absent further court order based upon very good cause shown"); *Haw. Longline*, 288 F. Supp. 2d at 13.

### III. Plaintiffs are not entitled to injunctive relief.

In addition to remand and vacatur of the agency actions challenged in the Amended Complaint, Plaintiffs also request this Court to vacate lease sales and leases from Category 2, all of which post-date the Amended Complaint.[6] ECF No. 111 at 19. However, since this Court does not have jurisdiction over those actions, it cannot remand or vacate them under 5 U.S.C. § 706(2). Thus, what Plaintiffs actually seek is an injunction that would direct BLM to cancel these additional twenty-nine leases from Category 2. Because Plaintiffs fail to satisfy the high bar for this request, they are not entitled to such relief. Furthermore, while their briefing is unclear, to the extent that Plaintiffs seek an order from the Court directing the form, substance, or process of the supplemental environmental analysis required by the March 13, 2020 Order, Plaintiffs fail to show they are entitled to such injunctive relief.

---

[6] This request would affect an additional twenty-nine leases. Two of these have approved APDs. Bobo Decl. ¶ 3.

*Fed. Defs.' Remedy Br.*            14

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). In fact, it "has been characterized as one of the most drastic tools in the arsenal of judicial remedies." *Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001) (citation and internal quotation marks omitted). The decision to issue an injunction is discretionary. *Hornback v. Brotherhood of R.R. Signalmen*, 346 F.2d 161, 164 (6th Cir. 1965). A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Monsanto*, 561 U.S. at 156-57. Plaintiffs cannot make that showing here.

### A. Plaintiffs are not entitled to injunctive relief requiring BLM to cancel its leases.

With respect to the first factor, Plaintiffs cannot show that vacatur of these additional twenty-nine leases is required to prevent their members from suffering an irreparable injury. Plaintiffs rely, generally, on their members' speculations about harms to their interest in the resources of the Wayne National Forest. Pls.' Br. 11. This is problematic for several reasons.

First, the fears of Plaintiffs' declarants – alleged to establish standing to bring their claims – do not rise to the level of meeting the Plaintiffs' burden to show that "irreparable injury is *likely* in the absence of an injunction." *Berger v. Nat'l Bd. of Med. Exam'rs*, No. 1:19-cv-99, 2019 WL 4040576, at \*26 (S.D. Ohio Aug. 27, 2019) (citations omitted). Additionally, while Plaintiffs assert that their interests would be harmed by development of leases, they concede no development has occurred. Pls.' Br. 16 ("[t]he vast majority of the leases have not yet been proposed or approved for drilling"); ECF No. 111-1, ¶¶ 5-6 (of leases that post-date the complaint, only two have approved APDs); Bobo Decl. ¶¶ 3, 13, 14 (confirming that only two of the twenty-nine Category 2 leases have approved APDs). Furthermore, the operators for those leases have no planned activity any sooner than mid-March 2021. *Id*. ¶ 14. If and when operations go forward, they will be from pre-existing well pads on private land served by pre-

---

*Fed. Defs.' Remedy Br.*                                                   15

1  existing roads. *Id.*; *id.* ¶ 17. Plaintiffs simply cannot show that their interests are likely to suffer

2  irreparable injury during the pendency of the remand.

3  The third and fourth elements also weigh against enjoining the twenty-nine post-

4  complaint leases. To undo the leases, BLM would have to update the land and minerals record

5  systems, and process refunds from money that has been spent or allocated to other programs.

6  Bobo Decl. ¶ 8. This administrative burden is not warranted here. Since February 2017, BLM

7  has received $1,515,449.00 in bonus bids and rental payments from these Category 2 leases,

8  which has been spent or allocated. *Id.* ¶ 8. Almost half of this amount – or $742,570.01 – has

9  been transferred to the State of Ohio. *Id.* Thus, the public interest favors denying any

10  injunction, as the State of Ohio transfers a substantial portion of this revenue to the counties

11  directly impacted by oil and gas development. *Id.*; *id.* ¶ 6.

12  Finally, Plaintiffs' request to vacate the post-complaint leases is not narrowly tailored.

13  "If injunctive relief is proper, it should be no broader than necessary to remedy the harm at

14  issue." *United States v. Miami Univ.*, 294 F.3d 797, 816 (6th Cir. 2002) (citation omitted).

15  Plaintiffs assert that vacatur of the leases is required to prevent the harms their members

16  associate with lease development. Pls.' Br. 11. However, as discussed above, the suspension of

17  further APD approval or an order enjoining physical development or construction would achieve

18  the same result while being more appropriately tailored relief.

19  **B.    Plaintiffs are not entitled to an injunction directing the remand.**

20  Plaintiffs brief contains a *non sequitur* discussion of the Forest Service's planning

21  process to revise the relevant Forest Plan – which will include appropriate NEPA and

22  environmental analysis – that is unrelated to the issue of the appropriate remedy for the

23  violations found in the Court's March 13, 2020 Order. Pls.' Br. 15 n.9. At its conclusion,

24  Plaintiffs assert that "the Forest Service's EIS process for the Forest Plan revision would be the

25  most logical venue for remand of the deficient NEPA review here." *Id.* This may be Plaintiffs'

26  opinion. However, to the extent that they have included this suggestion to urge the Court to

27  condition lease approval upon completion of the Forest Service's plan revision/amendment

*Fed. Defs.' Remedy Br.*                                                    16

process, they are not entitled to such injunctive relief directing or constraining the agencies' remand process.

