NATHAN G. JOHNSON (OH 0082838)
Ohio Environmental Council
556 East Town Street
Columbus, OH 43215
(614) 487-7506
njohnson@theoec.org

MEGAN M. HUNTER (OH 96035)
EARTHJUSTICE
311 South Wacker Dr., Suite 1400
Chicago, IL 60606
mhunter@earthjustice.org
312-800-8331

WENDY S. PARK (CA State Bar No. 237331), *pro hac vice*
EMMA L. YIP (CA State Bar No. 352446), *pro hac vice application pending*
Center for Biological Diversity
2100 Franklin Street, Suite 375
Oakland, CA 94612
(510) 844-7138
wpark@biologicaldiversity.org
eyip@biologicaldiversity.org

ELIZABETH BENSON (CA State Bar No. 268851), *pro hac vice*
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5723
elly.benson@sierraclub.org

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, HEARTWOOD, OHIO ENVIRONMENTAL COUNCIL, SIERRA CLUB | ) Civ. No. 2:17-cv-372 ) ) ) Judge Michael H. Watson ) Magistrate Judge Kimberly A. Jolson |
| Plaintiffs, | ) ) |
| vs. | ) **PLAINTIFFS' MOTION TO** ) **ENFORCE INJUNCTION** |
| U.S. FOREST SERVICE, *et al*. | ) ) |
| Federal Defendants; and | ) ) |
| AMERICAN PETROLEUM INSTITUTE, *et al*. | ) ) |
| Intervenor Defendants. | ) ) |

**MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE INJUNCTION**

Pursuant to the Court's inherent authority to enforce its own judgments and Federal Rule of Civil Procedure 60(b), Plaintiffs move this Court to enforce the injunction established in its Opinion and Order, ECF 118. The Bureau of Land Management (BLM), U.S. Forest Service (USFS), and U.S. Fish and Wildlife Service (USFWS) (collectively, "Defendants") unilaterally declared they have satisfied the requirements of the National Environmental Policy Act (NEPA) and this Court's March 13, 2020 and March 8, 2021 orders, and stated they will no longer comply with the Court's injunction barring the issuance of new applications for permits to drill (APDs) in the Wayne National Forest ("Wayne"). ECF No. 141. However, Defendants failed to comply with the requirements set forth in the Court's orders, and therefore the injunction remains in place. Plaintiffs respectfully move this Court to enforce the existing injunction until the Court determines that BLM's remanded environmental analysis complies with NEPA and its previous orders.

## I.      BACKGROUND

Located in the Appalachian Mountains, the Wayne is Ohio's only national forest. Hundreds of thousands of people visit the Wayne annually, and hundreds of species of animals and plants call it home. ECF 49 at ¶¶ 47, 49 (Fed. Defs.' Answer). In late 2015, BLM proposed leasing federally owned minerals in the Marietta Unit of the Wayne (the "Project"). AR at BLM-043962. In 2016, BLM conducted NEPA review on the Project, issuing an environmental assessment (EA) and finding of no significant impact, and approved leasing up to 40,000 acres of federal mineral estate in the Marietta Unit. AR at BLM-1750, 1754. Shortly after, BLM offered and leased approximately 1,866 acres of the Wayne, issuing a total of approximately 65 leases. Final Supplemental EA (FSEA) at 1-10 (Exhibit A).

*Plaintiffs' Motion to Enforce Injunction*                                                                    1

On May 5, 2017, Plaintiffs brought this action challenging the EA and FONSI. In 2020, the Court ruled that BLM and USFS violated NEPA because prior to deciding to grant the leases the agencies failed to take a "hard look" at the impacts of fracking (also known as "unconventional" or "horizontal" well development), including "surface area disturbance," the "cumulative impacts on … the Little Muskingum River" and "impacts on air quality." *Center for Biological Diversity v. U.S. Forest Service* ("*CBD*"), 444 F. Supp. 3d 832, 872 (S.D. Ohio 2020) ("2020 Order").

On March 8, 2021, the Court remanded the 2016 EA and corresponding FONSI, ordering BLM to revise its NEPA analysis, and enjoined development of the 65 leases "until [BLM] complete[s] their NEPA analysis in accordance with" the Court's 2020 Order. *Center for Biological Diversity v. U.S. Forest Service*, No. 2:17-CV-372, 2021 WL 855938, at *5 (S.D. Ohio Mar. 8, 2021) ("2021 Order"). BLM completed a final supplemental EA (FSEA) in April 2025, issuing another finding of no significant impact (FONSI) (Exhibit B) on April 17 along with a decision record (DR) (Exhibit C) reauthorizing the Project and affirming issuance of the 65 leases. ECF No. 141 at PageID 7870. Subsequently, the U.S. Forest Service (USFS) affirmed prior consent authorizations of 65 leases. *Id*. On April 29, 2025, Defendants filed a "Notice of Satisfaction on Remand," claiming the FSEA complied with the 2020 Order and purporting to unilaterally dissolve the injunction. ECF No. 141. The Notice announced BLM's intent to begin accepting applications for permits to drill to develop the Wayne leases. *Id*. at PageID 7871-72.

