# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, | |
| Plaintiffs, | No. 2:17-cv-00372-MHW-KAJ |
| v. | Judge Watson |
| U.S. FOREST SERVICE, *et al.*, | Magistrate Judge Jolson |
| Defendants, | |
| and | |
| AMERICAN PETROLEUM INSTITUTE, *et al.*, | |
| Intervenor-Defendants. | |

## INTERVENOR-DEFENDANT ASSOCIATIONS' OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE INJUNCTION

Molly Crabtree, Trial Attorney
  (Bar No. 0073823)
Porter Wright Morris & Arthur LLP
41 S. High St., Suites 2800-3200
Columbus, OH 43215
Tel: (614) 227-2015
Fax: (614) 227-2100
mcrabtree@porterwright.com

Steven J. Rosenbaum
  (Admitted *pro hac vice*)
Bradley K. Ervin
  (Admitted *pro hac vice*)
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone:  (202) 662-6000
Fax:  (202) 662-6291
srosenbaum@cov.com

January 9, 2026

*Attorneys for Intervenor-Defendant Associations*

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................... 1

ARGUMENT ......................................................................................................................... 3

I.      The Supreme Court Has Made Clear That an Agency's Environmental Reviews
        Are Entitled to Substantial Deference Under NEPA. ............................................. 3

II.     Plaintiffs' Flyspecking of the Supplemental EA Falls Far Short of Overcoming
        the Substantial Deference Owed to BLM's Lengthy Environmental Review and
        Cautions Against Reviewing the Merits on Abbreviated Briefing and an
        Incomplete Record. ................................................................................................. 5

        A.      Air Quality Impacts.................................................................................... 6

        B.      Water Quantity Impacts. ............................................................................ 8

CONCLUSION..................................................................................................................... 11

**TABLE OF AUTHORITIES**

**Cases**

*Am. Wild Horse Campaign v. Raby*,
144 F.4th 1178 (10th Cir. 2025) .......................................................................................... 11

*Badger Helicopters, Inc. v. Fed. Aviation Admin.*,
154 F.4th 902 (8th Cir. 2025) ....................................................................................... 5, 7, 8

*Cascadia Wildlands v. U.S. Bur. of Land Mngmt.*,
153 F.4th 869 (9th Cir. 2025) ................................................................................. 3, 5, 8, 10

*Ctr. for Biological Diversity v. Fed. Aviation Admin.*,
--- F. Supp. 3d ---, 2025 WL 2643458 (D.D.C. Sept. 15, 2025).......................................... 7, 10

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
444 F. Supp. 3d 832 (S.D. Ohio 2020) ................................................................................. 1, 5

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
No. 17-cv-00372, 2021 WL 855938 (S.D. Ohio Mar. 8, 2021)........................................... 1, 2, 5

*Gas Transmission Northwest, LLC v. Fed. Energy Reg. Comm'n*,
157 F.4th 674 (5th Cir. 2025) ................................................................................................... 6

*Kentucky Heartwood, Inc. v. U.S. Forest Serv.*,
No. 22-cv-169, 2025 WL 2345818 (E.D. Ky. Aug. 13, 2025) .................................................... 6

*Nat'l Wildlife Refuge Ass'n v. Rural Utilities Serv.*,
No. 24-cv-139, 2025 WL 2719976 (W.D. Wisc. Sept. 24, 2025) ........................................... 10

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Col.*,
605 U.S. 168 (2025)................................................................. 2, 3, 4, 5, 6, 7, 8, 10, 11

*Sierra Club v. Fed. Energy Reg. Comm'n*,
145 F.4th 74 (D.C. Cir. 2025)........................................................................................... 2, 5

**Statutes**

42 U.S.C. § 4336a(e)(2)........................................................................................................... 6