It has been "the guiding principle" for almost seventy years in the administrative context that "the function of the reviewing court ends when an error of law is laid bare. At that point the matter once more goes to the [agency] for reconsideration." *Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952). The Supreme Court has made it clear that under the APA, a remand order should allow the agency the discretion to determine how it "may best proceed to develop the needed evidence and how its prior decision should be modified in light of such evidence as develops." *Transcon. Gas Pipe Line Corp.*, 423 U.S. at 333-34. Agencies have discretion as to how they exercise this power, and "courts lack authority 'to impose upon [an] agency its own notion of which procedures are "best" or most likely to further some vague, undefined public good.' To do otherwise would violate 'the very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101-02 (2015) (quoting *Vt. Yankee Nuclear Power Corp. v. Natl. Res. Def. Council*, 435 U.S. 519, 549 (1978)) (internal citations omitted). Absent substantial justification, the reviewing court is not to dictate "to the agency the methods, procedures, and time dimension of the needed inquiry." *Vt. Yankee*, 435 U.S. at 544-45 (citation omitted). To do otherwise "clearly runs the risk of 'propel[ling] the court into the domain which Congress has set aside exclusively for the administrative agency.'" *Id.* at 545 (citation omitted).

Here, it is for the agencies to determine how they may best develop the needed evidence and analysis to address the violations identified in the Court's order. *Monsanto*, 561 U.S. at 159. It is also up to the agencies to determine what process should be used for this analysis and the timing of that process.[7] While certainly there is overlap of the subject matter, there is no need

_____

[7] For example, the Forest Plan revision process – which covers many more acres and resources issues than the leasing at issue here – will consist of a multi-phase process, with numerous rounds of public participation, that is estimated to last "into late 2022." *See* https://www.fs.usda.gov/detail/wayne/landmanagement/planning/?cid=fseprd695580 (last visited May 13, 2020). If the Court directed that the additional environmental analysis on remand here

*Fed. Defs.' Remedy Br.*                                                                      17

for the additional environmental analysis here to await inclusion in the Forest Plan revision process. While the agencies' prior leasing decisions tiered back to the EIS for the 2006 Forest Plan revision, this was a matter of administrative efficiency and not required by the relevant regulations. The regulations require only that before the Forest Service consents to lease specific lands, it either verify that such leasing was adequately addressed in a prior NEPA document or perform additional environmental analysis before giving its consent. 36 C.F.R. § 228.102(e)(1). Neither option requires that environmental analysis to be conducted as part of the forest plan revision process. *See id.* § 228.102(c) ("[L]easing analysis shall be conducted . . . in accordance with the requirements of 36 CFR part 219 (Forest land and resource management planning) *and/or, as appropriate, through preparation of NEPA documents.*") (emphasis added). The Court should reject any implied request or suggestion from Plaintiffs to dictate the process and timing of the analysis required by the relevant leasing regulations.[8]

## **CONCLUSION**

For the foregoing reasons, Federal Defendants respectfully submit that the appropriate remedy is remand of BLM's FONSI and the USFS's consent to lease without vacatur.

Respectfully submitted on this 15th day of May, 2020,

---

be conducted as part of the Forest Plan revision process, it necessarily would be imposing the "methods, procedures, and time dimension" of the broader Forest Plan revision process onto the remand here. *Vt. Yankee*, 435 U.S. at 544-45.

[8] Plaintiffs lump in a request to vacate BLM's EA along with vacatur of the FONSI. *See* Pls.' Br. 2, 15, 20. Under the APA, judicial review is limited to "final agency action." 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) ("[T]wo conditions must be satisfied for agency action to be final: First, the action must mark the consummation of the agency's decisionmaking process . . . second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.") (citations and internal quotation marks omitted). For purposes of NEPA, the "[i]ssuance of a FONSI is final agency action and provides notice that [the agency] has completed its evaluation of the environmental impact of the action in question." *Sw. Williamson Cty. Cmty. Ass'n, Inc. v. Slater*, 173 F.3d 1033, 1037 (6th Cir. 1999). Here, BLM's FONSI and decision records – not the EA – are the final agency actions subject to judicial review, and any remedy should be directed at the FONSI and the decision records.

*Fed. Defs.' Remedy Br.* 18

1

2

3

4

PRERAK SHAH
Deputy Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

5

6

7

8

9

*/s/ Bridget Kennedy McNeil*
BRIDGET K. McNEIL (CO Bar 34299)
Senior Trial Attorney
Wildlife and Marine Resources Section
999 18th St., Suite 370
Denver, Colorado 80202
Ph: 303-844-1484
bridget.mcneil@usdoj.gov

10

11

12

13

14

15

*/s/ John P. Tustin*
JOHN P. TUSTIN
Senior Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Ph:202-305-3022
john.tustin@usdoj.gov

16

*Attorneys for Federal Defendants*

17

18

19

20

21

22

23

24

25

26

27

28

*Fed. Defs.' Remedy Br.*                                                              19