Plaintiffs filed a timely appeal with the Interior Board of Land Appeals (IBLA), which denied their motion to stay leasing decisions on June 26, 2025. BLM submitted the record for that appeal in late June, and Plaintiffs voluntarily dismissed the appeal on August 13. Having

*Plaintiffs' Motion to Enforce Injunction*                                                                  2

attempted to resolve these issues through the IBLA, Plaintiffs, accordingly, raise the issues in this motion within a reasonable time. *See* Fed. R. Civ. P. 60(c).

## II.     STANDARD OF REVIEW

### A.  Injunction

"The power of a federal court to protect and enforce its judgments is unquestioned." *Marshall v. International Brotherhood of Teamsters, etc.*, 593 F.2d 1297, 1302 (D.C. Cir. 1979). "When a court issues an injunction, it automatically retains jurisdiction to enforce it." *Lorillard Tobacco Co. v. Chester*, 589 F.3d 835, 847 (6th Cir. 2009) (citations omitted).

Rule 60(b) provides that on "motion and just terms," a party may seek relief from a "Final Judgment, Order, or Proceeding" for any "reason that justifies relief." Fed. R. Civ. P. 60(b). A plaintiff may move under Rule 60(b) to "enforce the terms of the injunction" and to "tighten [a] decree." *Salazar v. District of Columbia*, 896 F.3d 489, 498 (D.C. Cir. 2018). A motion to enforce should be granted if a "prevailing plaintiff demonstrates that a defendant has not complied with a judgment entered against it." *Heartland Hosp. v. Thompson*, 328 F.Supp.2d 8, 11 (D.D.C. 2004).

### B.  NEPA and the APA

NEPA "promotes its sweeping commitment to 'prevent or eliminate damage to the environment and biosphere' by focusing Government and public attention on the environmental effects of proposed agency action." *Northwoods Wilderness Recovery v. U.S. Forest Serv.*, 323 F.3d 405, 412 (6th Cir. 2003) (quoting 42 U.S.C. § 4321; *Marsh v. Or. Natural Resources Council*, 490 U.S. 360, 472 (1989)). NEPA's "twin aims" are to ensure an agency "consider[s] every significant aspect of the environmental impacts of a proposed action" and "inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983). NEPA "employs 'a set of 'action-forcing' procedures that require agencies to take a 'hard look at environmental consequences.'" *Ky.*

*Plaintiffs' Motion to Enforce Injunction*                                                                3

*Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 407 (6th Cir. 2013) (citations omitted). These procedures ensure "administrative decisions are fully informed and well-considered." *Latin Ams. for Soc. & Econ. Dev. v. Adm'r of the FHA*, 756 F.3d 447, 463 (6th Cir. 2014) (cleaned up).

Accordingly, agencies must prepare a "detailed" environmental impact statement (EIS) when they propose to take "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), if those significant effects are "reasonably foreseeable," *id*. § 4336(b)(1). When the significance of an effect is unknown agencies must prepare an "environmental assessment" (EA). *Id*. § 4336(b)(2). The EA must "set forth the basis of [an] agency's finding of no significant impact or determination that an environmental impact statement is necessary." 42 U.S.C. § 4336(b)(2).

A court reviews NEPA compliance under the Administrative Procedure Act (APA). *Latin Americans*, 756 F.3d at 462. The Court's role "is to 'ensure that the agency has adequately considered and disclosed the environmental impacts of its actions and that its decision is not arbitrary or capricious,'" *CBD*, 444 F. Supp. 3d at 846 (citing *Ky. Riverkeeper*, 714 F.3d at 407).

## III.    ARGUMENT

### A.  <u>The injunction did not automatically dissolve upon BLM's completion of a legally deficient supplemental EA and FONSI.</u>

This Court's 2021 Order on remedies provided that the injunction issued "shall remain in effect until [] Defendants complete their NEPA analysis in accordance with the Court's previous Opinion and Order." *CBD*, 2021 WL 855938, at *5. As explained below, Defendants have not satisfied the 2021 Order and thus continue to deny Plaintiffs the granted relief. The Court's previous order held that Defendants failed to take NEPA's required "hard look" at the impacts of fracking in the Wayne. But Defendants' FSEA does not remedy the hard look failures identified by the Court and therefore was not completed "in accordance with the Court's previous Opinion and Order." *Id*. Accordingly, the Court should enforce the injunction until Defendants comply with the judgment. *Sherwood v. Tennessee Valley Auth.* 46 F.4th 439, 445 (6th Cir. 2022)

*Plaintiffs' Motion to Enforce Injunction*                                                                    4

(requiring district court to review the sufficiency of agency's EIS prior to dissolution of injunction); *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 583 (6th Cir. 2012) (requiring Rule 60(b) motion, rather than mere notice, to lift injunction); *Deja Vu of Nashville, Inc. v. Metropolitan Government of Nashville & Davidson Cnty.*, 466 F.3d 391, 395 (6th Cir. 2006) ("[M]odifications or dissolution of injunctions must take place under Rule 60(b).").