**INTRODUCTION**

In 2015, Defendant Bureau of Land Management ("BLM") first proposed to offer parcels for oil and gas leasing in the Marietta Unit of the Wayne National Forest, and completed its initial environmental analysis under the National Environmental Policy Act ("NEPA") in October 2016. *See Ctr. for Biological Diversity v. U.S. Forest Serv.*, 444 F. Supp. 3d 832, 845–46 (S.D. Ohio 2020). Plaintiffs challenged BLM's NEPA analysis in 2017. After three years of litigation on the merits and an additional year of litigation on remedy, the Court concluded that BLM's environmental analysis failed under NEPA to adequately assess certain air and water impacts of subsequent potential horizontal drilling and hydraulic fracturing development operations on issued leases, and remanded BLM's environmental analysis and its decision to conduct leasing for further NEPA review. *See id.* at 871–72; *Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. 17-cv-00372, 2021 WL 855938, at *4–5 (S.D. Ohio Mar. 8, 2021). BLM duly conducted the required review in a new Supplemental Environmental Assessment ("Supplemental EA"), *see* Dkt. 141-1, and addressed the NEPA deficiencies identified by this Court, *see* Fed. Defs.' Opp. (Dkt. 149) at 6–11. Still unsatisfied with BLM's NEPA analysis and its decision to make parcels in the Marietta Unit available for oil and gas leasing and future development, Plaintiffs seek to revive this closed case by asking the Court to "enforce" its judgment. *See* Pls.' Mot. to Enforce (Dkt. 144) at 1.

Federal Defendants have fully demonstrated that this Court did not retain jurisdiction to consider Plaintiffs' NEPA challenge to a new BLM leasing decision and Supplemental EA. If Plaintiffs wish to challenge Federal Defendants' new actions, Plaintiffs must file a new lawsuit for review on the new, full administrative record. *See* Fed. Defs.' Opp. at 2–6. Federal Defendants have also shown that they complied with this Court's remand order and addressed the deficiencies identified by the Court. *See id.* at 6–11. Indeed, as the Federal Defendants' arguments demonstrate, the Court's injunction does not remain in effect to be enforced. By its terms, the

1

injunction lasted only "during the pendency of the NEPA review on remand" and "until [Federal] Defendants complete their NEPA analysis in accordance with this Court's previous Opinion and Order." *Ctr. for Biological Diversity*, 2021 WL 855938, at *5. Once the Federal Defendants completed the NEPA analysis on remand—right or wrong—the injunction dissolved of its own accord, and the Court did not retain jurisdiction to determine whether any new NEPA analysis complies with NEPA. *See id.*; Fed. Defs.' Opp. at 7–8.

Intervenor-Defendants American Petroleum Institute and Independent Petroleum Association of America (collectively, the "Associations") fully join in the Federal Defendants' argument that Plaintiffs may only challenge the Supplemental EA in a new lawsuit. In this brief, the Associations demonstrate why the Supreme Court's intervening decision in *Seven County Infrastructure Coalition v. Eagle County, Colorado*, 605 U.S. 168 (2025), further undercuts Plaintiffs' challenge to the Supplemental EA and the Motion to Enforce.

In *Seven County*, the Supreme Court announced a "course correction of sorts" in judicial review of agency compliance with NEPA, *id.*, at 184, admonishing that "[t]he bedrock principle of judicial review in NEPA cases can be stated in a word: Deference," *id*. 185. Plaintiffs' arguments do not account for this mandated discretion and instead rely on pre-*Seven County* conceptions of judicial review in NEPA cases in an attempt to further delay a decade-long administrative decision to conduct oil and gas leasing—the very type of delay in the guise of plaintiff demands "of just a little more process" that the Supreme Court has now directed reviewing courts to reject. *Id*. at 184; *see also, e.g.*, *Sierra Club v. Fed. Energy Reg. Comm'n*, 145 F.4th 74, 89 (D.C. Cir. 2025) ("*Seven County* pared back NEPA's jurisprudential growth from a 'legislative acorn . . . into a judicial oak that has hindered infrastructure development under the guise of just a little more process.'" (quoting *Seven County*, 605 U.S. at 184)). The substantial deference to which

2

the Supplemental EA is entitled provides an additional reason to reject Plaintiffs' request for a shortcut NEPA review, and to deny the Motion to Enforce.

ARGUMENT

**I.      The Supreme Court Has Made Clear That an Agency's Environmental Reviews Are Entitled to Substantial Deference Under NEPA.**

NEPA "ensures that the agency and the public are aware of the environmental consequences of proposed projects." *Seven County*, 605 U.S. at 177. But "NEPA imposes no substantive environmental obligations or restrictions;" rather NEPA "is a purely procedural statute that . . . simply requires an agency to prepare . . .[,] in essence, a report." *Id*. at 173. "Simply stated, NEPA is a procedural cross-check, not a substantive roadblock" to development. *Id*.