A party seeking to dissolve an injunction "bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction." *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000); *see also Salazar*, 869 F.3d at 498; *Gov't of Province of Manitoba v. Zinke*, 849 F.3d 1111, 1117 (D.C. Cir. 2017). Defendants have failed to meet this burden because they have not demonstrated compliance with the Court's orders. Further, a party cannot "dissolve an injunction by an act of noncompliance." *United States v. Prod. Plated Plastics, Inc.*, 61 F.3d 904 (Table), 1995 WL 428451, *8 (6th Cir. 1995). Yet, this is exactly what Defendants attempt to do here, as their FSEA and FONSI defy the Court's orders and NEPA.

In their Notice, Defendants argue that "[a]ny challenges to the new analysis completed on remand must be brought in a new suit," citing *SecurityPoint Holdings, Inc. v. TSA*, 836 F.3d 32 (D.C. Cir. 2016), and *Heartland Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24 (D.C. Cir. 2005). But those cases did not involve injunctions and cannot support Defendants' position that they can unilaterally dissolve the injunction established in the 2021 Order. *Swan View Coalition v. Barbouletos*, 639 F. Supp. 2d 1187, 1190 (D. Mont. 2009) (granting motion to enforce injunction where agency defendants unilaterally declared injunction dissolved); *Native Ecosystems Council v. Tidwell*, 2009 WL 10701988, *2 (D. Mont. 2009) (holding completion of supplemental EA did not dissolve injunction, and plaintiffs were mistaken in filing new action instead of motion to enforce injunction); *Concerned Friends of the Winema v. U.S. Forest Service*, 2018 WL 7254704,

*2 n.1 (D. Or. 2018) ("Forest Service has no authority to simply declare the injunction satisfied and must affirmatively seek dissolution of the injunction through a properly supported motion.").

**B.  BLM has not demonstrated compliance with the Court's Orders or NEPA.**

The injunction remains in place because BLM still has not taken the NEPA hard look at the Project's harmful impacts on air quality and water.

### 1.  BLM failed to take a hard look at air quality impacts.

In its 2020 Order, the Court held "USFS's and BLM's failure to analyze the foreseeable impacts on air quality from fracking activities was arbitrary and capricious." *CBD*, 444 F. Supp. 3d at 871. In so holding, the Court found Defendants' failure to provide quantified data and analysis prevented the Court from assessing the reasonableness of BLM's determination "that fracking will not exceed [NAAQS] attainment or have different environmental impacts from those associated with vertical drilling." *Id.* at 870-71. The Court rejected Defendants' argument that analysis of air impacts could wait until the APD phase. *Id.*

Despite the Court's orders, BLM's FSEA again fails to take NEPA's required hard look at the foreseeable impacts on air quality from fracking. BLM's hard look failure is two-fold: (1) while it quantified some emissions, BLM failed to use that quantified data to assess and analyze impacts to air quality, and (2) the FSEA's quantified air pollution data itself substantially underrepresents the amount of air pollution reasonably expected from the Project. As a result of these hard look failures BLM has no rational basis for its FONSI.

### a.  BLM failed to analyze the Project's air quality impacts.

The FSEA made some attempt to quantify anticipated air emissions but failed to assess the quantified emissions' impacts. Remarkably, in fact, BLM expressly refused to assess the Project's air quality impacts. E.g., FSEA, Appendix J at J-88 ("Impacts to air quality can only be

*Plaintiffs' Motion to Enforce Injunction*                                                            6

assessed through air quality modeling, which is not performed at the leasing stage since the decision does not authorize development to occur"). BLM's outright refusal and failure to assess air quality impacts falls short of this Court's prior orders and BLM's NEPA obligations. *CBD*, 444 F. Supp. 3d at 872 (holding "USFS and BLM failed to take a hard look at … impacts on air quality"); *see also id*. at 864 (noting consideration of impacts "requires some quantified or detailed information *that results in a useful analysis*, even when the agency is preparing an EA and not an EIS") (cleaned up) (emphasis added). "NEPA does not give BLM the discretion to ignore the impacts to the environment when there are methods for analyzing those impacts." *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1043 (10th Cir. 2023). To analyze environmental impacts "under NEPA, agencies must do more than quantify pollution— they must also 'discuss the *actual* environmental effects resulting from those emissions.'" *WildEarth Guardians v. Zinke*, 2019 WL 2404860, No. CV 17-80-BLG-SPW-TJC, at *8 (D. Mont. Feb. 11, 2019) (citation omitted) (emphasis in original); *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 995 (9th Cir. 2004) ("A calculation of the total number of acres to be harvested in the watershed … is not a sufficient description of the actual environmental effects that can be expected from logging those acres.").

Rather than analyze the significance of the emissions it quantified, BLM's FSEA states generally that the Project "is expected to lead to air quality impacts," and lists health impacts associated with the Clean Air Act's National Ambient Air Quality Standards (NAAQS) criteria pollutants. FSEA at 3-49 to 3-50. However, the FSEA does not say anything meaningful about the *degree* to which criteria pollutant increases would affect air quality in the local area, including the Project's potential to cause or contribute to violations of the NAAQS. *See* 40

C.F.R. § 1501.3(b) (2021)[1] ("In considering whether the effects of the proposed action are significant, agencies shall analyze the potentially affected environment and degree of the effects of the action."); *id*. at (b)(2)(iii)-(iv) ("In considering the degree of the effects, agencies should consider […] [e]ffects on public health and safety [and] [e]ffects that would violate Federal, State, Tribal, or local law protecting the environment.").