Despite this limited statutory scope, the Supreme Court observed that "[o]ver time, some courts have assumed an aggressive role in policing agency compliance with NEPA." *Id*. at 179. The Supreme Court in *Seven County* thus set out to "reiterate and clarify the fundamental principles of judicial review applicable in [NEPA] cases," making clear that "the central principle of judicial review in NEPA cases is deference." *Id*.; *see also Cascadia Wildlands v. U.S. Bur. of Land Mngmt.*, 153 F.4th 869, 880 (9th Cir. 2025) ("The limited scope of NEPA also circumscribes the scope of judicial review."). A reviewing court must keep in mind that, "[u]nder NEPA, an agency's only obligation is to prepare an adequate report" and therefore "the only role for a court is to confirm that the agency has addressed environmental consequences . . . as to the relevant project." *Seven County*, 605 U.S. at 180 (quotation omitted). Accordingly, "when determining whether an agency's [environmental review] complied with NEPA, a court should afford *substantial deference* to the agency." *Id*. (emphasis added).

The Supreme Court then provided guidance as to what substantial deference entails in practice. *See id*. For example, the detail that must be included in an environmental review

3

"involves primarily issues of fact." *Id*. at 181 (quotation omitted).  Because "[t]he agency is better equipped to assess what facts are relevant to the agency's own decision than a court is . . .[,] the question whether a particular report is detailed enough in a particular case itself requires the exercise of agency discretion—which should not be excessively second-guessed by a court." *Id*.

Indeed, to "identify significant environmental impacts" from a proposed action, "[a]n agency must make predictive and scientific judgments." *Id*.  "Black-letter administrative law instructs that when an agency makes those kinds of speculative assessments or predictive or scientific judgments, and decides what qualifies as significant . . ., a reviewing court must be at its most deferential." *Id*. at 182 (quotation omitted).  "So long as" an agency's environmental review "addresses environmental effects from the project at issue, courts should defer to agencies' decisions about where to draw the line—including . . . how far to go in considering indirect environmental effects from the project at hand." *Id*.  In short, "agencies possess discretion and must have broad latitude to draw a manageable line." *Id*. (quotation omitted).

Summing up this "course correction" in judicial review under NEPA, *see id*. at 184, the Supreme Court admonished that courts should not permit NEPA's "modest procedural requirement" to be used as a "tool employed by project opponents . . . to try to stop or at least slow down new infrastructure and construction projects," *id*. at 183.  Instead, "[w]hen assessing significant environmental effects . . . for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting" review document.  *Id*.  In reviewing the resulting environmental document, "[c]ourts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id*.

4

Although *Seven County* involved an environmental impact statement, courts of appeals have applied *Seven County*'s directives to other NEPA review documents, including, as relevant here, environmental assessments. *See, e.g.*, *Sierra Club*, 145 F.4th at 87–89; *Cascadia Wildlands*, 153 F.4th at 903–04. Indeed, as the Eight Circuit explained, "*Seven County*'s emphasis on deference has even greater force" where an environmental assessment is at issue because it "demands a less onerous analysis" under NEPA than an environmental impact statement. *Badger Helicopters, Inc. v. Fed. Aviation Admin.*, 154 F.4th 902, 913 n.2 (8th Cir. 2025).

**II.      Plaintiffs' Flyspecking of the Supplemental EA Falls Far Short of Overcoming the Substantial Deference Owed to BLM's Lengthy Environmental Review and Cautions Against Reviewing the Merits on Abbreviated Briefing and an Incomplete Record.**

As the Supreme Court has now made clear, "[t]he goal of [NEPA] is to inform agency decisionmaking, not to paralyze it." *Seven County*, 605 U.S. at 173. Plaintiffs' Motion to Enforce is a perfect example of impermissible inflationary analysis in the name of NEPA review.