Merely listing the expected quantity of emissions for each criteria pollutant but not assessing that data against the NAAQS or any other threshold for determining the Project's impacts on air quality does not constitute a hard look. *See 350 Montana v. Haaland*, 50 F.4th 1254, 1266 (9th Cir. 2022) (finding agency's generic discussion of climate change consequences was "untethered" to its FONSI such that "the reader is left to guess how or why" project's air emissions were insignificant); *Ky. Riverkeeper,* 714 F.3d at 408 (holding duty to assess effects not satisfied where agency provided survey data but did not discuss impacts).

The FSEA displays quantified Project emissions data in two tables. Table 3-3 lists quantified emissions estimates, but lacks any evaluation of these emissions' significance. FSEA at 3-51. Table 3-4 lists quantified Project emissions beside all oil and gas sector emissions in the

---

[1] In February 2025, CEQ rescinded its NEPA regulations (formerly at 40 C.F.R. § 1500 et seq.), effective April 11, 2025. 90 Fed. Reg. 10610 (Feb. 25, 2025). CEQ stated agencies "remain free to use or amend" their own NEPA implementing procedures, 90 Fed. Reg. at 10614, and may "voluntarily rely[] on [the CEQ] regulations in completing ongoing NEPA reviews." CEQ, Memo. for Heads of Fed. Dept's and Agencies (Feb. 19, 2025) at 4 (Appendix F). For the instant action, BLM "prepared the EA under CEQ's 2020 NEPA regulations and BLM's own NEPA regulations at 43 CFR Part 46, guided by Departmental Manual Section 516 Environmental Quality (DOI 2020) ["DM 516"]." FSEA at 1-12. After BLM authorized the Project, DOI rescinded 43 CFR Part 46 and revised DM 516. 90 Fed. Reg. 29498 (July 3, 2025)). Still, the court evaluates NEPA compliance based on the regulations and guidance that BLM relied on at the time of its decision. *See, e.g.*, *Bair v. Cal. DOT*, 982 F.3d 569, 577 n.20 (9th Cir. 2020); *Gulf v. Burgum*, 775 F. Supp. 3d 455, 467 n.5 (D.D.C. 2025); *City of Crossgate v. VA*, 526 F. Supp. 3d 239, 248 n.4 (W.D. Ky. 2021); *see also Citizens Action Coal. of Ind., Inc. v. FERC*, 125 F.4th 229, 240 (D.C. Cir. 2025) (applying "CEQ guidance" that agency "has chosen to follow").

state, including refining emissions, and estimates for all other federal (conventional) oil and gas wells in the state. FSEA at 3-54. But, again, BLM fails to discuss what any of these numbers might mean, leaving the listed data to speak for itself. BLM does not even supply comparative percentages for the data, forcing the reader to do their own calculations.

Calculating these comparative percentages sheds some light on the magnitude of the anticipated emissions BLM left unanalyzed. For example, percentage calculations completed by Plaintiffs, not BLM, show the Project could emit 82% of the coarse particulate matter ($PM_{10}$) emitted by Ohio's *entire* oil and gas industry (including refining) annually. *See* FSEA, Table 3-4 at 3-54 (407 tons per year ("tpy") from the Project's "High Scenario" compared to 497 tpy from "Ohio Oil and Gas"). Percentages for other pollutants are similarly concerning (e.g., 14% for fine particulate matter ($PM_{2.5}$) and 10% for hazardous air pollutants). *Id.* Further, the estimated annual air pollution amounts from BLM's projected 81 Project wells would greatly exceed the annual emissions generated by the 581 existing federal (conventional) wells in the state. *See* FSEA at 3-54. Yet BLM fails to acknowledge the enormity of these emissions, let alone analyze their potential impact on air quality—an egregious hard look failure that disregards the mandate in this Court's orders.

In its response to public comments on the Draft SEA, BLM admitted the FSEA does not actually assess air quality impacts, stating: "Impacts to air quality can only be assessed through air quality modeling," and "[t]he BLM does not do air quality modeling for EA-level lease sales as it would be costly, time-consuming and not represent actual development if it does occur." FSEA, Appendix J at J-88; *Id.* at. J-93. However, BLM does not substantiate its assertions about cost and time. Furthermore, these statements cannot provide a rational basis for BLM's refusal to analyze air quality impacts because they: (1) presuppose this is an "EA-level" lease sale project,

*Plaintiffs' Motion to Enforce Injunction* 9

(2) incorrectly claim that meaningful modeling or prediction cannot be done at the leasing decision stage, and (3) ignore other available methodologies for assessing impacts.

First, BLM cannot rationally determine the significance of the Project's effects—and therefore determine whether the Project is "EA-level" or "EIS-level"—without first assessing, *inter alia*, the Project's impacts to air quality. *See Sherwood v. Tennessee Valley Authority*, 590 Fed.Appx. 451, 459 (6th Cir. 2014) (finding circular reasoning where agency used unassessed assumptions about the effectiveness of management practices to determine that those same practices would not have environmental consequences).