BLM first proposed oil and gas leasing in the Marietta Unit in 2015; BLM issued its EA and final decision to lease in 2016; Plaintiffs filed suit under NEPA in 2017; this Court issued its decision granting Plaintiffs summary judgment in part in March 2020; and the Court remanded the leasing decision and EA to BLM in March 2021. *See Ctr. for Biological Diversity*, 444 F. Supp. 3d at 845–46; *Ctr. for Biological Diversity*, 2021 WL 855938, at *4–5. Since then, BLM prepared—and issued in April 2025—the 638-page Supplemental EA (157 pages excluding appendices) supporting a new final decision authorizing the leasing of parcels for potential oil and gas development. *See* Dkts. 141-1, 141-2, 141-3. That Supplemental EA includes new sections and appendices addressing the potential air and water impacts identified by this Court. *See* Fed. Defs.' Opp. at 8–11.

In the 2023 BUILDER Act, Congress directed that an environmental impact statement under NEPA "shall not exceed 150 pages" and "must be completed in 2 years or less." *Seven*

5

*County*, 605 U.S. at 181 n.3 (quotation omitted).  The Act further directs that "[a]n environmental assessment shall not exceed 75 pages, not including any citations or appendices."  42 U.S.C. § 4336a(e)(2).  Notably, the Supplemental EA's analysis here exceeds the requirements now reserved for the more detailed and extensive EIS analyses under NEPA.  Whether or not the Act applies directly to the Supplemental EA, it thus further signifies that BLM has done more than enough to comply with NEPA's procedural requirements.

Plaintiffs now ask this Court to "excessively second-guess[]," *Seven County*, 605 U.S. at 181, BLM's determinations regarding the contents and details of the Supplemental EA's air and water impact analyses—requesting ever "more" review to stack "[d]elay upon delay, so much so that the process . . . seems to border on the Kafkaesque," *id*. at 184 (quotation and alteration omitted).  *See also Kentucky Heartwood, Inc. v. U.S. Forest Serv.*, No. 22-cv-169, 2025 WL 2345818, at \*6 (E.D. Ky. Aug. 13, 2025) (applying *Seven County* to reject NEPA challenge where "over many years and hundreds of pages of responsive documents" the agency had considered impacts of project but the plaintiff "comes back to the Service for more").  A comparison of Plaintiffs' claims and the Supplemental EA against *Seven County*'s "'broad zone of reasonableness' that courts must afford agencies implementing NEPA," *Gas Transmission Northwest, LLC v. Fed. Energy Reg. Comm'n*, 157 F.4th 674, 709 (5th Cir. 2025) (quoting *Seven County*, 605 U.S. at 183), belies Plaintiffs' insistence that this Court may properly decide the Supplemental EA's compliance with NEPA in an abbreviated motion proceeding in a closed case without the administrative record.

### A.  Air Quality Impacts.

With respect to air quality, Plaintiffs concede that the Supplemental EA "made some attempt to quantify anticipated air emissions."  Pls.' Mot. to Enforce at 6.  Plaintiffs nevertheless complain that the Supplemental EA's quantification did not further calculate the real-world

6

impacts of these emissions and used "outdated" estimates of well development to understate emissions. *See id*. at 6–14. But it is not enough for Plaintiffs to demand use of additional calculations or different data.

As the Supplemental EA explains, it relied on projections for well development in the 2020 Reasonably Foreseeable Development Scenario ("RFDS")—81 wells distributed across 29 well pads—as reasonable estimates for development because "at the leasing stage, the BLM cannot reasonably determine whether, when, and in what manner a lease would be explored or developed," and the missing details "include[] crucial factors that would affect actual emissions *and associated impacts*." Dkt. 141-1 at 3-50 (emphasis added). Given the limitations on data at this stage of oil and gas well development decisionmaking, BLM thus drew a fact- and context-dependent line to serve as a basis for its predictive judgments on air quality impacts. As *Seven County* instructs, BLM "may draw what it reasonably concludes is a 'manageable line.'" 605 U.S. at 189. *See also id*. at 182 (agency "broad latitude to draw a manageable line" (quotation omitted)).

At bottom, BLM's choice "was reasonable because it relied on reliable data, which was in the agencies' view, the most accurate and current data available." *Badger Helicopters*, 154 F.4th at 914 (quotation omitted). "Whatever weakness the data may have had . . . did not nullify its ability to show," *id*. at 915, potential impacts through past BLM experience and agency development projections. *See Ctr. for Biological Diversity v. Fed. Aviation Admin*., --- F. Supp. 3d ---, 2025 WL 2643458, at *9 (D.D.C. Sept. 15, 2025) (rejecting challenge to data used by agency to consider space launch anomalies (*i.e.*, accidents) "because the [environmental assessment] *did* at least look to prior anomalies" to gauge potential future impacts). And even if BLM could have used different data or provided additional explanation, its choices "must [be] afford[ed] 'substantial deference'" and Plaintiffs cannot insist that this Court "'micromanage'

7

choices 'about the depth and breadth'" of the NEPA analysis.  *Badger Helicopters*, 154 F.4th at 915 (quoting *Seven County*, 605 U.S. at 183).