Second, the FSEA incorrectly states that any meaningful modeling or prediction of air quality effects is impossible at the leasing stage because the "scale, location, and types of equipment" are "unknown." FSEA at 3-52. However, just two paragraphs prior, BLM claims it used "estimates of well numbers and required equipment from similar lease developments within the Marietta Unit" to "estimate reasonably foreseeable on-site emissions[.]" *Id.* at 3-51. The FSEA does not explain why or how that same equipment and well data could not be used to model or predict air quality impacts to a useful degree. This Court has already rejected BLM's arguments that impacts from fracking are not reasonably foreseeable until the drilling stage. *CBD*, 444 F. Supp. 3d at 870. Furthermore, BLM has modeled air quality effects for future anticipated drilling prior to having site-specific well information. *Colorado Environmental Coalition v. Salazar (CEC)*, 875 F. Supp. 2d 1233, 1255-56 (D. Colo. 2012) (rejecting BLM's explanation that more precise information was needed to meaningfully model air impacts outside planning area because agency had already conducted predictive air modeling within planning area). This fact belies BLM's contention that it is not possible to predict or model air impacts in any meaningful way as part of a leasing decision.

Third, BLM's assumption that air quality impacts can only be assessed through a modeling analysis is incorrect, and BLM failed to use *any* other readily available means of assessing impacts. For example, BLM could have compared its quantified data to Clean Air Act (CAA) Conformity Rule *de minimis* thresholds. *Tinicum Tp., Pa. v. U.S. Dept. of Transp.*, 685 F.3d 288, 296 (3rd Cir. 2012) (holding agency satisfied NEPA where it compared quantified project emissions against CAA conformity *de minimis* thresholds, and that air dispersion modeling was therefore not required). Under the CAA General Conformity Rule, federal agencies are prohibited from engaging in, supporting, or approving any activity that does not conform to a state implementation plan to ensure attainment or maintenance of the NAAQS. 42 U.S.C. § 7506(c)(1). BLM did not compare its quantified estimates to the CAA *de minimis* thresholds, however. Furthermore, all of Washington County, including approximately half of the Marietta Unit, is designated as a maintenance area for ozone and $PM_{2.5}$ NAAQS. FSEA, Appendix I at I-3 to I-4. BLM acknowledges in the FSEA that "[a]ny developments in nonattainment or maintenance areas are subject to the General Conformity process of the CAA." *Id*. at I-2. Given the information before it, BLM's failure to compare its quantified emissions estimates to the CAA *de minimis* thresholds was arbitrary, capricious, and contrary to NEPA and the APA.

Furthermore, had BLM done such a comparison, it would show that the Project's emissions exceed CAA conformity *de minimis* thresholds in all development scenarios chosen by BLM, and should have triggered the agency to perform a full conformity determination. Agencies are required to undertake a full "conformity determination [...] for each criteria pollutant or precursor where the total of direct and indirect emissions of the criteria pollutant or precursor in a nonattainment or maintenance area caused by a Federal action would equal or

exceed" listed *de minimis* thresholds. 40 C.F.R. § 93.153(b). Per BLM's pollutant estimates, the Project exceeds the 100 tpy *de minimis* maintenance area thresholds for both ozone and $PM_{2.5}$ under all scenario estimates (through VOCs alone, a precursor pollutant of both ozone and $PM_{2.5}$). *Id*. at § 93.153(b)(2) (listing maintenance area thresholds); FSEA, Table 3-3 at 3-51 (listing "Average Year Low Scenario" VOCs at 432.9 tpy and "Max Year High Scenario" VOCs at 1,576.2 tpy). Thus, the quantified emissions presented in the FSEA warranted actual analysis, including conformity review under the CAA. BLM's decision to merely list emissions data in Table 3-3 and do nothing more was arbitrary, capricious, and contrary to NEPA and the APA.

This Court already found BLM did not "show its work" in a way that would allow the Court to assess the reasonableness of its NAAQS-based significance determination. *CBD*, 444 F. Supp. 3d at 870. BLM cannot again forgo doing that work as it attempts to comply with the Court's prior orders. *See CEC*, 875 F. Supp. 2d at 1257-59 (finding BLM's determination that ozone NAAQS violations were not likely was not supported by meaningful record evidence). In short, BLM's refusal to assess air quality impacts is a clear hard look failure. BLM's FSEA and FONSI are therefore not consistent with this Court's 2020 and 2021 Orders.

b. <u>BLM failed to include relevant emissions sources in its estimates.</u>

The FSEA grossly underestimates the emissions it quantifies by relying on assumptions contrary to the record before it. First, the FSEA's emission estimates for NAAQS criteria pollutants rely on the assumption that federal leasing will result in the construction of between a "low scenario" minimum of 29 wells and a "high scenario" maximum of 81 wells. FSEA at 3-50 to 51. BLM takes these assumptions from a 2020 Reasonably Foreseeable Development Scenario (2020 RFDS) report. FSEA at 2-22; FSEA Appendix D (2020 RFDS). However, state well location data and industry-submitted leasing Expressions of Interest (EOIs) reflected in the FSEA

demonstrate that a realistic development scenario would include significantly more wells—and therefore significantly more air pollution—than BLM estimates for the Project.