Moreover, estimations as to well development and understanding the details necessary accurately to predict emissions from well development activities are "technical, scientific issue[s] where deference to agency technical expertise is at its apogee."  *Cascadia Wildlands*, 153 F.4th at 906.  "At a high level," the data BLM used "are relevant and generally support BLM's conclusion[s]."  *Id*.  "That is sufficient to end the inquiry" given the substantial deference owed to BLM's choices under *Seven County*.  *Id*.  A reviewing court does not "act as a panel of scientists," and "[t]hat is precisely what the Plaintiffs ask [the court] to do here: don a lab coat, sharpen [its] peer-reviewed pencils, and dissect BLM's conclusion[s]."  *Id*. (quotation omitted); *see also Seven County*, 605 U.S. at 190 ("NEPA is not a game where project objectors can engage in unjustified obstructionism" (quotation omitted)).

## B. Water Quantity Impacts.

As to potential future water quantity impacts on leases that may be issued or developed under BLM's lease sale decision, Plaintiffs again concede that BLM quantified potential water withdrawals.  *See* Pls.' Mot. to Enforce at 14–15.  But Plaintiffs argue that BLM's consideration of the potential impacts of potential future water withdrawals relied on "unrepresentative data" and "unsupported conclusions about mitigation."  *Id*. at 15.  Again, Plaintiffs' arguments run counter to the Supreme Court's directive that "[c]ourts should afford substantial deference and should not micromanage . . . agency choices so long as they fall within a broad zone of reasonableness."  *Seven County*, 605 U.S. at 183.

For its part, BLM was forced to draw lines making assumptions on water consumption for purposes of review because "[w]ater sources proposed for future activities would be described in an" Application for Permit to Drill ("APD"), which must be approved before a lessee can conduct

8

the horizontal drilling and hydraulic fracturing operations requiring significant water withdrawals. *See* Dkt. 141-1 at 3-89.  The Supplemental EA thus assumed that all water would be sourced from the area, and projected potential future water usage based on (1) past data on horizontal well water usage in Monroe, Washington, and Noble Counties in Ohio, and (2) prior permits issued by the State of Ohio for water withdrawal for five wells previously approved by BLM.  *See id*. at 3-95–96.  The Supplemental EA then compared potential water withdrawals for the number of wells projected by the 2020 RFDS with U.S. Geological Survey streamflow and stream volume data for the Little Muskingum River over the past 63 years.  *See id*. at 3-96–97.  The Supplemental EA noted the highest (2004) and lowest (1999) streamflow rates during that period and explained that "[t]he overall trend line indicates that the Little Muskingum River has been gaining flow since 1959." *Id*. at 3-97.

Taking into account this historical data, BLM calculated that increased withdrawals for projected future lease development activity would equate to less than 1% of the river's annual streamflow, *see id*. at 3-98, even for the year with the lowest record streamflow in the past 63 years (1999), *see id*.  Still, the Supplemental EA acknowledged that "[p]oorly timed water withdrawal, such as extreme withdrawals during drought or low-flow periods, would deplete minimum flows or shorten the duration of periods of inundation for wetlands."  *Id*. at 3-100.  But overall, "[r]emoval of [the projected] percentage of the river's water, even during low-streamflow years, is anticipated to have minimal impacts on the Little Muskingum River given the total streamflow volumes in the river." *Id*. at 3-104.[1]

---

[1] Plaintiffs contend that the Supplemental EA improperly used "annualized data" because drilling operations typically occur only over a matter of days or weeks.  Pls.' Mot. to Enforce at 15–16. But Plaintiffs ignore that, absent actual APDs proposing actual operations, BLM does not know when in the year a future lessee may propose and plan to conduct operations.