The FSEA's development scenarios assume each unconventional well pad will have a maximum of three horizontal wells, which BLM says "is the average number of wells per well pad for recently drilled gas wells in the area based on review of ODNR [state] and AFMSS [federal] data (see section 6.2)." FSEA Appendix D at 36. But BLM's assumption of three wells per pad as the maximum for its air quantification scenarios is not supported by reliable evidence. A closer look at Section 6.2 of the 2020 RFDS reveals that, at least with respect to the federal data that informed its well count analysis, BLM only considered *conventional* wells in the area. *Id.* at 21 ("The Marietta Unit has 239 producing conventional gas wells and 152 conventional producing oil wells … in AFMSS."). Elsewhere, the RFDS acknowledges that *unconventional* well pads in the area may contain up to eighteen or more wells. *Id*. at 28; *see also* FSEA at 3-150 (assuming all 81 wells projected under the "high scenario" would be unconventional, horizontal wells). Moreover, the Ohio Department of Natural Resource's (ODNR) own data shows a total of 117 unconventional horizontal well pads in Monroe County, with an *average* of five wells per pad. Plaintiffs' Public Comment on the 2024 Draft SEA at 6, n.15 (Exhibit D); Monroe County Well Pad Data Spreadsheet at WNF 027236 (Exhibit E). In other words, BLM's air pollution estimates assume that well pads associated with the Project would contain up to a *maximum* of *three* wells, but record evidence demonstrated that *five* wells per pad was the actual *average* for the area.

During public comment, Plaintiffs raised concerns about the disparity between the 2020 RFDS' wells-per-pad estimate and actual data from the area, but BLM failed to meaningfully respond to Plaintiffs' comments on the issue. Instead, BLM decided to stick to the 2020 RFDS'

unreliable and outdated estimate of three unconventional wells per pad when estimating emissions for the Project. FSEA at 3-51. The consequences are far-reaching. Given that each well generates air pollution emissions, BLM's faulty well count assumption artificially and significantly lowered the agency's air pollution estimates for NAAQS criteria pollutants. As a result, BLM failed to take a hard look at the Project's reasonably foreseeable air quality impacts.

Second, and for reasons it did not explain, BLM entirely excluded Washington County from its projected development scenarios—despite Washington County harboring roughly half of the project area, and despite roughly half of existing industry EOIs being for parcels located in Washington County. FSEA Figure 4 at 3-34 (analysis area map displaying EOIs). Instead, and without any meaningful explanation, the FSEA assumes 80 of the Project's maximum projected 81 wells would be in Monroe County and 1 well would be in Noble County. FSEA Appendix D at 34. Without an adequate explanation, which BLM did not provide, BLM's decision to exclude roughly half of the project area from its development estimates was arbitrary and capricious.

BLM's decision to project zero wells in Washington County—even though it covers roughly half of the project area and contains roughly half of the industry-submitted expressions of interest—means the FSEA's air pollution estimates are unreliable and substantially under-representative. Thus, BLM failed to take a hard look at the Project's air quality impacts and therefore failed to comply with the Court's orders.

### 2. BLM failed to take a hard look at the impacts of fracking water withdrawals on the Little Muskingum River and local waterways.

In its 2020 decision, the Court found BLM's failure to meaningfully discuss water withdrawal impacts on the Little Muskingum River and local waterways arbitrary and capricious. *CBD*, 444 F.Supp.3d at 865-67. In particular, the Court found the 2016 EA's "conclusory" discussion of mitigation to be "meaningless" when BLM provided "no discussion or analysis of

how local waterways will likely be affected by the potential withdrawal of millions of gallons of water from both private and federal lands." *Id*. at 866-67. The FSEA again falls short of taking the "hard look" that NEPA and this Court's orders require in two important ways. First, BLM relied heavily on unrepresentative data regarding both fracking wells and streamflow to inform its consideration of water withdrawal impacts. Second, though BLM now indicates that *billions* of gallons of freshwater withdrawals are reasonably foreseeable impacts of its decision to authorize leasing, *see* FSEA at 3-96, it continues to rely on unsupported conclusions about mitigation to justify its FONSI.

> a. <u>BLM's quantified water withdrawal estimates are unsupported and unreliable.</u>

Per the FSEA, all of the Project's "future [water] withdrawals for mineral development are expected to be made in [the Little Muskingum—Middle Island HUC-8] watershed." FSEA at 3-96; *see id.* at 3-77 (map of watershed). The FSEA estimates that 19 to 27 million gallons of water are needed to drill and complete each well, or 114 to 162 million gallons *per year* to construct five to six wells annually. *Id*. at 3-95 to 96. Additionally, BLM estimates the Project's operations phase requires another 486 million gallons of water, or roughly 16.2 to 24 million gallons annually based on its assumption that only 81 wells are developed. *Id*. at 3-96. But, as discussed *supra*, the FSEA made arbitrary and capricious assumptions about well numbers, including the assumption that no well development would occur in Washington County. BLM's overall water withdrawal projections are therefore likely substantial underestimates.