As with air quality, the Supplemental EA's consideration of water quantity impacts is more than sufficient.  BLM properly relied on historic data it found reliable, and addressed the issues identified by the Court based on fact- and context-dependent line drawing.  "Particularly in light of the Supreme Court's guidance in *Seven County* . . ., the court may not disturb [the agency's] conclusions so long as the agency considered the relevant information and based its conclusion on such information."  *Nat'l Wildlife Refuge Ass'n v. Rural Utilities Serv.*, No. 24-cv-139, 2025 WL 2719976, at *20 (W.D. Wisc. Sept. 24, 2025); *see also Ctr. for Biological Diversity*, 2025 WL 2643458, at *9 (rejecting challenge to data used by agency to consider space launch anomalies (*i.e.*, accidents) "because the [environmental assessment] *did* at least look to prior anomalies" to gauge potential future impacts).  BLM's choices as to details and data are entitled to "substantial deference," and the data BLM used "are relevant and generally support BLM's conclusion[s]."  *Cascadia Wildlands*, 153 F.4th at 906.  Again, "[t]hat is sufficient to end the inquiry" given the substantial deference owed to BLM's choices that should not be "second-guessed by a court" under *Seven County*.  *Id*. at 905, 906 (quoting *Seven County*, 605 U.S. at 181).[2]

Moreover, "the textually mandated focus of NEPA is the 'proposed action'—that is, the project at hand—not other future or geographically separate projects that may be built (or expanded) as a result of or in the wake of the immediate project under consideration."  *Seven County*, 605 U.S. at 186–87.  Here, the project at issue is the proposal to offer parcels for lease for

---

[2] Plaintiffs sidestep the Supplemental EA's analysis—focusing instead on tangential issues related to trucking water in from outside the project area and proposed mitigation measures.  *See* Pls.' Mot. to Enforce at 17–18.  The former issue is irrelevant because the Supplemental EA assumed that "all water needed for hydraulic fracturing would be withdrawn from sources within the Analysis Area," and not trucked in.  *See* Dkt. 141-1 at 3-89.  The latter issue fairs no better because the Supplemental EA determined that water withdrawal impacts would be minimal even before considering potential mitigation.  *See supra*; *see also* Dkt. 141-1 at 3-104 (concluding that projected removal of water "is anticipated to have minimal impacts" given historical streamflow data, and ***then***, "[f]urthermore," proposed mitigation would further limit impacts).

10

potential future oil and gas development operations. As the Supplemental EA explains, the horizontal drilling and hydraulic fracturing operations responsible for water withdrawals are subject to further NEPA review and approval of an APD. *See* Dkt. 141-1 at 3-89. For purposes of NEPA review, it is not enough that "[t]he effects from" such future development operations "may be factually foreseeable" for NEPA "to hold the agency responsible for those effects" in evaluating a proposed project. *Seven County*, 605 U.S. at 187. The Supplemental EA's consideration of future water withdrawal impacts is therefore particularly entitled to deference at this leasing stage—when BLM lacks details about future operations and will have those details when APDs are submitted for approval by future lessees. *See Am. Wild Horse Campaign v. Raby*, 144 F.4th 1178, 1192 (10th Cir. 2025) (rejecting argument that agency needed to consider potential increased cattle grazing when assessing impacts of changes in wild horse management because "[i]ncreased grazing is a separate project that cannot occur without a separate decision-making process subject to NEPA").

## CONCLUSION

For the foregoing reasons and those set forth in the Federal Defendants' Opposition, the Court should deny Plaintiffs' Motion to Enforce.

Respectfully submitted,

*/s/ Molly Crabtree*
Molly Crabtree, Trial Attorney
  (Bar No. 0073823)
Porter Wright Morris & Arthur LLP
41 S. High St., Suites 2800-3200
Columbus, OH 43215
Tel: (614) 227-2015
Fax: (614) 227-2100
mcrabtree@porterwright.com

Steven J. Rosenbaum
  (Admitted *pro hac vice*)
Bradley K. Ervin

11

(Admitted *pro hac vice*)
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone:  (202) 662-6000
Fax:  (202) 662-6291
srosenbaum@cov.com

*Attorneys for Intervenor-Defendant Associations*

January 9, 2026

12

**CERTIFICATE OF SERVICE**

I hereby certify that on January 9, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record in this case.

/s/ Molly Crabtree
Molly Crabtree

13