Furthermore, BLM bases its consideration of water depletion impacts to the Little Muskingum River on unrepresentative annualized data. Specifically, BLM had before it more than fifty years of daily stream flow data demonstrating that the Little Muskingum River experiences both acute periods of low-flow and more extended, seasonal periods of low-flow.

*Plaintiffs' Motion to Enforce Injunction* 15

*See* FSEA at 3-97 (Site 03115400 stream gage data (USGS 2023b)). And, BLM knew that the drilling and construction phase—which requires 19 to 27 million gallons of water *per well*—does not happen over the course of a year, but typically in a matter of weeks, often "in succession, thus increasing the number of consecutive drilling days." *Id*. at 3-40. Furthermore, BLM acknowledged that "[p]oorly timed water withdrawal […] would deplete minimum flows […] especially in streams and rivers with lower flows such as the Little Muskingum River and its tributaries." *Id*. at 3-100. Nonetheless, BLM used figures that averaged both stream flow amounts and predicted withdrawal amounts across an entire year to determine that the Project would have "minimal impacts on the Little Muskingum River's streamflow." *Id*. at 3-98. BLM's use of annualized data to make this "minimal impacts" determination was arbitrary and capricious given the much more representative (daily and weekly) flow and withdrawal information before the agency.

b.  BLM's determination that water withdrawal impacts would be insignificant is unsupported.

An agency must provide a "convincing statement of reasons to explain why the project's impacts are insignificant." *350 Montana*, 50 F.4th at 1265. This "convincing statement of reasons" is "crucial to evaluating whether the [agency] took the requisite "hard look." *Ocean Advocates v. U. S. Army Corps of Eng'rs*, 402 F.3d 846, 864 (9th Cir. 2005). Further, "[t]o take the requisite hard look, an agency may not rely on incorrect assumptions … in arriving at its conclusion of no significant impacts." *Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt*., 36 F.4th 850, 872 (9th Cir. 2022). Here, Defendants relied on unexamined and incorrect assumptions that certain mitigating factors and mitigation measures would render water withdrawal impacts insignificant. *See* FONSI at 12 (listing possibility of alternative water sources, state water withdrawal registration, and withdrawal prohibitions).

*Plaintiffs' Motion to Enforce Injunction*                                                      16

> > > i. *BLM's FONSI relies on unfounded assumptions about water trucks and water agreements/registrations.*

BLM's first stated reason for why impacts from water withdrawals would be insignificant is the "possibility that water withdrawn from sources outside of the Analysis Area may be trucked into the Analysis Area[.]" FONSI at 12. But the FSEA never considered trucked-in water in any meaningful way, leaving this assumption completely unsupported. FSEA at 3-89 (stating trucked-in water "is not reviewed as part of this analysis").

As its second reason for finding water withdrawal impacts insignificant, BLM states that water withdrawals "require approval from the source owner/manager and water withdrawal registration with ODNR and may entail potential requirements from the U.S. Army Corps of Engineers." FONSI at 12. However, the Court has already found that BLM's mere restatement of Ohio's "reasonable use doctrine," standards, and regulations does not constitute an actual effects analysis. *CBD,* 444 F.Supp.3d at 865-66. Further, BLM expressly admits that "registration with ODNR is not a permit to withdraw water, nor does it place any restrictions on withdrawals such as during droughts or low-flow conditions." FSEA at 3-100. BLM adds that it "is not aware of how this system may prevent an individual withdrawal during a drought period from affecting aquatic habitat or protected species." FSEA at 3-118; FSEA Appendix G at 128. There is therefore no basis for BLM to assume registrations will reduce water withdrawal impacts.

> > > ii. *BLM's FONSI relies on an incorrect assumption about an undefined and unexplained withdrawal prohibition measure, "Aquatic AMM 5."*

For its third justification, the FONSI states that "for all leases issued under the Proposed Action, the BLM will prohibit water withdrawals from Little Muskingum River" and associated listed mussel and hellbender streams. FONSI at 12. BLM is referring to "Aquatic AMM 5," an "avoidance and minimization measure" that, if applied, would "prohibit water withdrawals from

*Plaintiffs' Motion to Enforce Injunction* 17

the Little Muskingum River, Muskingum River, and any other Group 2 or 4 streams that may be identified in the future or additional hellbender streams that may be identified in the future." FSEA at 3-100 to 102. However, the FSEA's discussion of AMM 5 fails to provide sufficient detail to support a finding of no significant impact. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989) (mitigation must be discussed "in sufficient detail to ensure environmental consequences have been fairly evaluated").

First, BLM describes AMM 5 as a "prohibit[ion]" on water withdrawals that will apply to "all leases." FSEA at 3-100. However, the record belies BLM's claim that AMM 5 would apply to "all leases." Elsewhere, the FSEA says "some or all of" the AMMs, including AMM 5, "*could* be attached to APDs as conditions of approval to avoid and minimize potential impacts associated with the Proposed Action." FSEA at 3-115 to 116; *see also* FSEA Appendix G at 118 (explaining BLM will review the proposed source and amount of water at the site-specific permitting stage and apply AMMs that "*could* include" AMM 5 (emphasis added)). Indeed, BLM's Decision Record authorizing the Project only commits BLM to "*possible* application [of AMMs] at the APD stage," Decision Record at 5, and only "as appropriate," *id*. at 6. Nowhere does BLM explain what specific, "appropriate" circumstances would trigger AMM 5. Even if BLM finds AMM 5 or other conditions of approval appropriate in a specific case, BLM may not apply the condition "[i]f an applicant cannot follow all appropriate AMMs." FSEA at 59. Thus, the FONSI's assumption that BLM will prohibit water withdrawals from the Little Muskingum and associated streams for all leases is incorrect and unsupported.

Furthermore, the FSEA and AMM 5 lack basic details necessary for a fair evaluation of the Project's environmental consequences. While an EIS need not provide and adopt a complete mitigation plan, it must contain a "reasonably complete discussion of possible mitigation

*Plaintiffs' Motion to Enforce Injunction*                                                                                     18

measures" such that an agency and the public "can properly evaluate the severity of the adverse effects." *Robertson*, 490 U.S. at 352. This requirement carries added weight when an EA relies on mitigation to support a FONSI. *See National Audubon Soc. v. Hoffman*, 132 F.3d 7, 17 (2nd Cir. 1997) (emphasizing requirement that mitigation measures be supported by evidence "in order to avoid creating a temptation for federal agencies to rely on mitigation proposals as a way to avoid preparation of an EIS") (citing cases); *Ky. Riverkeeper*, 714 F.3d at 411-412 (where mitigation measures are used to support an impacts determination, effectiveness of those measures must be supported by documented information). Yet BLM fails to adequately define AMM 5, let alone discuss it in meaningful detail. For example, AMM 5 would only apply "as appropriate," which BLM does not define. Likewise, the agency does not specify whether AMM 5 entails a complete prohibition on all withdrawals at all times or whether it entails temporary prohibitions based on potential variables such as stream flow conditions or seasonality. In other words, even if BLM were to apply AMM 5 to "all leases," the vagueness of the measure leaves its environmental consequences unclear. This falls short of NEPA's hard look requirement and the Court's prior orders. *See Ky. Riverkeeper*, 714 F.3d at 411-412; *Audubon*, 132 F.3d at 17; *Monroe Cty. Bd. of Comm. v. U.S. Forest Serv.*, 2025 WL 2687723 at *10, *13 (S.D. Ind. Sept. 18, 2025) (supplemental EA was not an "adequate report" and decision to proceed was not "fully informed," "well-considered," or "reasonably explained" where agency did not explain how mitigation measures would be effective enough to mitigate significant impacts) (quoting *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*, 145 S.Ct. 1497, 1514 (May 29, 2025)).

Finally, unaddressed questions arise even if one assumes, *arguendo*, that AMM 5 is a complete ban on all withdrawals from the Little Muskingum River. Smaller tributaries in the local area could then become more likely targets for industry withdrawals. Likewise,

*Plaintiffs' Motion to Enforce Injunction* 19

withdrawals from tributaries of the Little Muskingum could impact the flow of the River itself. But the FSEA does not recognize, let alone address, these unintended yet reasonably foreseeable consequences. This is important because, as BLM recognizes in the FSEA, stream flow reductions from Project withdrawals "would be especially pronounced in smaller streams, tributaries, and drainages that are more susceptible to impacts." FSEA at 3-112.

## IV. CONCLUSION

For the above reasons, Defendants have failed to comply with the Court's 2020 and 2021 Orders, the injunction remains in place, and Plaintiffs ask that this Court use its inherent authority to enforce it.

DATED: December 3, 2025                    Respectfully submitted,


*/s/ Nathan G. Johnson*
NATHAN G. JOHNSON (OH 0082838)
*Trial Attorney for Plaintiff Ohio*
*Environmental Council*
Ohio Environmental Council
556 East Town Street
Columbus, OH 43215
(614) 487-7506
njohnson@theoec.org


WENDY S. PARK (CA State Bar No.
237331), *pro hac vice*
EMMA L. YIP (CA State Bar No. 352446),
*pro hac vice application pending*
*Counsel for Center for Biological Diversity*
Center for Biological Diversity
2100 Franklin Street, Suite 375
Oakland, CA 94612
(510) 844-7138
wpark@biologicaldiversity.org
eyip@biologicaldiversity.org

*/s/ Megan M. Hunter*
MEGAN M. HUNTER (OH 96035)
*Trial Attorney for Plaintiffs Center for*
*Biological Diversity, Sierra Club, and*
*Heartwood*
EARTHJUSTICE
311 South Wacker Dr., Suite 1400
Chicago, IL 60606
312-800-8331
mhunter@earthjustice.org


ELIZABETH BENSON (CA State Bar No.
268851), *pro hac vice*
*Counsel for Sierra Club*
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5723
elly.benson@sierraclub.org


*Plaintiffs' Motion to Enforce Injunction*                                        20

**CERTIFICATE OF SERVICE**

I certify that on December 3, 2025, I filed the foregoing document on behalf of Plaintiffs

Center for Biological Diversity, Ohio Environmental Council, Sierra Club, and Heartwood via

the CM/ECF system which will provide electronic service to all counsel of record.


DATED: December 3, 2025


*/s/ Nathan G. Johnson*
NATHAN G. JOHNSON
*Trial Attorney*
